## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| LMCHH PCP LCC, *et al.*,[1] | ) | Case No. 17-10201 (___) |
| | ) | |
| Debtors. | ) | Joint Administration Pending |
| | ) | |

**MOTION FOR ORDERS (I) AUTHORIZING DEBTORS TO USE CASH COLLATERAL, (II) AUTHORIZING DEBTOR TO (A) OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105(a), 362(d), 363(b), 364(c)(1), 364(c)(2), 364(c)(3) AND 364(e) AND (B) APPLY CASH COLLATERAL TO PREPETITION SECURED CLAIM OF DIP LENDER PURSUANT TO 11 U.S.C. § 363(b)(1) AND 363(c)(2)(A) AND (III) SCHEDULING FINAL HEARING**

LMCHH PCP LLC, a Delaware limited liability company (the "**Physicians Group**"),

and of Louisiana Medical Center and Heart Hospital, LLC, a North Carolina limited liability

company ("**LHH**" and collectively with the Physicians Group, the "**Debtors**"), hereby move

(the "**Motion**") pursuant to Sections 105(a), 361, 362(d), 363(a), 363(b), 363(c), 364(c)(1),

364(c)(2), 364(c)(3), and 364(e) of Title 11 of the United States Code (the "**Bankruptcy**

**Code**"), Rules 2002, 4001 and 6004 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**") and Rules 2002-1 and 4001-2 of the Local Rules for the United States

Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for entry of an interim order

(the "**Interim Order**") substantially in the form attached hereto as Exhibit C, and a final order

to be filed with the Court in advance of the final hearing hereon (the "**Final Order**" and together

with the Interim Order, the "**DIP Orders**") (i) authorizing the Debtors to use, pursuant to 11

U.S.C. § 363 and subject to certain terms and conditions, cash collateral within the meaning of

---

[1]     The last four digits of the taxpayer identification numbers for each of the Debtors follow in parenthesis: (i) LMCHH PCP LLC (8569); and (ii) Louisiana Medical Center and Heart Hospital, LLC (7298).  The mailing address for both of the Debtors is 64030 Highway 434, Lacombe, LA  70445.

11 U.S.C. § 363(a) in which MedCare and MidCap (together the "**Secured Parties**," and further defined herein) assert that they have a security interest, (ii) provide adequate protection under 11 U.S.C. §§ 361 and 363 on account of such use, and (iii) (a) authorizing the Debtors to obtain postpetition financing from MedCare Investment Fund V, L.P. (the "**DIP Lender**," or "**MedCare**") subject to the budget attached hereto as <u>Exhibit B</u> (the "**Budget**," as the same may be amended or supplemented from time to time in accordance with the DIP Loan Agreement) and pursuant to the terms of the Debtor-In-Possession Loan and Security Agreement (the "**DIP Loan Agreement**") attached hereto as <u>Exhibit A;</u> (b) confirming the DIP Lender's good faith in furnishing the loans under the DIP Loan Agreement; (c) authorizing the Debtors to use a portion of the collection of the receivables and cash proceeds in which MidCap Financial LLC ("**MidCap**") asserts an interest (the "**Cash Collateral**") to pay down the prepetition secured loans provided by MidCap; (d) modifying the automatic stay imposed by Bankruptcy Code Section 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Agreement and the DIP Orders; and (e) waiving any applicable stay (including under Bankruptcy Rule 6004 and any applicable Local Rules) and providing for immediate effectiveness of the DIP Orders; and (ii) as part of the Interim Order only, scheduling a final hearing (the "**Final Hearing**") to consider approval of the relief sought in the Motion on a final basis pursuant to the Final Order.

In support of the Motion, the Debtors rely upon and incorporate by reference the Declaration of Neil F. Luria, Chief Restructuring Officer, in Support of Chapter 11 Petition and First Day Pleadings (the "**Luria Declaration**"), which has been filed with the Court concurrently herewith.[2] In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). The Debtors consent to the entry of an order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such order absent the consent of the parties. Venue of this case and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The predicates for the relief requested herein are Bankruptcy Code Sections 105(a), 362(d), 363(b), 363(c), 364(c)(1), 364(c)(2), 364(c)(3) and 364(e), Bankruptcy Rules 2002, 4001 and 6004 and Local Rules 2002-1 and 4001-2.

## SUMMARY OF RELIEF REQUESTED

2.      FED. R. BANKR. P. 4001(b)(1)(B) and Local Rule 4001-2(a) require a motion for authority to use cash collateral and to authorization post-petition financing under Section 364 to contain a summary of all material provisions of the relevant loan agreement.[3] The specific financial terms and conditions of Debtors' proposed use of Cash Collateral are as set forth in the

---

[2]      Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to such terms in the Luria Declaration or the DIP Loan Agreement, as applicable.

[3]      The individual locations of these material provisions are provided for in the DIP Loan Agreement chart in Section II of this motion, *infra*.

Interim Order.  The principal elements of the Cash Collateral portion of the Interim Order are summarized as follows:

(a)     **Use of Cash Collateral**.  Debtors will be permitted to use Cash Collateral as provided in the Interim Order, and solely for the purposes identified, and the amounts provided in the Budget, for the purpose of meeting Debtors' cash needs from the date of entry of the Interim Order through Termination (described below) of the DIP Loan Agreement in accordance with the Budget and any approved amendments.  For any week, the use of Cash Collateral may vary from the line items in the Budget so long as the actual expenditures paid by Debtors do not exceed 110% of the projected expenditures in the Budget and provided that Debtors' weekly minimum cash balance is not less than 90% of the amount projected in the Budget for the week shown.

(b)     **Adequate Protection**.  Debtors shall provide the following adequate protection to CCG and MidCap:

*(i) Collateral Security*.  The Debtors are authorized to grant MidCap replacement liens in the same collateral generated post-petition (i.e. accounts receivable), in which, MidCap has a security interest pre-petition.

In addition, (a) the existing value of MidCap's collateral in excess of the MidCap debt, plus (b) the payment of adequate protection payments to MidCap equal to 25% of all accounts receivables collected by the Debtors postpetition shall provide MidCap adequate protection for the use of its cash collateral.

MedCare as the DIP Lender, shall be granted liens in all of the Debtor's assets subject only to existing liens and security interests, except that such liens granted to DIP Lender shall be senior to the existing lien and security interests of CCG (defined below) which is subordinated to the MidCap liens in the real property owned by the Debtors.

*(ii) Payment of the Secured Parties' Professional Fees.*  Debtors shall pay to the MidCap the professional fees and expenses it incurs, subject to a ten (10) day objection period by Debtors, the U.S. Trustee or the Committee (if appointed) after delivery of a statement of fees and expenses (without disclosing the substance of the

underlying work or any privileged matters).  MedCare's professionals fees shall be paid as provided in the DIP Loan Agreement.

(c)    **Carve-Out**.  The Carve-Out is for all unpaid fees of the Clerk of Court and the U.S. Trustee and Professional Fees of professionals retained by Debtors and any Committee in an amount not to exceed the amounts in the Cash Collateral Budget.[4]

(d)    **Debtors' Professional Fees**.  Subject to the Carve-Out, Debtors may pay the reasonable fees and expenses of their professionals in accordance with the Cash Collateral Budget and permitted variances.[5]

(e)    **11 U.S.C. §§ 506(c) and 552 Waivers**.  Subject to entry of a Final Order and the Challenge Period (as defined in the DIP Loan Agreement as noted below), the entry of the Interim Order by the Court shall be a conclusive and binding determination on all as to the scope, extent, perfection, validity, and enforceability, in all respects, of the MedCare security interests and liens.  Upon entry of a Final Order (not the Interim Order), no costs or expenses of

---

[4]    "Carve-Out" means, at any time, the aggregate amount of the following: (a) all accrued and unpaid fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. §1930(a) plus interest pursuant to 31 U.S.C. § 3717, (b) an amount equal to $35,000 to compensate an examiner or a Committee or any of their Professionals for the costs of investigating the claims, if any, that Borrowers may have against the Lender, (c) all accrued and unpaid fees and disbursements of Professionals relating to the Bankruptcy Case incurred by persons or entities authorized to receive compensation under 11 U.S.C. §§ 330, 331 or 363, but limited to (i) subject to the Budget, all accrued and unpaid fees, disbursements costs and expenses of professional or professional firms retained by the Borrowers and the Committee accrued or incurred at any time before the date and time of the delivery by the Lender of a Carve-Out Trigger Notice, plus (ii) fees, costs and expenses incurred by the aforementioned after the date of delivery by the Lender of the Carve-Out Trigger Notice in an amount not to exceed $500,000, plus (iii) before the date of delivery by the Lender of the Carve-Out Trigger Notice, any Deferred Restructuring Fee (as defined in the SOLIC Engagement Letter) payable to SOLIC (as defined in the SOLIC Engagement Letter) pursuant to the SOLIC Engagement Letter, and (d) if the Bankruptcy Case is converted to a case under Chapter 7 of the Code, all accrued and unpaid professional fees and disbursements relating to the Bankruptcy Case (following such conversion) by the trustee or successor trustee appointed pursuant to §§701, 702 or 703 of the Bankruptcy Code in an aggregate amount not to exceed $25,000 (it being understood that the limitation set forth in this clause (d) in no way serves as a limitation on any of the items described in clauses (a) through (c) above).

[5]    Notably, in *In re Ames Dep't Stores*, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the court found that "carve-outs" are not only reasonable, but necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. *Id*. at 40. The Debtors submit that the terms of the Carve-Out (including the disparity that exists between the amounts recoverable by professionals of the Debtor on the one hand and any statutory committee on the other) are reasonable under the circumstances.

administration that have been or may be incurred in Debtors' cases at any time shall be charged against MedCare or its claims and liens pursuant to 11 U.S.C. §§ 105, 506(c) or 552.

(f) **Termination**. Without further Court order, Debtors shall no longer be authorized to use Cash Collateral (unless otherwise consented to in writing by MidCap and MedCare) upon the occurrence of a Termination Event, as defined in the DIP Loan Agreement.

(g) **Deemed Request for Stay Relief**. The Interim Order shall be deemed to constitute a request by MidCap for relief from the automatic stay with respect to the Prepetition Collateral for purposes of any request for adequate protection granted by the Interim Order.

(h) **Modification of Stay**. Debtors request that the automatic stay imposed by Section 362 of the Bankruptcy Code be vacated and modified insofar as necessary to permit the Secured Parties to: (i) receive payments to be made by the Debtors approved herein and (ii) take any action expressly authorized or contemplated by the Interim Order.

(i) **Reservation of Rights**. Except as provided in the Interim Order, neither Debtors nor the Secured Parties waive any of their respective rights under the Bankruptcy Code or any applicable law at any time to seek any relief (or to oppose any such relief) under the Bankruptcy Code, or the right of the Debtors or the Secured Parties to exercise any of their rights and remedies under the Bankruptcy Code at any time.

3.        By this By this Motion, the Debtors also request that this Court approve the Debtors' entry into the DIP Loan Agreement and authorize it to borrow, from time to time and subject to the terms and conditions set forth therein, amounts such that the aggregate amount of the DIP Loans made shall not exceed $4,200,000.

## I.        GENERAL BACKGROUND

4.        On the date hereof (the "**Petition Date**"), each Debtor commenced a voluntary case under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

## A.        The Debtors' Business and Reasons for Seeking Chapter 11 Relief

5.        The Debtors operate a nationally recognized 132-bed acute-care hospital located in the heart of St. Tammany Parish in Lacombe, Louisiana, specializing in treatment of cardiovascular disease and injuries affecting the spine.  In addition to cardiovascular and spine care, the Debtors offer a full range of inpatient and outpatient medical, surgical, and diagnostic services covering more than 35 specialties including orthopedics, vascular and general surgery, urology, gastroenterology, and neurology.

6.        In recent years, admissions revenue and net outpatient revenue have fallen below projections, while salaries, wages, and benefits have risen substantially.  In an attempt to increase revenue, the Debtors added additional physicians to their network, engaged in a concerted marketing effort, and sought out supplier contracts with advantageous terms. Despite implementing these new strategic initiatives, Debtors' operations have not been profitable due, in part, to flat hospital intake volume and the cost of the expanded physician network exceeding its revenues.

7.        Additional information regarding the Debtors, their business and the events leading to the commencement of the Bankruptcy Cases can be found in the Luria Declaration.

B.     **The Debtors' Debt Structure**

8.     LHH was formed to develop, own, and operate an acute care hospital (the "**Hospital**") in Lacombe, Louisiana, on the Interstate 12 corridor on the "North Shore" of New Orleans between two major population centers.

9.     The Hospital opened as a Cardiology and Spine Center in 2003 with 19 physician partners specializing in all aspects of cardiology and cardiovascular surgery.  In 2007, eight additional physician were added as partners, bringing the total number of physician partners to 21.

10.    LHH formed the Physicians Group to facilitate LHH's goal of providing a diversified offering of acute care specialties and enable it to satisfy patient needs.   The Physicians Group formally associated first-class physicians and physician practice groups with LHH's core operations.  In view of the symbiotic relationship between the Physicians Group and the Hospital's operations, the Hospital and the Physicians Group operate as one consolidated entity with the expenses of the Physicians Group being funded by the Hospital out of revenues generated by both Debtors.

11.    On or about September 30, 2011, Cardiovascular Care Group ("**CCG**"), through a wholly-owned subsidiary Cardiovascular Care Group of Louisiana ("**CCGLA**") acquired all of the direct and indirect interests of LHH owned by MedCath Corporation, Louisiana Hospital Management, LLC and Medcath Financing Company, LCC ((collectively, "**MedCath**") and the outstanding loans between LHH and MedCath Finance Company pursuant to that certain Debt and Equity Purchase Agreement (the "**Acquisition**").

12.    CCG's Acquisition of the direct and indirect interests in the Debtors was in furtherance of its corporate vision to build a world-class network of cardiovascular specialty

hospitals with an integrated delivery system that would deliver optimal patient-focused healthcare across the entire continuum of care for patients with cardiovascular diseases.

13.    CCGLA currently acts as the managing member in accordance with LHH's operating agreement.

14.    On or about July 7, 2004, MedCath Finance Company and LHH entered into that certain Real Estate Note and Loan Agreement (the "**MedCath Note**" and collectively with all amendments, restatements, supplements, modifications, mortgages, assignments of leases and rents and other related documents, the "**MedCath Loan Documents**") to refinance the construction loan incurred to construct the Hospital.

15.    The MedCath Note and the other MedCath Loan Documents are secured by a mortgage in the Hospital and two medical office buildings pursuant to that certain Mortgage, Assignment of Lease and Rents and Security Agreement between MedCath and LHH.

16.    Immediately prior to the Acquisition, LHH was indebted to MedCath in an amount totaling $81,431,000.

17.    In connection with the Acquisition, MedCath converted a portion of the indebtedness owing to MedCath into equity in LHH, thereby increasing its ownership interest to 95.4% of the outstanding membership interests in LHH and, with certain working capital adjustments, reducing the outstanding amount owing to MedCath to $21,763,903.

18.    The MedCath debt, now held by CCG, remains outstanding and accrues interest monthly at a fixed rate of 7.50%.

19.    On December 12, 2011, following the Acquisition, CCG provided supplemental working capital to the Debtors pursuant to that certain Demand Note between CCG and LHH in

the principal amount of $15,000,000 (as amended, modified, and supplemented over time, the "**CCG Demand Note**").  The CCG Demand Note is due upon demand and is unsecured.

20.     On or about January 22, 2014, pursuant to Amendment No. 1 to Demand Note, CCG and LHH amended the CCG Demand Note, increasing the principal amount that may be outstanding to $58,000,000.

21.     On November 12, 2014, pursuant to Amendment No. 2 to Demand Note, CCG and LHH amended the CCG Demand Note, increasing the principal amount that may be outstanding to $80,000,000.

22.     On January 25, 2016, pursuant to Amendment No. 4 to Demand Note, CCG and LHH amended the CCG Demand Note, increasing the principal amount that may be outstanding to $100,000,000.

23.     On January 19, 2017, pursuant to Amendment No. 5 to Demand Note, CCG and LHH amended the CCG Demand Note, increasing the principal amount that may be outstanding to $105,000,000.

24.     As of the Petition Date, the amounts owing under the CCG Demand Note totaled approximately $104,000,000.00.

25.     In 2014, LHH entered into a revolving line of credit with MidCap Financial LLC ("**MidCap**") in the amount of $12,000,000 (the "**MidCap Revolver**").[6]  The MidCap Revolver bears interest at a variable rate based on the greater of the 1-month LIBOR rate or 1.50% plus an

---

[6]     Provided certain conditions are satisfied, the amount available under the MidCap Revolver can be increased to $15,000,000.

applicable margin of 4.25%. The amounts owing under the MidCap Revolver (the "**MidCap Indebtedness**") are secured with a first-priority lien on substantially all of the Debtors' assets.[7]

26.    As of the Petition Date, the MidCap Indebtedness totaled approximately $6,729,460.83.[8]

**C**.    **The Debtors' Determinations Regarding and Efforts to Obtain Postpetition Financing**

27.    As set forth in greater detail in the Luria Declaration, the loan structure with MidCap required that a junior secured lender be located to provide financing to the Debtors.

28.    To continue to operate, pay ordinary expenses and fund the costs of the Chapter 11 Case, the Debtors need to continue to rely on funding from the DIP Lender or, theoretically, a third party. Given (a) the nature of and risks associated with the Debtors' business, and (b) that the Debtors do not have material unencumbered assets, the Debtors do not believe that third-party debtor-in-possession financing is available to the Debtors.

29.    Acting with the assistance of independent counsel, the DIP lender agreed to provide financing to the Debtors on the terms embodied in the proposed DIP Loan Agreement. The Debtors believe that such terms are favorable to the Debtors.

30.    Under the DIP Loan Agreement, the DIP Lender is committed to lend to the Debtor from time to time, up to $4.2 million (the "**DIP Loans**"), with $1 million being funded prior to entry of the Final Order.

---

[7]    The MedCath Obligations were subordinated to the MidCap Indebtedness pursuant to that certain Subordination Agreement dated November 25, 2014.

[8]    Prior to the Petition Date, the MidCap Revolver required the Debtors to utilize a lockbox wherein all cash receipts were automatically swept to reduce the principal amounts owing on the MidCap Revolver prior to being re-advanced to the Debtors.

31.     The DIP Lender's commitment to make the DIP Loans (the "**Commitment**"),
however, is conditioned upon, among other things, the grant of perfected liens on and security
interests in all assets of the Debtors (the "**DIP Collateral**") subject only to any lien or security
interest existing on the Petition Date, and specifically excluding any Liens upon the Debtor's
claims and causes of action under Bankruptcy Code Sections 502(d), 544, 545, 547, 548, 549 550
and/or 553 or similar state law and all proceeds of any of the foregoing (collectively, the
"**Avoidance Actions**"), pursuant to Bankruptcy Code Section 364(c).

32.     In sum, the Debtors believe that the terms and conditions of the proposed DIP
Loans are reasonable under the circumstances, favorable to the Debtors, and could not be
replicated in the marketplace. In the absence of immediate access to the DIP Loans from the DIP
Lender, the Debtors will be unable to bear the costs and expenses of the Chapter 11 Case, the
going concern value of its estate will rapidly deteriorate, and serious and irreparable harm to the
Debtors, the estate, and other stakeholders will occur, thus preventing the Debtors from realizing
their chapter 11 objectives. The Debtors, thus, submit that the entry into the DIP Loan
Agreement on the terms and conditions set forth therein represented a prudent exercise of
business judgment and ought to be approved.

## II.        REQUEST FOR RELIEF

33.     By this Motion, Debtors seek the entry of the Interim Order, (i) authorizing
Debtors to use Cash Collateral and to obtain DIP Financing, subject to the terms and conditions
of the Motion, the Interim Order and a Final Order, and (ii) authorizing and approving the grant
of adequate protection to the Secured Parties on account of such use of Cash Collateral, and
granting the DIP Lender the liens and security interests described herein and in the DIP Loan

01:21494309.1

Agreement.  Further, Debtors seek entry of a Final Order, after at least fourteen (14) days' notice of the Motion.

34.      FED. R. BANKR. P. 4001(b) requires a final hearing on a motion for authorization to use cash collateral to be held on no less than fourteen (14) days' notice.  FED. R. BANKR. P. 4001(b) permits the Court to conduct a preliminary hearing prior to the expiration of the 14-day period to consider authorizing Debtors to use that amount of Cash Collateral, as necessary to avoid immediate and irreparable harm to the estate pending the final hearing.  The same time frames apply to debtor in possession financing under Section 364.  FED. R. BANKR. P. 4001(c).

35.      As indicated above, absent authority to use Cash Collateral, Debtors will have no funds to cover their expenses, including payroll that would accrue until a final hearing could be held on the Motion.  Thus, without authorization to use Cash Collateral on an immediate basis, and to obtain DIP Financing to cover anticipated cash shortfalls, Debtors would be forced to suspend or close their business and liquidate their assets.  Debtors believe that such a liquidation is inconsistent with the goal of maximizing the value of their estates for the benefit of creditors.

36.      Debtors request that the Court exercise its authority to enter the Interim Order pursuant to FED. R. BANKR. P. 4001(b)(2) and Local Rule 4001-2(b).  Entry of the Interim Order will not cause irreparable harm to interested parties, because such parties will be granted an opportunity to assert an objection to the Motion subsequent to the entry of the Interim Order (until approximately fourteen (14) days after service of the Motion).  The Interim Order permits the interim use of Cash Collateral and grants certain liens and security interests junior to existing liens and security interests, in accordance with the Cash Collateral and DIP Loan Budget, pending a final hearing, which will be scheduled pursuant to the Interim Order.

37.     By this Motion, the Debtors also request that this Court (a) approve the Debtors'

entry into the DIP Loan Agreement and authorize it to borrow, from time to time and subject

to the terms and conditions set forth therein, amounts such that the aggregate amount of the DIP

Loans made shall not exceed $4,200,000 (up to $1 million on an interim basis); (b) afford the

DIP Lender the protections of Bankruptcy Code Sections 364(c)(1), 364(c)(2) and 364(c)(3);

(c) confirm the DIP Lender's good faith in furnishing the DIP Loans and the attendant

applicability of Bankruptcy Code Section 364(e); (d) modify the automatic stay imposed by

Bankruptcy Code Section 362 to the extent necessary to implement and effectuate the terms and

provisions of the DIP Orders and the DIP Loan Agreement; (e) waive any applicable stay

(including under Bankruptcy Rule 6004 and any applicable Local Rules) and provide for

immediate effectiveness of the DIP Orders; and (f) schedule the Final Hearing on the Motion to

be held within twenty (20) days after the Petition Date to consider entry of the Final Order,

which would, if entered as proposed, grant all of the relief requested in the Motion on a final

basis. The Debtors submit that obtaining the relief here requested is in the best interest of the

Debtors, the estates and creditors and presents the best opportunity for the Debtors to maximize

the value of their assets for the benefit of all stakeholders and realize their chapter 11 objectives.

38.     The following table sets forth the most notable provisions of the DIP

Loan Agreement and the DIP Orders[9], including those that are expressly required to be identified

in accordance with Bankruptcy Rule 4001(c)(i)(B) [10] and Local Rule 4001-2(a)(i)[11]:

---

[9]     The Debtor anticipates that the proposed Final Order will be substantially similar in all material substantive respects to the proposed Interim Order, other than the fact that only the Final Order. The proposed Final Order will be filed in advance of the Final Hearing and served on the Initial Notice Parties (as defined below), all parties that have requested notice pursuant to Bankruptcy Rule 2002(i) and any other parties as may be ordered. Accordingly, all of the references in the following table cite to the provisions in the Interim Order rather than the Final Order.

[10]    Certain provisions referenced in Bankruptcy Rule 4001 are not applicable here: (i) a determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or any lien

**Terms of the DIP Loan and Security Agreement**

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| N/A | Borrowers | Louisiana Medical Center and Heart Hospital, LLC and LMCHH PCP LLC | DIP Loan Agreement: Preamble<br><br>Interim Order: Introductory paragraph |
| N/A | Lender | MedCare Investment Fund V, L.P. | DIP Loan Agreement: Preamble<br><br>Interim Order: Introductory paragraph |
| Bankruptcy Rule 4001(c)(i)(B) | Size of postpetition facility | Maximum principal amount of up to $4.2 million (the "Loan Commitment"), subject to the terms and conditions and in reliance on the representations and warranties of the Borrowers set forth therein. | DIP Loan Agreement: §§ 1.1, 2.1<br><br>Interim Order: Introductory paragraph (a) |

---

securing the claim, Bankruptcy Rule 4001(c)(i)(B)(iii); (ii) waiver or modification of authority to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, Bankruptcy Rule 4001(c)(i)(B)(v); and (iii) prepayment premiums, Bankruptcy Rule 4001(c)(i)(B)(xii). There is a release, waiver, and limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action against the DIP Lender, its agents, and representatives as set forth in detail in the DIP Loan Agreement, Bankruptcy Rule 4001(c)(i)(B)(viii),.

[11]      Certain provisions referenced in Local Rule 4001-2 are not applicable here: (i) grant of cross-collateralization protection, Local Rule 4001-2(a)(i)(A); (ii) provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor, Local Rule 4001-2(a)(i)(B); (iii) "roll-up" provisions, Local Rule 4001-2(a)(i)(E), (iv) provisions that prime any secured lien of that lienor, Local Rule 4001-2(a)(i)(G); and (v) provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1), Local Rule 4001-2(a)(i)(H).

| N/A | Use of proceeds | Each Borrower covenants and agrees that it shall use the proceeds of the Loans solely to the extent required to pay those expenses enumerated in the Budget as and when such expenses become due and payable. | DIP Loan Agreement: § 5.12<br><br>Interim Order: ¶ (d) |
|---|---|---|---|
| Bankruptcy Rule 4001(c)(i)(B) | Interest Rate | All Obligations shall bear interest on the Daily Balance thereof at a fixed rate equal to 7.5% per annum. Upon the occurrence and during the continuation of an Event of Default, all Obligations shall bear interest on the Daily Balance thereof at a per annum rate equal to four percentage points (4%) above the per annum rate otherwise applicable hereunder without any notice from Lender or any other Person. | DIP Loan Agreement: § 2.3 |
| Bankruptcy Rule 4001(c)(i)(B) | Term/Maturity date | The earliest to occur of (a) July 31, 2017, (b) the date of the indefeasible payment in full of the Loans and other Obligations, (c) 35 days after the Filing Date if the Final Order has not been entered by the Bankruptcy Court by such date, (d) the date upon which the Interim Order expires, unless the Final Order shall have been entered and become effective as of such date, (e) the date of entry of an order of the Bankruptcy Court confirming a plan of reorganization in the Bankruptcy Case that has not been consented to by the Lender and fails to provide for the payment in full in cash of all Obligations under this Agreement and the other Loan Documents on the effective date of such plan, (f) the date of the closing of a sale of all or substantially all of the Borrowers' assets pursuant to Section 363 of the Bankruptcy Code, (g) the date of entry of an order of the Bankruptcy Court converting the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code or dismissing the Bankruptcy Case, and (h) if a plan of reorganization that has been consented to by the Lender or that provides for the payment in full in cash of all of the Obligations under this Agreement and the other Loan Documents has been confirmed by the Bankruptcy Court, the earlier of the effective date of such plan of reorganization or the thirtieth day after the date of entry of such confirmation order. | DIP Loan Agreement: § 1.1, 2.6, 2.7<br><br>Interim Order: ¶21 |

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| N/A | Payments and Prepayments | All payments remitted to Lender and all proceeds of Collateral received by Lender shall be applied as follows (unless otherwise directed by Lender): <br><br> First, to pay any Lender Expenses (including cost or expense reimbursements) in accordance with the Interim Order and the Final Order or indemnities then due to Lender under the Loan Documents, until paid in full; <br><br> Second, to pay any fees or premiums then due to Lender under the Loan Documents until paid in full; <br><br> Third, to pay interest due in respect of the Revolving Loan until paid in full; <br><br> Fourth, to pay the principal of the Revolving Loan until paid in full; <br><br> Fifth, to pay any other Obligations until paid in full; and <br><br> Sixth, to Borrowers or as otherwise required by applicable law. Borrowers may prepay the outstanding principal amount of the Revolving Loan at any time in whole or in part, without premium or penalty. | DIP Loan Agreement: §§ 2.2, 2.3 |
| N/A | Fees | Fees are to be paid to MidCap under Section 506(b) as MidCap is oversecured, and fees are to be paid to MedCare as the DIP Lender as part of the cost of the DIP Loan. | N/A |

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| Bankruptcy Rule 4001(c)(i)(B)(i);<br><br>Bankruptcy Rule 4001(c)(i)(B)(ii);<br><br>Bankruptcy Rule 4001 (c)(i)(B)(xi);<br>Local Rule 4001-2(a)(i)(D)9 | Priority and Security | As security for all Obligations, each Borrower hereby grants to the DIP Lender a security interest in and continuing lien on all of such Borrower's right, title and interest in, to and under all personal property of such Borrower including the following, in each case whether now owned or existing or hereafter acquired or arising and wherever located (all of which being hereinafter collectively referred to as the "Collateral"):<br><br>(a)   Accounts;<br><br>(b)   Chattel paper, including electronic chattel paper or tangible chattel paper;<br><br>(c)   Documents;<br><br>(d)   General Intangibles;<br><br>(e)   Goods, including all Inventory and equipment (in each case, regardless of whether characterized as goods under the UCC);<br><br>(f)   Instruments;<br><br>(g)   Insurance;<br><br>(h)   Intellectual Property;<br><br>(i)   Investment Related Property;<br><br>(j)   Letter of Credit Rights;<br><br>(k)   Money;<br><br>(l)   Receivables and Receivable Records;<br><br>(m)   Commercial Tort Claims;<br><br>(n)   to the extent not otherwise included above, all Collateral Records, Collateral Support and Supporting Obligations relating to any of the foregoing; and<br><br>(o)   to the extent not otherwise included above, all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing. | DIP Loan Agreement: §§ 9.1, 9.2, 9.3<br><br>Interim Order: ¶ 8, 9 |

The DIP Agreement provides, however, in no event shall the Collateral include or the security interest granted under Section 9.1 attach to any lease, license, contract, property rights or agreement to which any Borrower is a party or any of its rights or interests thereunder if and for so long as the grant of such security interest shall constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of such Borrower therein or (ii) a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract property rights or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Section 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity); provided that the Collateral shall include and such security interest shall attach immediately at such time as the condition causing such abandonment, invalidation or unenforceability shall be remedied and to the extent severable, shall attach immediately to any portion of such lease, license, contract, property rights or agreement that does not result in any of the consequences specified in clause (i) or (ii) above.

Notwithstanding the foregoing, the Collateral shall include any Proceeds, substitutions or replacements of any of the property described above (unless such Proceeds, substitutions or replacements would constitute property described above).

The liens granted to the DIP Lender shall be junior to the Permitted Senior Liens, which include the Liens granted to MidCap and (b) all liens that, as of the Petition Date, have priority under applicable law over the liens created under the DIP Loan Agreement.

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| Bankruptcy Rule 4001(c)(i)(B)(x)<br><br>Local Rule 4001-2(a)(i)(C) | 506(c) waiver | Each Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by Lender on which any Borrower may in any way be liable.<br>Each Borrower hereby agrees that:<br>(a) so long as Lender complies with its obligations, if any, under the UCC, Lender shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by such Borrower, except any thereof resulting from the gross negligence, bad faith or willful misconduct of Lender as finally determined by a court of competent jurisdiction. | DIP Loan Agreement: §§ 10.1, 10.2<br><br>Interim Order: ¶12 |

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| Bankruptcy Rule 4001(c)(i)(B)(i x) | The indemnification of any entity | The Debtor has agreed to pay, indemnify, defend, and hold the Lender-Related Persons (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable and documented out of pocket fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them in connection with or as a result of or related to the execution and delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of the Borrowers' or any of their respective Subsidiaries' compliance with the terms of the Loan Documents (each and all of the foregoing, the "Indemnified Liabilities"). The foregoing to the contrary notwithstanding, no Borrower shall have any obligation to any Indemnified Person under this Section 11.3 with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence, fraud or willful misconduct of such Indemnified Person or its officers, directors, employees, attorneys, or agents. This provision shall survive the termination of this Agreement and the repayment of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which any Borrower was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by such Borrower with respect thereto. | DIP Loan Agreement: § 10.3 |

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| Bankruptcy Rule 4001(c)(i)(B)(iv) | Waiver or modification of the automatic stay | Debtors request an order modifying the automatic stay imposed by Bankruptcy Code Section 362 solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Agreement. | Interim Order: ¶16 |
| N/A | Representations and Warranties | Among other things, the Debtors represent that: each Borrower (i) is duly formed and existing and in good standing under the laws of the jurisdiction of its formation, (ii) is qualified to do business in any state where the failure to be so qualified could reasonably be expected to result in a Material Adverse Change, and (iii) subject to any limitation under applicable bankruptcy law, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, and upon the entry by the Bankruptcy Court of the Order, to enter into the Loan Documents and to carry out the transactions contemplated thereby. | DIP Loan Agreement: §§ 4.1-4.16 |
| N/A | Affirmative Covenants | The DIP Loan Agreement contains usual affirmative covenants, including but not limited to, the Debtor's agreement to provide the DIP Lender with certain reporting information related to cash receipts and disbursements and updates to the Budget; maintenance of properties and insurance, compliance with laws; keeping of records and books of account; use of proceeds; payment of taxes; disclosure of litigation relating to the Debtor; notice of certain other material events; and notification of Events of Default | DIP Loan Agreement: §§ 5.1-5.17 |
| N/A | Negative Covenants | The DIP Loan Agreement contains usual negative covenants, including but not limited to, limitations on: the incurrence of indebtedness and liens (other than certain permitted encumbrances), sales, mergers, certain types of payments and investments, and transactions with Affiliates. | DIP Loan Agreement: §§ 6.1-6.16 |

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| Local Rule 4001-2(a)(i)(F) | Carve-out and, in particular, provisions that provide disparate treatment for professionals retained by a creditors' committee from those professionals retained by the debtors with respect to same. | "Carve-Out" means, at any time, the aggregate amount of the following: (a) all accrued and unpaid fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. §1930(a) plus interest pursuant to 31 U.S.C. § 3717, (b) an amount equal to $35,000 to compensate an examiner or a Committee or any of their Professionals for the costs of investigating the claims, if any, that Borrowers may have against the Lender, (c) all accrued and unpaid fees and disbursements of Professionals relating to the Bankruptcy Case incurred by persons or entities authorized to receive compensation under 11 U.S.C. §§ 330, 331 or 363, but limited to (i) subject to the Budget, all accrued and unpaid fees, disbursements costs and expenses of professional or professional firms retained by the Borrowers and the Committee accrued or incurred at any time before the date and time of the delivery by the Lender of a Carve-Out Trigger Notice, plus (ii) fees, costs and expenses incurred by the aforementioned after the date of delivery by the Lender of the Carve-Out Trigger Notice in an amount not to exceed $500,000, plus (iii) before the date of delivery by the Lender of the Carve-Out Trigger Notice, any Deferred Restructuring Fee (as defined in the SOLIC Engagement Letter) payable to SOLIC (as defined in the SOLIC Engagement Letter) pursuant to the SOLIC Engagement Letter, and (d) if the Bankruptcy Case is converted to a case under Chapter 7 of the Code, all accrued and unpaid professional fees and disbursements relating to the Bankruptcy Case (following such conversion) by the trustee or successor trustee appointed pursuant to §§701, 702 or 703 of the Bankruptcy Code in an aggregate amount not to exceed $25,000 (it being understood that the limitation set forth in this clause (d) in no way serves as a limitation on any of the items described in clauses (a) through (c) above). | DIP Loan Agreement: § 1.1<br><br>Interim Order: ¶11 |

01:21494309.1

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| Bankruptcy Rule 4001(c)(i)(B)(vi) Events of default | Events of Default | The following events constitute an event of default under the Loan Agreement: (a) failure to make payments when due; (b) failure of Debtor to perform or comply with any term or condition contained in Sections 5.1, 5.4, 5.9, 5.15, 5.17 of the Loan Agreement; (c) the failure to pay when due any principal of or interest on one or more items of Indebtedness in an individual principal amount of $500,000 or more or with an aggregate principal amount of $1,000,000 or more; (d) breach of any representation, warranty, certification or other statement made or deemed made by the Borrowers in any Loan Document or in any statement or certificate at any time given by any Borrower in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or (e) default in the performance of or compliance with any term contained herein or any of the other Loan Documents; or (f) if  this Agreement or any other Loan Document ceases to be in full force and effect or shall be declared null and void, or Lender shall not have or shall cease to have a valid and perfected, first-priority (subject to Permitted Senior Liens) Lien  in  any Collateral purported to be covered by the Loan Documents,  or (ii) if Debtor contests the validity or enforceability of any Loan Document in writing or deny in writing that it has any further liability under any Loan Document; or(g) The Bankruptcy Court enters any order, or any Borrower or any party in interest files a motion to seeks entry of an order, (i) amending, reversing, revoking, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Interim Order, the Final Order or any other order with respect to the Chapter 11 Case affecting in any material respect this Agreement or the Loan Documents, without Lender's consent, (ii) appointing a chapter 11 trustee or an examiner, with enlarged powers relating to the operation of the business pursuant to Section 1104 of the Bankruptcy Code (powers beyond those set forth in Section 1106(a)(3) and (4) and 1106(b) of the Bankruptcy Code) in the Chapter 11 Case, (iii) dismissing the Chapter 11 Case or converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, | DIP Loan Agreement: § 8.1<br><br>Interim Order: ¶15, 22 |

or (iv) granting relief from the automatic stay to any creditor holding or asserting a Lien or reclamation claim on the assets of the Borrowers to permit such creditor to foreclose upon or to reclaim Collateral with a value in excess of $100,000; or (h) if entry of the Interim Order, in form and substance reasonably satisfactory to Lender, is not made by the Bankruptcy Court within three (3) Business Days after the filing of the motion to approve the Interim Order; or (i) If a motion shall be filed (i) seeking to obtain additional financing under Section 364 of the Bankruptcy Code and to use cash collateral of Lender under Section 363(c) of the Bankruptcy Code without the consent of Lender, (ii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (iii) to take any other action or actions adverse to Lender or its rights and remedies hereunder or under any of the other Loan Documents or any of the documents evidencing or creating Lender's interest in any of the Collateral; or (j) if any Borrower uses cash collateral other than in accordance with the terms of an order approving its use entered by the Bankruptcy Court; or (k)      if any Material Adverse Change shall occur; or (l) If there shall exist or have occurred a material violation, default or failure to perform, comply with or observe any term, provision, covenant or agreement under any Material Contract which is not cured by the later of (i) five (5) days after the date of receipt by a Responsible Officer of any Borrower of written notice of such violation, default or failure or after a Responsible Officer of any Borrower has knowledge thereof, and (ii) the expiration of any applicable cure period under the Material Contract, or if any Material Contract is terminated or otherwise not in full force and effect; or  (m) (i) There shall occur one or more ERISA Events which individually or in the aggregate results in or might reasonably be expected to result in liability of any Borrower, any of their respective Subsidiaries or any of their respective ERISA Affiliates in excess of $250,000 during the term hereof; or (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest under Section 430(k) of the Internal Revenue Code or under Section 303(k) of ERISA; or (n) any order, judgment or decree shall be entered against any Borrower or any of their respective Subsidiaries decreeing the dissolution or split up of such Person and such order shall remain undischarged or unstayed for a period in excess of 30 days; and (1) upon the occurrence of any Event of Default described in Section 8.1(g) – (i), automatically, or (2) upon the occurrence of any other Event of Default, upon notice to Borrowers, the Revolving Loan , all interest thereon and all other Obligations payable under this Agreement and the other Loan Documents shall be forthwith due and payable.

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| N/A | Termination and Remedies | On the third Business Day after the Termination Date, and notwithstanding the provisions of Section 362 of the Bankruptcy Code, Lender may, by written notice to Borrowers, and in addition to any other rights or remedies provided for hereunder or under any other Loan Document (including, without limitation, the Order) or by the UCC or any other applicable law, do any one or more of the following: (a)declare the Obligations, whether evidenced by this Agreement or by any of the other Loan Documents immediately due and payable, whereupon the same shall become and be immediately due and payable, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by the Borrowers; and (b) obtain and liquidate the Collateral without the necessity for any further order from the Bankruptcy Court or any other court, or the initiation of any further proceeding with any Borrower, to be negotiated by Lender in good faith.<br><br>Remedies Cumulative. The rights and remedies of Lender under this Agreement, the other Loan Documents, and all other agreements shall be cumulative. Lender shall have all other rights and remedies not inconsistent herewith as provided under the UCC, by law, or in equity. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default shall be deemed a continuing waiver. No delay by Lender shall constitute a waiver, election, or acquiescence by it. | DIP Loan Agreement: § 8.2, 8.3.<br><br>Interim Order ¶8, 16, 20 |
| Bankruptcy Rule | Conditions Precedent to Loans | The obligation of the Lender to make the Revolving Loan on the Closing Date is subject to the satisfaction of the following conditions in a manner satisfactory to the Lender: (a) This Agreement and all Loan Documents and any other documents to be delivered in connection with the transactions contemplated by this Agreement shall have been delivered, executed, or recorded and shall be in form and substance reasonably satisfactory to Lender. (b)Lender shall have received (i) a copy of each of the articles or certificate of formation of each Borrower and each Borrower's limited liability company agreement, and in each case, to the extent applicable, certified as of a recent date by the appropriate governmental official each dated the Closing Date or a recent date prior thereto; | DIP Loan Agreement: §3.1, 3.2 |

(ii) signature and incumbency certificates of the officers of each Borrower executing the Loan Documents; (iii) resolutions of the board of directors or similar governing body of each Borrower approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents, certified as of the Closing Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment and (iv) a good standing certificate from the applicable Governmental Authority of each Borrower's jurisdiction of formation and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Closing Date.

(g) All first day motions and applications shall have been filed, and all orders with respect thereto and any other orders entered in the Chapter 11 Case prior to the Closing Date shall be in form and substance reasonably satisfactory to Lender.

(h) Lender shall have received the Budget, in form and substance reasonably satisfactory to Lender.

(i) Lender shall have received the Historical Financial Statements.

(j) Lender shall have received a certificate, dated the Closing Date and signed by a Responsible Officer of each Borrower, certifying as to compliance with clauses (e), (f) and (m) of this Section 3.1 and clauses (b) and (c) of Section 3.2. (k) All fees required to be paid on the Closing Date under this Agreement and the other Loan Documents shall have been paid (including, without limitation, all legal fees and expenses of Lender's counsel).

(l) Lender shall have completed its business, legal, market and collateral due diligence, including (i) review of Material Contracts, (ii) UCC, tax lien, litigation and Intellectual Property searches, (iii) review of the Borrowers' and their respective Subsidiaries' books and records, in each case which shall be reasonably satisfactory to Lender.

(m) No action, proceeding, investigation, regulation or legislation shall have been instituted or threatened before any Governmental Authority to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of this Agreement or any of the other Loan Documents or the consummation of the transactions contemplated hereby and thereby and which, in Lender's sole judgment, would make it inadvisable to consummate the transactions contemplated by this Agreement or any of the other Loan Documents.

| Bankruptcy Rule/Local Rule | Type of Provision | Summary | Location of Provision in Relevant Document(s) |
|---|---|---|---|
| Bankruptcy Rule 4001(c)(i)(B)(viii) - Release | Release | Each borrower, on behalf of itself its agents, representatives, subsidiaries, heirs, successors and assigns (collectively, the "Releasors"), hereby forever waives, releases, holds harmless, acquits and discharges, to the fullest extent permitted by law, the lender and other lender-related persons (collectively, the "Releasees") from any and all claims, losses, liabilities, damages, interests and causes of action of any kind or nature by, on behalf of, or through the borrower (collectively, the "claims") that the borrower has, had or may have against any of the Releasees, when acting in a representative or official capacity on behalf of Lender based on facts arising on or before the date hereof that relate to: (i) this agreement, the other loan documents, the prepetition loans or financings provided by lender or other lender-related persons to the borrowers (directly or indirectly), or other transactions or dealings between any borrower, on the one hand, and the lender or any other such lender-related person on the other hand (ii) any transaction, action or omission contemplated hereby or thereby or (iii) any aspect of the dealings or relationships between or among the Releasors, on the one hand, and the Releasees, on the other hand, relating to this agreement, the other loan documents, or such prepetition loans and financings or any other transaction, action, dealings or omission contemplated hereby or thereby. The provisions of this section 10.4 shall survive the termination of this agreement.<br><br>To the fullest extent permitted by law, each borrower, on behalf of itself and the other Releasors, hereby unconditionally and irrevocably agrees that it will not sue any Releasee on the basis of any claim released, remised and discharged by any Releasor pursuant to section 10.4(a) above.  If any borrower or other Releasor violates the foregoing covenant, each of the borrowers, for itself and the other Releasors (as applicable), agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.<br><br>Notwithstanding the preceding, nothing herein or in the final order or the loan documents shall prejudice the rights of any committee, a successor trustee and any other party in interest with requisite standing other than the debtor, to seek to object to or to challenge the claims being released by the Releasors in section 10.4(a) above.  Within 75 days of the date of entry of the final order, a party, including the committee, must commence, as appropriate, a contested matter or adversary proceeding raising such claim, or must file a motion seeking standing; provided, however, that any such actions or claims must be brought and, where applicable standing obtained, no later than the earlier of (a) 120 days from the entry of the final order or (b) June 30, 2017 (the "challenge period"). The challenge period may only be extended with the written consent of the lender (without need for court order or notice), or by order of the court after notice and a hearing.  Upon the expiration of such applicable challenge period, to the extent not otherwise waived or barred: (a) any and all such claims by any party (including, without limitation, any committee, any chapter 11 trustee, and/or any examiner appointed in this bankruptcy case, and any chapter 7 trustee and/or examiner appointed in any successor case), shall be deemed to be forever waived and barred.  The final order shall contain an injunction barring any claims being asserted, or sought to be asserted, unless the conditions for bringing such claims during the challenge period are met. | DIP Loan Agreement: §10.4<br>Interim Order: ¶ 14 |

### III.        APPLICABLE AUTHORITY AND BASIS FOR RELIEF

**A.     The Debtors Should be Authorized to Use Cash Collateral**

(i)        The secured parties' Interests Are Adequately Protected

39.    Pursuant to 11 U.S.C. § 363(c), the Court may permit the use of cash collateral so long as the debtor provides "adequate protection of such interest."  11 U.S.C. § 361 sets forth three non-exclusive examples of adequate protection.  *In re Nashua Trust Co.*, 73 B.R. 423, 430 (Bankr. D.N.J. 1987).  Adequate protection "is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process."  *In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).  11 U.S.C. § 361 states, in pertinent part, that when "adequate protection" of an entity's interest in property is required, such adequate protection may be provided by:

(1)    requiring the [debtor in possession] to make a cash payment or periodic cash payments to such entity, to the extent that the . . . use, sale, or lease under [11 U.S.C. § 363] . . . results in a decrease in the value of such entity's interest in such property;

(2)    providing to such entity an additional or replacement lien to the extent that such . . . use, sale [or] lease . . . results in a decrease in the value of such entity's interest in such property; or

(3)    granting such other relief, other than entitling such entity to compensation allowable under [11 U.S.C. § 503(b)(1)] as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

40.    Provision of a replacement lien in property equal to the value of the cash collateral used specifically complies with 11 U.S.C. § 361(2) and provides adequate protection within the meaning of 11 U.S.C. § 363(e).  *See, e.g., MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re T.H.B. Corp.*, 85 B.R. 192, 195 (Bankr. D. Mass. 1988).  The focus of the requirement of adequate protection is to protect a secured

creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Club Associates*, 107 B.R. 385, 394 (Bankr. N.D. Ga. 1989); *Ridgemont Apartment Associates Ltd. v. Atlanta English Village Ltd.*, 110 B.R. 77, 82 (Bankr. N.D. Ga. 1989).

41.     Debtors' respectfully submit that, pursuant to 11 U.S.C. § 361(2), the Adequate Protection Liens and priority granted to the secured parties combined with the substantial equity cushion in LHH's assets, constitute adequate protection for Debtors' use of Cash Collateral.

42.     Under the circumstances of the Bankruptcy Cases, the interests of the Secured Parties are adequately protected from Debtors' use of Cash Collateral subject to the Interim Order.   Thus, approval of the relief requested in this Motion will allow Debtors to fund the chapter 11 process, maximizing value for their creditors without harming or prejudicing the rights or interests of the secured parties.

(ii)     Without the Cash Collateral the Debtors Would Suffer Immediate and Irreparable Harm

43.     Pursuant to FED. R. BANKR. P. 6003(b), any motion seeking to use property of the estate pursuant to 11 U.S.C. § 363, or to incur an obligation regarding property of the estate within twenty-one (21) days of the petition date, requires that Debtors demonstrate such relief would prevent "immediate and irreparable harm."   As set forth in this Motion, Debtors do not have sufficient liquidity to properly reorganize, sell or wind-down and liquidate their estates and assets, and immediately obtaining use of cash collateral is therefore vital to maintaining the value of Debtors' assets.   Debtors respectfully submit that they have satisfied FED. R. BANKR. P. 6003(b).

44.     Additionally, any delay in authorizing the relief requested in this Motion would also be detrimental to Debtors, their estates and their creditors.   To successfully implement the

foregoing, Debtors seek a waiver of the stay imposed under FED. R. BANKR. P. 6004(h), to the extent that provision may be applicable to the order approving this Motion.

**B.      The DIP Loan Agreement Should Be Approved**

45.      As described above, it is essential that the Debtors immediately obtain access to financing in order to continue operating in the ordinary course and preserve estate assets. The Debtors have proposed to obtain financing under the DIP Loan Agreement by providing the DIP Lender with protections pursuant to Bankruptcy Code Section 364(c). More specifically, the Debtors are proposing that the Court, through entry of the DIP Orders, afford the DIP Lender (a) pursuant to Bankruptcy Code Section 364(c)(2) and subject to the Carve-Out, first priority perfected Liens on and security interests in any of the DIP Collateral that is not subject to a Lien or security interest on the Petition Date (excluding, however, for purposes of the Interim Order, Avoidance Actions), and (b) pursuant to Bankruptcy Code Section 364(c)(3) and subject to the Carve-Out, second or other junior priority perfected Liens on and security interests in any of the DIP Collateral that is subject to a validly existing, properly perfected and unavoidable Lien or security interest on the Petition Date held by a person or entity including MidCap.

(i)      Approval of Postpetition Financing Under Bankruptcy Code Section 364(c)

46.      Bankruptcy Code Section 364 distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security. If a debtor in possession cannot obtain postpetition credit on an unsecured administrative basis, then pursuant to Bankruptcy Code Section 364(c), a court may authorize the obtaining of credit or the incurring

of debt, repayment of which is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing.

47.     Specifically, the statutory requirement for obtaining postpetition credit under Bankruptcy Code Section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c). *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made reasonable effort to seek other sources of financing under Bankruptcy Code Sections 364(a) and (b)); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under Bankruptcy Code Section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

48.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under Bankruptcy Code Section 364(c). Specifically, courts look to whether:

> a) the debtor is unable to obtain unsecured credit under Bankruptcy Code Section 364(b), i.e., by allowing a lender only an administrative claim;
>
> b) the credit transaction is necessary to preserve the assets of the estate; and
>
> c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Ames Dep't Stores*, 115 B.R. at 37-39; *see also In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying three factors in making a determination under Bankruptcy Code Section 364(c)); *In re St. Mary Hospital*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988) (same); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same).

49.     Each of these elements are here satisfied. Specifically, the Debtors have determined (in consultation with its advisors) that its current capital structure and business condition, as described in the Luria Declaration, renders it unable to obtain adequate postpetition financing on an unsecured administrative basis. Notably, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

50.     The Debtors have also satisfied the second prong of the aforementioned test, which looks to whether the credit transaction is necessary to preserve the assets of the estate. Here, in the absence of the financing, the Debtors would be unable to meet its ordinary course operational obligations, much less bear the costs of the chapter 11 process, forcing the Debtors into an immediate liquidation, with the attendant damage to employees, stakeholders and other parties in interest.

51.     Finally, the Debtors submit that the proposed terms of the DIP Loan Agreement are fair, reasonable and adequate given today's market and the facts of this case. Moreover, they likely represent the only financing source available to the Debtors.

52.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003*); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re*

*Ellingsen MacLean Oil Co.*),  65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter

into hard bargains to acquire funds). The appropriateness of a proposed financing facility should

also be considered in light of current market conditions. *See* Transcript of Record at 740:4-6, *In*

*re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr S D N Y. Feb. 27, 2009) ("[B]y reason of

present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions

[of a DIP that included a roll-up of prepetition secured debt] reasonable here and now").

(ii)     The DIP Loan Agreement Reflects an Exercise of the Debtors' Reasonable Business
         Judgment

      53.     A debtor's decision to enter into a postpetition lending facility under Bankruptcy

Code Section 364 is governed by the business judgment standard. *See In re Trans  World*

*Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del 1994) (noting that the interim loan, receivable

facility and asset based facility were approved because they "reflect[ed] sound and prudent

business judgment [were] reasonable under the circumstances and in the best interests of TWA

and its creditors"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)

("cases consistently reflect that the court's discretion under section 364 is to be utilized on

grounds that permit reasonable business judgment to be exercised so long as the financing

agreement does not contain terms that leverage the bankruptcy process and powers or its purpose

is not so much to benefit the estate as it is to benefit parties in interest"); *Group of Institutional*

*Holdings v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*,

47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room

and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983)

(same).

      54.     Bankruptcy courts typically defer to a debtor's business judgment on the decision

to borrow money unless such decision is arbitrary and capricious. *See In re Trans World*

*Airlines, Inc.*, 163 B.R. at 974. In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

55.     For the reasons set forth above, the Debtors submit that the entry into the DIP Loan Agreement is a decision that represents the exercise of the Debtors' reasonable business judgment. Further, the Debtors have satisfied the respective requirements of Bankruptcy Code Section 364(c) and the approval sought with respect to those aspects of the DIP Orders which seek to afford the DIP Lender the protections of these provisions should be approved.

56.     In the instant case, the fact that MedCare is an affiliate does not change the analysis or the decision.  It is clear that there is no over-reaching in the DIP Loan by MedCare and that the terms are reasonable under the circumstances.

### C.    Approval of Application of Cash Collateral Is Appropriate

57.     Bankruptcy Code Section 363(c)(2) provides that a debtor may not use, sell or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

58.     The use of Cash Collateral conditioned on the receipt by MidCap of replacement liens in post-petition collateral, MidCap's substantial equity cushion, and the partial paydown of the MidCap debt, provide appropriate adequate protection for the use of MidCap's Cash Collateral.

**D.      The Automatic Stay Should be Modified**

59.      The DIP Orders contemplate a modification of the automatic stay of Bankruptcy Code Section 362(d) to the extent applicable and necessary, to permit the parties to implement the terms of the DIP Orders and the DIP Loan Agreement. Provisions of this kind are standard in debtor-in-possession financings and are reasonable under the circumstances.

**E.      The DIP Lender Should be Protected by Bankruptcy Code Section 364(e)**

60.      Bankruptcy Code Section 364(e) provides that "[t]he reversal or  modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal." 11 U.S.C. § 364(e). The terms and conditions of the DIP Loan Agreement were negotiated by the parties in good faith and at arm's length, and are fair and reasonable under the circumstances. Accordingly, the DIP Lender should be afforded the benefits of Bankruptcy Code Section 364(e) in respect of the DIP Loans.

**F.      Interim Approval Should Be Granted**

61.      Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to Bankruptcy Code Section 364 may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

01:21494309.1

62.     The Debtors request that the Court hold and conduct an interim hearing to consider entry of the Interim Order authorizing the Debtors from and after entry of the Interim Order until the Final Hearing to receive the DIP Loans contemplated by the DIP Loan Agreement, in an amount not to exceed $1.0 million pending entry of the Final Order. This relief will enable the Debtors to preserve and maximize the value of its assets and, therefore, avoid immediate and irreparable harm and prejudice to its estate and all parties in interest, pending the Final Hearing.

**G.     Bankruptcy Rule 6004 Should be Waived and the DIP Orders Should be Deemed Immediately Effective**

63.     To the extent that any aspect of the relief sought herein constitutes a use of property under Bankruptcy Code Section 363(b), the Debtors seek a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h). As described above, the relief that the Debtors seek in this Motion is immediately necessary in order for the Debtors to be able to continue to operate its business and preserve the value of its estate. The Debtors thus submit that the requested waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h) is here appropriate. Thus, the Interim Order and the Final Order should each be deemed effective immediately upon entry.

**H.     Notice Procedures and the Final Hearing**

64.     Pursuant to Local Rule 4001-2(c), the Final Order may only be entered after notice and a hearing, and a hearing to consider the Final Order is ordinarily not held until at least ten (10) days after the organizational meeting of the creditors' committee. The Debtors will, within three (3) business days of the entry of the Interim Order by the Court, serve by first-class mail, a copy of the Interim Order and a notice of the Final Hearing to consider entry of the Final Order on the date established by the Court in the manner proscribed by the Interim Order.

65.     The Debtors respectfully request that the Court schedule the Final Hearing on this Motion no later than twenty (20) days after the Petition Date. Such relief is necessary in order to avoid a default under the DIP Loan Agreement and to avoid immediate and irreparable harm and prejudice to the Debtor's estate.

## NOTICE OF MOTION

66.     No trustee, examiner, or official committee of unsecured creditors has been appointed in any of Debtors' chapter 11 cases.

67.     Notice of this Motion has been given to the following parties, or in lieu thereof, to their counsel: (a) the Office of the United States Trustee for the District of Delaware; (b) Debtors' twenty (20) largest unsecured creditors (on a consolidated basis); (c) MidCap; (d) MedCare; (e) the Internal Revenue Service; (f) CCG; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Application, the Debtors will serve copies of this Application and any order entered respecting this Motion as required by rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.  The Debtors submit that no other or further notice need be provided.

68.     No previous request for the relief sought herein has been made by Debtors to this or any other court.

WHEREFORE, the Debtors request entry of an order, substantially in the form attached hereto as <u>Exhibit C</u>, granting the relief requested herein and such other and further relief as is just and proper.

DATED:  January 30, 2017

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

/s/ Kenneth J. Enos
Joel A. Waite (No. 2925)
Kenneth J. Enos (No. 4544)
Rodney Square
1000 North King Street
Wilmington, DE 19801-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

**ALSTON & BIRD LLP**

Grant T. Stein
David A. Wender
Sage M. Sigler
1201 West Peachtree Street
Atlanta, Georgia  30309-3424
Telephone:  (404) 881-7000
Facsimile:  (404) 881-7777

*Proposed Attorneys for the Debtors*

# EXHIBIT A
## Debtor-In-Possession Loan and Security Agreement

**DEBTOR-IN-POSSESSION**
**LOAN AND SECURITY AGREEMENT**


**by and between**

**LOUISIANA MEDICAL CENTER AND HEART HOSPITAL, LLC**

**LMCHH PCP LLC**

**each as Borrower, and collectively as Borrowers,**


**and**

**MEDCARE INVESTMENT FUND V, L.P.**

**as Lender**


**Dated as of [__], 2017**

---

**Up to $4,200,000 Loan**

---

# TABLE OF CONTENTS

Page

1.    DEFINITIONS AND CONSTRUCTION. ...................................................................1

    1.1    Definitions ........................................................................................................1
    1.2    UCC ................................................................................................................18
    1.3    Accounting Terms...........................................................................................18
    1.4    Interpretation, etc ...........................................................................................19

2.    LOAN AND TERMS OF PAYMENT. ....................................................................19

    2.1    Loan Commitments, Additional Loans and Borrowing Mechanics ................19
    2.2    Payments; Prepayments. .................................................................................20
    2.3    Interest Rates and Rates, Payments, and Calculations....................................21
    2.4    Crediting Payments; Clearance Charge ..........................................................22
    2.5    Maintenance of Loan Account; Statements of Obligations .............................22
    2.6    Maturity ..........................................................................................................22
    2.7    Effect of Maturity ...........................................................................................22
    2.8    Lead Borrower ................................................................................................22
    2.9    Joint and Several Liability of Borrowers ........................................................23

3.    CONDITIONS TO THE CLOSING DATE. ............................................................23

    3.1    Conditions Precedent to the Closing Date ......................................................23
    3.2    Conditions Precedent to each Credit Extension ..............................................24

4.    REPRESENTATIONS AND WARRANTIES...........................................................25

    4.1    Due Organization and Qualification; Subsidiaries..........................................25
    4.2    Due Authorization; No Conflict......................................................................25
    4.3    Binding Obligations; Perfected Liens .............................................................25
    4.4    Title to Assets; No Encumbrances ..................................................................25
    4.5    Compliance with Laws; Permits .....................................................................26
    4.6    Fraudulent Transfer.........................................................................................26
    4.7    Intellectual Property........................................................................................26
    4.8    Complete Disclosure .......................................................................................26
    4.9    Patriot Act .......................................................................................................26
    4.10   Payment of Taxes............................................................................................27
    4.11   Governmental Regulation ...............................................................................27
    4.12   Budget.............................................................................................................27
    4.13   Environmental Matters ....................................................................................27

5.    AFFIRMATIVE COVENANTS. .............................................................................28

    5.1    Financial Statements, Reports, Certificates ....................................................28
    5.2    Other Notices ..................................................................................................28
    5.3    Collateral Reporting........................................................................................29
    5.4    Existence.........................................................................................................29
    5.5    Maintenance of Properties And Intellectual Property; Permits .......................30

|       |                                                                 |    |
|-------|-----------------------------------------------------------------|----|
| 5.6   | Taxes                                                           | 30 |
| 5.7   | Inspection                                                       | 30 |
| 5.8   | Compliance with Laws                                            | 30 |
| 5.9   | Environmental                                                    | 30 |
| 5.10  | Further Assurances                                              | 31 |
| 5.11  | Insurance                                                        | 31 |
| 5.12  | Use of Proceeds                                                 | 31 |
| 5.13  | Chapter 11 Milestones.                                          | 31 |

**6.    NEGATIVE COVENANTS.** ....................................................................... 31

| 6.1   | Indebtedness                                                    | 32 |
| 6.2   | Liens                                                            | 32 |
| 6.3   | Restrictions on Fundamental Changes.                           | 32 |
| 6.4   | Disposal of Assets                                              | 32 |
| 6.5   | Change Name                                                     | 32 |
| 6.6   | Nature of Business                                              | 32 |
| 6.7   | Investments                                                      | 32 |
| 6.8   | . Make, acquire, or permit to exist any Investment other than Permitted Investments. | 32 |
| 6.9   | Prepayments and Amendments.                                    | 32 |
| 6.10  | Change of Control                                               | 33 |
| 6.11  | Restricted Junior Payment                                      | 33 |
| 6.12  | Accounting Methods                                             | 33 |
| 6.13  | Transactions with Affiliates                                   | 33 |
| 6.14  | Limitation on Capital Expenditures                            | 33 |
| 6.15  | Sales and Lease Backs                                         | 33 |
| 6.16  | Bankruptcy Case                                                | 33 |
| 6.17  | Plan                                                            | 34 |
| 6.18  | Subsidiaries                                                    | 34 |

**7.    [INTENTIONALLY OMITTED]** .............................................................. 34

**8.    EVENTS OF DEFAULT.** ........................................................................ 34

| 8.1   | Event of Default                                               | 34 |
| 8.2   | Rights and Remedies                                           | 36 |
| 8.3   | Remedies Cumulative.                                          | 36 |

**9.    PRIORITY AND COLLATERAL SECURITY** .......................................... 36

| 9.1   | Grant of Security Interest                                     | 36 |
| 9.2   | Certain Limited Exclusions                                    | 37 |
| 9.3   | Collateral Security.                                           | 37 |
| 9.4   | No Discharge; Survival of Claims                              | 38 |
| 9.5   | Power of Attorney                                             | 38 |

**10.   WAIVERS; INDEMNIFICATION.** ......................................................... 39

| 10.1  | Demand; Protest; etc.                                         | 39 |
| 10.2  | Lender's Liability for Collateral                            | 39 |

10.3     Indemnification ........................................................................................................39
10.4     General Release; Covenant Not to Sue; Reservation of Certain Third Party Rights .......40

11.     NOTICES................................................................................................................................41

12.     CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER......................................................42

13.     AMENDMENTS; WAIVERS; SUCCESSORS; INDEMNIFICATION. ...................................43

13.1     Amendments and Waivers. ......................................................................................43
13.2     No Waivers; Cumulative Remedies...........................................................................43
13.3     Successors ...............................................................................................................43
13.4     Costs and Expenses; Indemnification ......................................................................43

14.     GENERAL PROVISIONS. ....................................................................................................44

14.1     Effectiveness............................................................................................................44
14.2     Section Headings .....................................................................................................44
14.3     Interpretation...........................................................................................................44
14.4     Severability of Provisions ........................................................................................44
14.5     Debtor-Creditor Relationship....................................................................................44
14.6     Counterparts; Electronic Execution .........................................................................44
14.7     Revival and Reinstatement of Obligations ...............................................................44
14.8     Lender Expenses .....................................................................................................45
14.9     USA PATRIOT Act...................................................................................................45
14.10   Integration...............................................................................................................45

## LIST OF EXHIBITS AND SCHEDULES

Exhibit A                   Initial Budget
Exhibit B                   Form of Funding Notice

Schedule A-1                Loan Account
Schedule C-1                Commercial Tort Claims
Schedule C-2                Commodities Accounts, Deposit Accounts and Securities Accounts
Schedule P-1                Permitted Indebtedness
Schedule P-2                Permitted Liens
Schedule P-3                Pledged Debt and Equity
Schedule 9.1                Real Property

# DEBTOR-IN-POSSESSION
# LOAN AND SECURITY AGREEMENT

THIS **DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** (this "Agreement"), is entered into as of January __, 2017, by and among **LOUISIANA MEDICAL CENTER AND HEART HOSPITAL, LLC**, a North Carolina limited liability company ("LMCHH"), **LMCHH PCP LLC**, a Delaware limited liability company ("LMCHH PCP" and together with LMCHH, each a "Borrower" and collectively, the "Borrowers") and **MEDCARE INVESTMENT FUND V, L.P.**, a Delaware limited partnership (together with its successors and assigns, the "Lender").

## RECITALS

WHEREAS, on January __, 2017 (the "Filing Date"), the Borrowers commenced a voluntary Chapter 11 Case No. [_____] under chapter 11 of the Bankruptcy Code (the "Bankruptcy Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, Borrowers intend to continue to operate their respective businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Borrowers have requested that Lender provide a secured loan facility in an aggregate principal amount of up to Four Million, Two Hundred Thousand U.S. Dollars ($4,200,000) pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code;

WHEREAS, Borrowers are a party to that certain Credit and Security Agreement (the "Senior Credit Agreement"), dated as of November 25, 2014, by and among Borrowers, the various lenders party thereto from time to time, (the "Senior Lenders") and Midcap Financial, LLC, as agent to the Senior Lenders (the "Senior Agent");

WHEREAS, Lender has indicated its willingness to agree to make Loans to Borrowers, on terms and conditions set forth herein and in the other Loan Documents and in accordance with Sections 364(c) and 364(d) of the Bankruptcy Code, so long as the Obligations are secured by Liens on the Collateral granted by each Borrower, subject in priority only to the Carve-Out and certain Permitted Senior Liens, including the Liens in favor of the Senior Agent for the benefit of itself and the Senior Lenders, as hereinafter provided; and

WHEREAS, each Borrower has agreed to provide such collateral security, subject to the approval of the Bankruptcy Court;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## 1.     DEFINITIONS AND CONSTRUCTION.

1.1     **Definitions.** Capitalized terms used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"Account Debtor" shall mean each Person who is obligated on a Receivable or any Supporting Obligation related thereto.

"Accounts" means all "accounts" as defined in Article 9 of the UCC.

"Additional Documents" has the meaning specified in Section 5.10.

"Adverse Proceeding" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of any Borrower or any of their respective Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of any Borrower or any of their respective Subsidiaries, threatened against or affecting any Borrower or any of their respective Subsidiaries or any property of any Borrower or any of  their respective Subsidiaries.

"Affiliate" means, as applied to any Person, any other Person who controls, is controlled by, or is under common control with, such Person; provided, however, that the term "Affiliate" (i) as it pertains to any Borrower, shall not include Lender or any Person who controls Lender and (ii) as it pertains to Lender, shall not include any Borrower or any Subsidiary of any Borrower. For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of Stock, by contract, or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Bankruptcy Case" has the meaning specified in the recitals.

"Bankruptcy Code" means title 11 of the United States Code, as in effect from time to time.

"Bankruptcy Court" shall have the meaning set forth in the recitals.

"Benefit Plan" means a (i) "defined benefit plan" (as defined in Section 3(35) of ERISA) for which any Borrower or ERISA Affiliates has been an "employer" (as defined in Section 3(5) of ERISA) within the past six years and (ii) any other healthcare, pension, multiemployer benefit, welfare or similar plans or obligations of the Borrowers maintained for any of its employees, officers or directors.

"Borrower" and "Borrowers" each have the meaning specified in the preamble.

"Budget" means the Initial Budget and any subsequent budget prepared by the Borrowers and approved by Lender pursuant to Section 5.1(d).  Until a new or amended budget is approved by Lender, references herein to the Budget shall be deemed a reference to the last Budget then approved by Lender.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the state of Texas.

"Capital Expenditures" means, with respect to any Person for any period, the aggregate of all expenditures by such Person and their Subsidiaries during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP, subject to Section 1.3.

"Capitalized Lease Obligation" means that portion of the obligations under a Capital Lease that is required to be capitalized in accordance with GAAP.

"Cash Collateral" means "Cash Collateral" as that term is defined in Bankruptcy Code § 363.

"Carve-Out" means, at any time, the aggregate amount of the following: (a) all accrued and unpaid fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. §1930(a) plus interest pursuant to 31 U.S.C. § 3717, (b) an amount equal to $35,000 to compensate an examiner or a Committee or any of their Professionals for the costs of investigating the claims, if any, that Borrowers may have against the Lender, (c) all accrued and unpaid fees and disbursements of Professionals relating to the Bankruptcy Case incurred by persons or entities authorized to receive compensation under 11 U.S.C. §§ 330, 331 or 363, but limited to (i) subject to the Budget, all accrued and unpaid fees, disbursements costs and expenses of professional or professional firms retained by the Borrowers and the Committee accrued or incurred at any time before the date and time of the delivery by the Lender of a Carve-Out Trigger Notice, plus (ii) fees, costs and expenses incurred by the aforementioned after the date of delivery by the Lender of the Carve-Out Trigger Notice in an amount not to exceed $500,000, plus (iii) in all cases, whether before or after the date of delivery by the Lender of the Carve-Out Trigger Notice, any Deferred Restructuring Fee (as defined in the SOLIC Engagement Letter) payable to SOLIC (as defined in the SOLIC Engagement Letter) pursuant to the SOLIC Engagement Letter and (d) if the Bankruptcy Case is converted to a case under Chapter 7 of the Code, all accrued and unpaid professional fees and disbursements relating to the Bankruptcy Case (following such conversion) by the trustee or successor trustee appointed pursuant to §701, §702 or § 703 of the Bankruptcy Code in an aggregate amount not to exceed $25,000 (it being understood that the limitation set forth in this clause (d) in no way serves as a limitation on any of the items described in clauses (a) through (c) above).

"Carve-Out Trigger Notice" shall mean a written notice delivered by the Lender to the Borrowers and their counsel, the U.S. Trustee, and lead counsel to the Committee, which notice may be delivered following the occurrence of an Event of Default.

"Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one (1) year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within one (1) year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"), (c) commercial paper maturing no more than 270 days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances or time deposits maturing within one (1) year from the date of acquisition thereof issued or guaranteed by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank having at the date of acquisition thereof combined capital and surplus of not less than $250,000,000, (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and surplus of not less than $250,000,000, having a term of not more than seven days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above, and (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above.

"Change of Control" means any sale or transfer of any equity interest in any Borrower or any of their respective Subsidiaries.

"Chapter 11 Milestones" means, collectively, the Chapter 11 Milestones contained in Section 5.13.

"Chattel Paper" means all "chattel paper" as defined in Article 9 of the UCC, including, without limitation, "electronic chattel paper" or "tangible chattel paper", as each term is defined in Article 9 of the UCC.

"Closing Date" means the first date upon which all of the conditions set forth in Article 3 are satisfied.

"Collateral" means, collectively, the Personal Property Collateral and the Real Property Collateral, each as described in Section 9.1.

"Collateral Records" means books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks and related data processing software and similar items that at any time evidence or contain information relating to any of the Collateral or are otherwise necessary or helpful in the collection thereof or realization thereupon.

"Collateral Support" means all property (real or personal) assigned, hypothecated or otherwise securing any Collateral and shall include any security agreement or other agreement granting a lien or security interest in such real or personal property.

"Committee" shall mean an official committee of unsecured creditors appointed in the Bankruptcy Case by the United States Trustee, if any.

"Commercial Tort Claims" means all "commercial tort claims" as defined in Article 9 of the UCC, including, without limitation, all commercial tort claims listed on Schedule C-1 (as such schedule may be amended or supplemented from time to time).

"Commitment Period" means the period beginning on the Closing Date and ending on the Business Day prior to the Termination Date.

"Committee" means the official committee of unsecured creditors to be appointed by the United States Trustee in relation to the Bankruptcy Case, as applicable.

"Commodities Accounts" (i) means all "commodity accounts" as defined in Article 9 of the UCC and (ii) includes all of the accounts listed on Schedule C-2 under the heading "Commodities Accounts" (as such schedule may be amended or supplemented from time to time).

"Consolidated Subsidiaries" means, at any date, any Subsidiary the accounts of which would be consolidated with those of the "parent" Borrower in its consolidated financial statements if such statements were prepared as of such date.

"Credit Date" means the date, which shall be a Business Day, on which any Loan is made in accordance with Section 2.1.

"Daily Balance" means, as of any date of determination and with respect to any Obligation, the amount of such Obligation owed at the end of such day.

"Daily Cash Report" has the meaning specified in Section 5.1(c).

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Deposit Account" means any (i) deposit account (as that term is defined in the UCC) and (ii) includes all of the accounts listed on Schedule C-2 under the heading "Deposit Accounts" (as such schedule may be amended or supplemented from time to time).

"Documents" means all "documents" as defined in Article 9 of the UCC.

"Dollars" or "$" means United States dollars.

"Environmental Action" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority or any third party involving violations of Environmental Laws or releases of Hazardous Materials (a) from any assets, properties, or businesses of any Borrower or any of their respective Subsidiaries, or any of their predecessors in interest, (b) from adjoining properties or businesses, or (c) from or onto any Facilities which received Hazardous Materials generated by any Borrower or any of their respective Subsidiaries or any of their predecessors in interest.

"Environmental Claim" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (a) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (b) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (c) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"Environmental Law" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on any Borrower or any of their respective Subsidiaries, relating to the environment, the effect of the environment on employee health, or Hazardous Materials.

"Environmental Liabilities" means all liabilities, monetary obligations, losses, damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities.

"Equipment" means (i) all "equipment" as defined in Article 9 of the UCC, (ii) all machinery, manufacturing equipment, data processing equipment, computers, office equipment, furnishings, furniture, appliances, fixtures and tools (in each case, regardless of whether characterized as equipment under the UCC) and (iii) all accessions or additions thereto, all parts thereof, whether or not at any time of

determination incorporated or installed therein or attached thereto, and all replacements therefor, wherever located, now or hereafter existing, including any fixtures.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means (a) any Person subject to ERISA whose employees are treated as employed by the same employer as the employees of any Borrower or any of their respective Subsidiaries under IRC Section 414(b), (b) any trade or business subject to ERISA whose employees are treated as employed by the same employer as the employees of any Borrower or any of their respective Subsidiaries under IRC Section 414(c), (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which any Borrower or any of their respective Subsidiaries is a member under IRC Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any Person subject to ERISA that is a party to an arrangement with any Borrower or any of their respective Subsidiaries and whose employees are aggregated with the employees of any Borrower or any of their respective Subsidiaries under IRC Section 414(o).

"ERISA Event" means (a) any "reportable event" as defined in Section 4043 of ERISA with respect to a Pension Plan (other than an event as to which the PBGC has waived under subsection .22, .23, .25, .27 or .28 of PBGC Regulation Section 4043 the requirement of Section 4043(a) of ERISA that it be notified of such event), (b) any failure to make a required contribution to any Pension Plan that would result in the imposition of a lien or other encumbrance or the provision of security under Section 430 of the Internal Revenue Code or Section 303 or 4068 of ERISA, or the arising of such a lien or encumbrance, there being or arising any "unpaid minimum required contribution" or "accumulated funding deficiency" (as defined or otherwise set forth in Section 4971 of the Internal Revenue Code or Part 3 of Subtitle B of Title 1 of ERISA), whether or not waived, or any filing of any request for or receipt of a minimum funding waiver under Section 412 of the Internal Revenue Code or Section 303 of ERISA with respect to any Pension Plan or Multiemployer Plan, or that such filing may be made, or any determination that any Pension Plan is, or is expected to be, in at-risk status under Title IV of ERISA, (c) any incurrence by any Borrower, any of their respective Subsidiaries or any of their respective ERISA Affiliates of any liability under Title IV of ERISA with respect to any Pension Plan or Multiemployer Plan (other than for premiums due and not delinquent under Section 4007 of ERISA), (d) any institution of proceedings, or the occurrence of an event or condition which would reasonably be expected to constitute grounds for the institution of proceedings by the PBGC, under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, (e) any incurrence by any Borrower, any of their respective Subsidiaries or any of their respective ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Pension Plan or Multiemployer Plan, or the receipt by any Borrower, any of their respective Subsidiaries or any of their respective ERISA Affiliates of any notice that a Multiemployer Plan is in endangered or critical status under Section 305 of ERISA, (f) any receipt by any Borrower, any of their respective Subsidiaries or any of their respective ERISA Affiliates of any notice, or any receipt by any Multiemployer Plan from any Borrower, any of their respective Subsidiaries or any of their respective ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (g) engaging in a non-exempt prohibited transaction within the meaning of Section 4975 of the Internal Revenue Code or Section 406 of ERISA; or (h) any filing of a notice of intent to terminate any Pension Plan if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA, any filing under Section 4041(c) of ERISA of a notice of intent to terminate any Pension Plan, or the termination of any Pension Plan under Section 4041(c) of ERISA.

"Event of Default" has the meaning specified in Section 8.1.

"Exchange Act" means the Securities Exchange Act of 1934, as in effect from time to time.

"Facility" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by any Borrower or any of their respective Subsidiaries or any of their respective predecessors or Affiliates.

"Filing Date" has the meaning specified in the recitals.

"Final Hearing" means a hearing held by the Bankruptcy Court regarding the approval of the Final Order.

"Final Order" means a final order of the Bankruptcy Court authorizing and approving this Agreement and the other Loan Documents on a final basis and entered following a final hearing in form and substance reasonably satisfactory to Lender.

"Flood Hazard Property" means any real estate asset of any Borrower subject to a mortgage in favor of Lender, and located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"Funding Notice" means a notice substantially in the form of Exhibit B hereto, executed by Responsible Officer of the Lead Borrower.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"General Intangibles" (i) means all "general intangibles" as defined in Article 9 of the UCC, including "payment intangibles" also as defined in Article 9 of the UCC and (ii) includes, without limitation, all interest rate or currency protection or hedging arrangements, all tax refunds, all licenses, permits, concessions and authorizations, all Material Contracts and all Intellectual Property (in each case, regardless of whether characterized as general intangibles under the UCC).

"Goods" (i) means all "goods" as defined in Article 9 of the UCC and (ii) includes all Inventory and Equipment (in each case, regardless of whether characterized as goods under the UCC).

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Hazardous Materials Activity" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage,

holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"Highest Lawful Rate" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

"Historical Financial Statements" means as of the Closing Date, the unaudited financial statements and profit and loss statements of Borrowers and their respective Subsidiaries year to date through November 30, 2016, certified by the chief financial officer of the Lead Borrower that they fairly present, in all material respects, the financial condition of Borrowers and their respective Subsidiaries as of the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to normal year-end adjustments and the absence of footnotes.

"Indebtedness" means (a) all obligations for borrowed money, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all Capitalized Lease Obligations, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all payment obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices), (f) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by such Person, (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off-balance sheet financing products, or (h) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, indorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (h) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"Indemnified Liabilities" has the meaning specified in Section 10.3.

"Indemnified Person" has the meaning specified in Section 10.3.

"Initial Budget" means the Budget attached hereto as Exhibit A.

"Insolvency Proceeding" means a proceeding under the Bankruptcy Code, an assignment for the benefit of credits, the appointment of a receiver, or any similar proceeding.

"Instruments" means all "instruments" as defined in Article 9 of the UCC.

"Insurance" means (i) all insurance policies covering any or all of the Collateral (regardless of whether the Lender is the loss payee thereof) and (ii) any key man life insurance policies.

"Intellectual Property" means (a) all present and future trade secrets, know-how and other proprietary information, (b) trademarks, trademark applications, internet domain names, service marks, service mark applications, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing), indicia and other source and/or business identifiers, and the goodwill of the business relating thereto and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world, (c) copyrights and copyright applications (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights, (d) unpatented inventions (whether or not patentable), patents and patent applications, (e) industrial design applications and registered industrial designs, (f) license agreements related to any of the foregoing and income therefrom, books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing, (g) the right to sue for all past, present and future infringements of any of the foregoing, (h) all other intellectual property, and (i) all common law and other rights throughout the world in and to all of the foregoing.

"Interim Order" means the Interim Order pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (a) approving postpetition financing pursuant to this Agreement and the other Loan Documents and the making of the Loans, (b) authorizing use of cash collateral, (c) granting Liens, (d) granting adequate protection, (e) modifying the automatic stay, and (f) scheduling a final hearing with respect to the Bankruptcy Case (including the Budget), to be entered on the docket of the Bankruptcy Case.

"Inventory" means (i) all "inventory" as defined in Article 9 of the UCC and (ii) all goods held for sale or lease or to be furnished under contracts of service or so leased or furnished, all raw materials, work in process, finished goods, and materials used or consumed in the manufacture, packing, shipping, advertising, selling, leasing, furnishing or production of such inventory or otherwise used or consumed in the Borrowers' or any of their respective Subsidiaries' business; all goods in which any Borrower has an interest in mass or a joint or other interest or right of any kind; and all goods which are returned to or repossessed by any Borrower or any of their respective Subsidiaries, all computer programs embedded in any goods and all accessions thereto and products thereof (in each case, regardless of whether characterized as inventory under the UCC).

"Investment" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, capital contributions (excluding (a) commission, travel, and similar advances to officers and employees of such Person made in the ordinary course of business, and (b) *bona fide* Accounts arising in the ordinary course of business), or acquisitions of Indebtedness, Stock, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.

"Investment Related Property" means (i) all "investment property" (as such term is defined in Article 9 of the UCC) and (ii) all of the following (regardless of whether classified as investment property under the UCC): all Pledged Equity Interests, Pledged Debt, any Deposit Account, Securities Account or Commodities Account of the Borrowers and certificates of deposit.

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time.

"Lead Borrower" means Louisiana Medical Center and Heart Hospital, LLC.

"Lender" has the meaning set forth in the preamble.

"Lender Expenses" means all (a) costs or expenses required to be paid by any Borrower under any of the Loan Documents that are paid, advanced, or incurred by Lender, (b) out-of-pocket fees or charges paid or incurred by Lender in connection with its transactions with the Borrowers under any of the Loan Documents, including, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, appraisal (including periodic collateral appraisals or business valuations to the extent of the fees and charges (and up to the amount of any limitation) contained in the Agreement), real estate surveys, real estate title policies and endorsements, and environmental audits, (c) reasonable out-of-pocket costs and expenses incurred by Lender in the disbursement of funds to Borrowers (by wire transfer or otherwise), (d) out-of-pocket charges paid or incurred by Lender resulting from the dishonor of checks payable by or to any Borrower, (e) reasonable out-of-pocket costs and expenses paid or incurred by Lender to correct any default or enforce any provision of the Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (f) reasonable out-of-pocket audit fees and expenses (including reasonable travel, meals, and lodging) of Lender related to any inspections or audits to the extent of the fees and charges (and up to the amount of any limitation) contained in the Agreement, (g) reasonable out-of-pocket costs and expenses of third party claims or any other suit paid or incurred by Lender in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or Lender's relationship with the Borrowers, (h) Lender's reasonable costs and expenses (including reasonable attorneys' fees) incurred in advising, structuring, drafting, reviewing, administering (including reasonable travel, meals, and lodging), or amending the Loan Documents, (i) Lender's reasonable costs for the maintenance and preservation of the Collateral to the extent the Borrowers fail to do so and (j) Lender's reasonable costs and expenses (including reasonable attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including reasonable attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an Insolvency Proceeding concerning the Borrowers or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought, or in taking any Remedial Action concerning the Collateral.

"Lender-Related Person" means Lender and Lender's related investment funds and management company, and their respective partners, shareholders, directors, managers, officers, employees, agents, advisors, representatives, heirs, successors and assigns, when acting in a representative or official capacity on behalf of Lender.

"Lender's Liens" means the Liens granted by any Borrower or any of their respective Subsidiaries to Lender under the Loan Documents, and for the avoidance of doubt, "Lender's Liens" shall not include Liens granted by any Borrower to Affiliates of Lender with respect to prepetition financings made by such Affiliates of Lender.

"Letter of Credit Right" means "letter-of-credit right" as defined in Article 9 of the UCC.

"Lien" means any pledge, hypothecation, assignment (which is intended as security), charge, deposit arrangement (which is intended as security), encumbrance, easement, lien (statutory or other), security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever (which is intended as security), including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

-10-

"<u>Liquidity</u>" means, at any time, the dollar amount of Borrowers' unrestricted cash held in Borrowers' deposit accounts as of such time (minus the aggregate amount of all outstanding checks, debits, offsets or other obligations with respect thereto), which shall be subject to Lender's perfected Liens.

"<u>Loan(s)</u>" means a loan or loans, as the case may be, made to the Borrowers by the Lender pursuant to <u>Section 2.1</u>.

"<u>Loan Account</u>" means an account maintained hereunder by the Lender on its books of account, in which the Borrowers will be charged with all Obligations incurred by the Borrowers and to which payments shall be made in accordance with the wiring instructions set forth on <u>Schedule A-1</u>.

"<u>Loan Commitment</u>" means Four Million, Two Hundred Thousand U.S. Dollars, the maximum principal amount of Lender's obligation to make Loans to Borrowers pursuant to <u>Section 2</u>.

"<u>Loan Documents</u>" means the Agreement, the Interim Order, the Final Order and any note or notes executed by any Borrower or any of their respective Subsidiaries in connection with this Agreement and payable to Lender, any other agreement entered into, now or in the future, by any Borrower or any of their respective Subsidiaries and Lender in connection with this Agreement, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing.

"<u>Material Adverse Change</u>" means (a) except as a result of the commencement of the Bankruptcy Case, a material adverse change in the business, operations, results of operations, assets, liabilities or financial condition of the Borrowers, taken as a whole, (b) a material impairment of the Borrowers' ability to perform its obligations under the Loan Documents to which it is a party or of Lender's ability to enforce the Obligations or realize upon the Collateral or (c) a material impairment of the enforceability or priority of Lender's Liens with respect to any material portion of the Collateral as a result of an action or failure to act on the part of any Borrower or any of their respective Subsidiaries.

"<u>Material Contract</u>" means each contract or agreement to which any Borrower or any of their respective Subsidiaries is a party for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to result in a Material Adverse Change.

"<u>Money</u>" means "money" as defined in the UCC.

"<u>Moody's</u>" has the meaning specified in the definition of Cash Equivalents.

"<u>Multiemployer Plan</u>" means any "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is or may be an obligation to contribute of) any Borrower or any ERISA Affiliate, or to which any Borrower or any ERISA Affiliate is then making or accruing an obligation to make contributions or, within the preceding five Pension Plan years, has contributed to or had an obligation to contribute to such plan.

"<u>Obligations</u>" means the Loans and all loans, debts, principal, interest, contingent reimbursement or indemnification obligations, premiums, liabilities (including all amounts charged to the Loan Account pursuant to the Agreement), obligations (including indemnification obligations), fees, Lender Expenses, guaranties, covenants, and duties of any kind and description owing by any Borrower to Lender pursuant to or evidenced by the Loan Documents, irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that any Borrower is

required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents.

"Orders" means the Interim Order and the Final Order; and "Order" means whichever of the Interim Order or the Final Order is then in effect.

"Organizational Documents" means (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of designation or other instrument relating to the rights of preferred shareholders or stockholders of such corporation, any shareholder rights agreement and all applicable resolutions of the board of directors (or any committee thereof) of such corporation, (b) for any partnership, the partnership agreement and, if applicable, the certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or organization and all applicable resolutions of any managing member or board of managers  or other governing body of such limited liability company, and (d) any agreement between any Borrower and its shareholders, members, partners or its equity owners, or among any of the foregoing.

"Patriot Act" has the meaning specified in Section 4.9.

"Pension Plan" means any "employee benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) maintained or contributed to by any Borrower or any ERISA Affiliate or to which any Borrower or any ERISA Affiliate has or may have an obligation to contribute, and each such plan that is subject to Title IV of ERISA for the five-year period immediately following the latest date on which any Borrower or any ERISA Affiliate maintained, contributed to or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan.

"Permits" means any license, lease, power, permit, franchise, certificate, authorization or approval issued by a Governmental Authority.

"Permitted Dispositions" means:

(a)    sales, abandonment, or other dispositions of Equipment that is substantially worn, damaged, or obsolete in the ordinary course of business, provided that the proceeds thereof are used either to replace such Equipment with Equipment of equal or greater value or are applied to the repayment of the Loans or the repayment of obligations to the Senior Lenders,

(b)    any involuntary loss, damage or destruction of property,

(c)    any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property,

(d)    the making of a Permitted Investment, and

(e)    dispositions expressly set forth in the Budget[1].

"Permitted Indebtedness" means:

(a)    Indebtedness evidenced by this Agreement and the other Loan Documents,

---

[1] Discuss certain payments to be made to physicians from the proceeds of receivables.

(b)        Indebtedness in existence on the Filing Date and set forth on Schedule P-1 (and refinancings or amendments thereof to the extent permitted by the Bankruptcy Court),

(c)        purchase money Indebtedness and Indebtedness in respect of Capital Leases, in each case, incurred after the Filing Date in the ordinary course of business of any Borrower or any of their respective Subsidiaries,,

(d)        Indebtedness consisting of unsecured guarantees incurred in the ordinary course of business with respect to surety and appeal bonds, performance bonds, bid bonds, appeal bonds, completion guarantee and similar obligations,

(e)        Indebtedness constituting reimbursement obligations with respect to (and deposits of cash to secure) letters of credit issued in the ordinary course of business in respect of workers' compensation, unemployment insurance, social security or other similar laws, to secure the performance of tenders, statutory obligations, bids, leases, government contracts, trade contracts and other similar obligations,

(f)        Indebtedness incurred in the ordinary course of business during the Bankruptcy Case under performance, surety, statutory, and appeal bonds,

(g)        indorsement of items for deposit or collection in the ordinary course of business,

(h)        Indebtedness representing deferred compensation to directors, officers, members of management, employees or consultants of any Borrower or any of their respective Subsidiaries, in the ordinary course of business,

(i)        contingent obligations in respect of indemnities or similar agreements to hold others harmless arising in the ordinary course of business,

(j)        Indebtedness owed to any Person providing property, casualty, liability, or other insurance to any Borrower or any of their respective Subsidiaries, in an amount not to exceed $100,000 at any time outstanding incurred in the ordinary course of business under financing arrangements related to the payment of premiums and deductibles under insurance policies so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of such insurance (exclusive of interest, fees and other charges incurred in connection with premium financing), and shall be incurred only to defer the cost of, such insurance for a period not to exceed one year and shall be payable in full not later than the end of such one year period, and

(n)        Permitted Investments to the extent constituting Indebtedness.

"Permitted Investments" means:

(a)        Investments in cash and Cash Equivalents,

(b)        advances made in connection with purchases of goods or services in the ordinary course of business,

(c)        Investments received in settlement of amounts due to any Borrower or any of their respective Subsidiaries effected in the ordinary course of business or owing to any Borrower or any of their respective Subsidiaries as a result of insolvency proceedings involving an Account

Debtor or upon the foreclosure or enforcement of any Lien in favor of any Borrower or any of their respective Subsidiaries,

(d)      guarantees permitted under the definition of Permitted Indebtedness,

(e)      Stock or other securities acquired in connection with the satisfaction or enforcement of Indebtedness or claims due or owing to any Borrower or any of their respective Subsidiaries (in bankruptcy of customers or suppliers or otherwise outside the ordinary course of business) or as security for any such Indebtedness or claims, and

(f)      deposits of cash made in the ordinary course of business to secure performance of operating leases.

"Permitted Liens" means (a) the Liens in favor of the Lender under the Loan Documents, (b) Permitted Senior Liens, (c) deposits or pledges of cash to secure obligations under workmen's compensation, social security or similar laws, or under unemployment insurance (but, excluding Liens arising under ERISA or, with respect to any Pension Plan or Multiemployer Plan, the Code) pertaining to any Borrower's or any of their respective Subsidiaries employees, (d) deposits or pledges of cash to secure bids, tenders, contracts (other than contracts for the payment of money or the deferred purchase price of property or services), leases, statutory obligations, surety and appeal bonds or other obligations of like nature arising in the ordinary course of business of any Borrower or any of their respective Subsidiaries, (e) Liens on Collateral, other than Accounts, for taxes or other governmental charges not at the time delinquent or thereafter payable without penalty or that are the subject of a Permitted Protest, (f) with respect to real estate, easements, rights of way, restrictions, minor defects or irregularities of title, none of which, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Loan Documents, materially affect the value or marketability of the Collateral, impair the use or operation of the Collateral for the use currently being made thereof or impair the Borrowers' ability to pay the Obligations in a timely manner or impair the use of the Collateral or the ordinary conduct of the business of any Borrower or any of their respective Subsidiaries and which, in the case of any real estate that is part of the Collateral, are set forth as exceptions to or subordinate matters in the title insurance policy accepted by Lender insuring the lien thereon, (g) Liens on the Collateral existing on the Closing Date and set forth on Schedule P-2, and (h) any Lien on any equipment securing Indebtedness permitted under clause (c) of the definition of Permitted Indebtedness; provided that such Lien attaches concurrently with or within twenty (20) days after the acquisition thereof.

"Permitted Protest" means the right of any Borrower or any of their respective Subsidiaries to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment, provided that (a) a reserve with respect to such obligation is established on any Borrowers' or any of their respective Subsidiaries' books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Borrower or such Subsidiary, as applicable, in good faith, and (c) Lender is reasonably satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Lender's Liens.

"Permitted Senior Liens" means (a) the Liens granted to the Senior Agent for its own benefit and the benefit of the Senior Lenders pursuant to the Senior Loan Documents and (b) all liens that, as of the Filing Date, have priority under applicable law over the Liens created under the Loan Documents, are not subordinated by agreement or applicable law, and are non-avoidable, valid, properly perfected and enforceable.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Personal Property Collateral" has the meaning specified in Section 9.1.

"Plan of Reorganization" means a chapter 11 plan for the Borrowers, that provides for, inter alia, payment in full in cash of all Obligations on the effective date thereof, together with releases, exculpations, waivers and indemnification, reasonably acceptable to Lender.

"Pledged Debt" shall mean all Indebtedness owed to any Borrower, including all Indebtedness described on Schedule P-3 under the heading "Pledged Debt" (as such Schedule may be amended or supplemented from time to time), issued by the obligors named therein, the instruments evidencing such Indebtedness, and all interest, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Indebtedness.

"Pledged Equity Interests" means all Pledged Stock, Pledged LLC Interests, Pledged Partnership Interests and Pledged Trust Interests.

"Pledged LLC Interests" means all interests in any limited liability company including, without limitation, all limited liability company interests listed on Schedule P-3 under the heading "Pledged LLC Interests" (as such schedule may be amended or supplemented from time to time) and the certificates, if any, representing such limited liability company interests and any interest of any Borrower on the books and records of such limited liability company or on the books and records of any securities intermediary pertaining to such interest and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such limited liability company interests.

"Pledged Partnership Interests" means all interests in any general partnership, limited partnership, limited liability partnership or other partnership including, without limitation, all partnership interests listed on Schedule P-3 under the heading "Pledged Partnership Interests" (as such schedule may be amended or supplemented from time to time) and the certificates, if any, representing such partnership interests and any interest of any Borrower on the books and records of such partnership or on the books and records of any securities intermediary pertaining to such interest and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such partnership interests.

"Pledged Stock" means all shares of capital stock owned by any Borrower, including, without limitation, all shares of capital stock described on Schedule P-3 under the heading "Pledged Stock" (as such schedule may be amended or supplemented from time to time), and the certificates, if any, representing such shares and any interest of any Borrower in the entries on the books of the issuer of such shares or on the books of any securities intermediary pertaining to such shares, and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares.

"Pledged Trust Interests" means all interests in a Delaware business trust or other trust including, without limitation, all trust interests listed on Schedule P-3 under the heading "Pledged Trust Interests"

(as such schedule may be amended or supplemented from time to time) and the certificates, if any, representing such trust interests and any interest of any Borrower on the books and records of such trust or on the books and records of any securities intermediary pertaining to such interest and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such trust interests.

"Proceeds" means (i) all "proceeds" as defined in Article 9 of the UCC, (ii) payments or distributions made with respect to any Investment Related Property and (iii) whatever is receivable or received when Collateral or proceeds are sold, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

"Professionals" shall mean the attorneys, accountants and other consultants retained by any Person to provide representation or advice in connection with the Bankruptcy Case and this Agreement or the transactions contemplated thereby or hereby.

"Real Property Collateral" has the meaning specified therefor in Section 9.1.

"Receivables" means all rights to payment, whether or not earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, including, without limitation all such rights constituting or evidenced by any Account, Chattel Paper, Instrument, General Intangible or Investment Related Property, together with all of any Borrower's rights, if any, in any goods or other property giving rise to such right to payment and all Collateral Support and Supporting Obligations related thereto and all Receivables Records.

"Receivables Records" means (i) all original copies of all documents, instruments or other writings or electronic records or other Records evidencing the Receivables, (ii) all books, correspondence, credit or other files, Records, ledger sheets or cards, invoices, and other papers relating to Receivables, including, without limitation, all tapes, cards, computer tapes, computer discs, computer runs, record keeping systems and other papers and documents relating to the Receivables, whether in the possession or under the control of any Borrower or any computer bureau or agent from time to time acting for any Borrower or otherwise, (iii) all evidences of the filing of financing statements and the registration of other instruments in connection therewith, and amendments, supplements or other modifications thereto, notices to other creditors or secured parties, and certificates, acknowledgments, or other writings, including, without limitation, lien search reports, from filing or other registration officers, (iv) all credit information, reports and memoranda relating thereto and (v) all other written or nonwritten forms of information related in any way to the foregoing or any Receivable.

"Record" shall have the meaning specified in Article 9 of the UCC.

"Release" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Materials into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Materials), including the movement of any Hazardous Materials through the air, soil, surface water or groundwater.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial

studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"Responsible Officer" means, with respect to any Person, any individual holding the position of, chief executive officer, chief restructuring officer or chief financial officer.

"Restricted Junior Payment" means to (a) declare or pay any dividend or make any other payment or distribution on account of Stock issued by any Borrower (including any payment in connection with any merger or consolidation involving any Borrower) or to the direct or indirect holders of Stock issued by any Borrower in its capacity as such, (b) purchase, redeem, or otherwise acquire or retire for value (including in connection with any merger or consolidation involving any Borrower) any Stock issued by any Borrower, or (c) declare, pay or agree to pay any management, advisory or similar fees or expenses.

"Sale" means the sale of all or substantially all of the Collateral to Lender or its designees or assignees, pursuant to a credit bid or otherwise by Lender, or such other higher and better bid which provides for the indefeasible and final payment in full, in cash, of the Obligations, and all other obligations to Lender, whether arising prior to, on, or after the Filing Date, upon the closing of such sale and no later than on the first Business Day on or after **[ ?]** after the Filing Date.

"Schedules" means those certain schedules annexed to this Agreement and made a part hereof.

"S&P" has the meaning specified in the definition of Cash Equivalents.

"SEC" means the United States Securities and Exchange Commission and any successor thereto.

"Securities" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"Securities Accounts" (i) means all "securities accounts" as defined in Article 8 of the UCC and (ii) includes all of the accounts listed on Schedule C-2 under the heading "Securities Accounts" (as such schedule may be amended or supplemented from time to time).

"Security Instruments" means all UCC financing statements filed in connection with the Loan Documents.

"Senior Agent" has the meaning set forth in the recitals.

"Senior Credit Agreement" has the meaning set forth in the recitals.

"Senior Loan Documents" means the Senior Credit Agreement and any and all notes, security instruments or other documents executed from time to time in connection with the Senior Credit Agreement.

"Senior Lenders" has the meaning set forth in the recitals.

"SOLIC Engagement Letter" means that certain letter agreement dated on or about the date hereof among SOLIC Capital Advisors, LLC, SOLIC Capital, LLC and the Borrowers.

"Stock" means all shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in a Person, whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"Subsidiary" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the shares of Stock having ordinary voting power to elect a majority of the board of directors (or appoint other comparable managers or governing body) of such corporation, partnership, limited liability company, or other entity.

"Supporting Obligation" means all "supporting obligations" as defined in Article 9 of the UCC.

"Termination Date" means the earliest to occur of (a) July 31, 2017, (b) the date of the indefeasible payment in full of the Loans and other Obligations, (c) 35 days after the Filing Date if the Final Order has not been entered by the Bankruptcy Court by such date, (d) the date upon which the Interim Order expires, unless the Final Order shall have been entered and become effective as of such date, (e) the date of entry of an order of the Bankruptcy Court confirming a plan of reorganization in the Bankruptcy Case that has not been consented to by the Lender and fails to provide for the payment in full in cash of all Obligations under this Agreement and the other Loan Documents on the effective date of such plan, (f) the date of the closing of a sale of all or substantially all of the Borrowers' assets pursuant to Section 363 of the Bankruptcy Code, (g) the date of entry of an order of the Bankruptcy Court converting the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code or dismissing the Bankruptcy Case, and (h) if a plan of reorganization that has been consented to by the Lender or that provides for the payment in full in cash of all of the Obligations under this Agreement and the other Loan Documents has been confirmed by the Bankruptcy Court, the earlier of the effective date of such plan of reorganization or the thirtieth day after the date of entry of such confirmation order.

"UCC" means the Texas Uniform Commercial Code, as in effect from time to time.

"United States" means the United States of America.

"Voidable Transfer" has the meaning specified in Section 14.7.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

1.2    **UCC.** Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided, however, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

1.3    **Accounting Terms.** Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP. Financial statements and other information required to be delivered by Borrowers to Lender pursuant to Section 5.1(a) shall be prepared in accordance with GAAP as in effect at the time of such preparation. Subject to the foregoing, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the Historical Financial Statements. To the extent there are any changes in GAAP from the date of this Agreement, if at any time such change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and Borrowers or Lender shall so request, Lender and

Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP; provided that, until so amended, such ratio or requirement shall continue to be computed in accordance with GAAP as in effect immediately prior to such change therein. Notwithstanding anything to the contrary contained in this Section or the definition of "Capital Lease," in the event of an accounting change requiring all leases to be capitalized, only those leases that would constitute Capital Leases on the Closing Date (assuming for purposes hereof that they were in existence on the Closing Date) shall be considered Capital Leases and all calculations and deliverables under this Agreement or any other Loan Document shall be made or delivered, as applicable, in accordance therewith (provided that together with all financial statements delivered to the Lender in accordance with the terms of this Agreement after the date of such accounting change, the Borrowers shall deliver a schedule showing the adjustments necessary to reconcile such financial statements with GAAP as in effect immediately prior to such accounting change).

1.4   **Interpretation, etc.**

(a)   Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.

(b)   References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided.

(c)   The use herein of the word "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not no limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.

(d)   The word "will" shall be construed to have the same meaning and effect as the word "shall."

(e)   Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as it was originally executed or as it may from time to time be amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (ii) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (iii) the words "hereof", "herein" and "hereunder" and words of similar import shall be construed to refer to this Agreement as a whole and not to any particular provision hereof, (iv) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time and (v) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(f)   Unless otherwise expressly stated, all time references herein shall be to Eastern Time.

## 2.   LOAN AND TERMS OF PAYMENT.

2.1   **Loan Commitments, Additional Loans and Borrowing Mechanics.**

(a)    **Loan Commitment**. During the Commitment Period, subject to the terms and conditions and in reliance on the representations and warranties of the Borrowers set forth herein, the Lender agrees to make Loans to the Borrowers in amounts such that the aggregate amount of the Loans made shall not exceed the Loan Commitment in effect from time to time. Such Loan amounts shall accrue interest thereon from the date such additional principal amounts are funded. Amounts borrowed pursuant to this Section 2.1 may not be repaid and reborrowed during the Commitment Period.

(b)    **Borrowing Mechanics**. Whenever Borrowers desire that Lender make a Loan, Borrowers shall deliver to Lender a Funding Notice no later than 11:00 a.m. at least one Business Day in advance of the proposed Credit Date specifying the amount of such requested Loan and the proposed Credit Date, executed by a Responsible Officer of each Borrower. The amount of such Loan requested shall not exceed the lesser of (i) the Loan Commitment then in effect minus the principal amount of all Loans made prior to the making of the requested Loan and (ii) the aggregate principal amount of Loans anticipated to be needed for the week that includes the proposed Credit Date, as set forth in the Budget, less the principal amount of Loans previously made during such week.

2.2    **Payments; Prepayments.**

(a)    **Payments by Borrower**. Except as otherwise expressly provided herein, all payments by Borrowers shall be made to the Loan Account for the account of Lender and shall be made in immediately available funds, no later than 4:00 p.m. on the date specified herein. Any payment received by Lender later than 4:00 p.m. shall be deemed to have been received on the following Business Day and any applicable interest or fees shall continue to accrue until such following Business Day.

(b)    **Apportionment and Application**. All payments remitted to Lender and all proceeds of Collateral received by Lender shall be applied as follows (unless otherwise directed by Lender):

(i)    <u>first</u>, to pay any Lender Expenses (including cost or expense reimbursements) in accordance with the Interim Order and the Final Order or indemnities then due to Lender under the Loan Documents, until paid in full,

(ii)    <u>second</u>, to pay any fees or premiums then due to Lender under the Loan Documents until paid in full,

(iii)    <u>third</u>, to pay accrued interest due in respect of the Loans until paid in full,

(iv)    <u>fourth</u>, to pay the principal of the Loans until paid in full,

(v)    <u>fifth</u>, to pay any other Obligations until paid in full, and

(vi)    <u>sixth</u>, to Borrowers or as otherwise required by applicable law.

In the event of a direct conflict between the priority provisions of this <u>Section 2.2</u> and any other provision contained in any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this <u>Section 2.2</u> shall control and govern.

(c)    **Optional Prepayments.** Borrowers may prepay the outstanding principal amount of the Loans at any time in whole or in part, without premium or penalty.

(d)    **Overadvances**. Borrowers shall from time to time prepay the Loans to the extent necessary so that the aggregate outstanding principal amount of the Loans shall not at any time exceed the Loan Commitment.

2.3    <u>**Interest Rates and Rates, Payments, and Calculations.**</u>

(a)    **Interest Rate.** All Obligations shall bear interest on the Daily Balance thereof at a fixed rate equal to 7.5% per annum.

(b)    **Default Rate.** Upon the occurrence and during the continuation of an Event of Default, all Obligations shall bear interest on the Daily Balance thereof at a per annum rate equal to four percentage points (4%) above the per annum rate otherwise applicable hereunder without any notice from Lender or any other Person.

(c)    **Payment.**  Interest, all other fees payable hereunder or under any of the other Loan Documents, and all costs, expenses, and Lender Expenses payable hereunder or under any of the other Loan Documents shall be due and payable, in arrears, on the first day of each month at any time that Obligations are outstanding. Borrowers hereby authorize Lender, from time to time without prior notice to Borrowers, to charge all interest and all other fees payable hereunder or under any of the other Loan Documents (in each case, as and when due and payable), all costs, expenses, and Lender Expenses payable hereunder or under any of the other Loan Documents (in each case, as and when due and payable), and all other payments as and when due and payable under any Loan Document to the Loan Account, which amounts thereafter shall constitute Obligations hereunder and shall accrue interest at the rate then applicable to the Loans. Any interest, fees, costs, expenses, Lender Expenses, or other amounts payable hereunder or under any other Loan Document not paid when due shall be compounded by being charged to the Loan Account and shall thereafter constitute Obligations hereunder and shall accrue interest at the rate then applicable to the Loans in accordance with the terms of this Agreement.

(d)    **Computation**. All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 365/366 day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue.

(e)    **Usury Savings Clause**. Notwithstanding any other provision herein, the aggregate interest rate charged or agreed to be paid with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Borrowers shall pay to Lender an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lender and Borrowers to conform strictly to any applicable usury laws. Accordingly, if Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to Borrowers. In determining whether the interest contracted for, charged, or received by Lender exceeds the Highest Lawful Rate, such Person may, to the extent

permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest, throughout the contemplated term of the Obligations hereunder.

2.4    **Crediting Payments; Clearance Charge.** The receipt of any payment item by Lender shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to the Loan Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment and interest shall be calculated accordingly. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Lender only if it is received into the Loan Account on a Business Day on or before 4:00 p.m. If any payment item is received into the Loan Account on a non-Business Day or after 4:00 p.m. on a Business Day, it shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day.

2.5    **Maintenance of Loan Account; Statements of Obligations.** Lender shall maintain the Loan Account on its books in the name of Borrowers on which Borrowers will be charged with the Loans and with all other payment Obligations hereunder or under the other Loan Documents including accrued interest, fees and expenses, and Lender Expenses. In accordance with Section 2.4, the Loan Account will be credited with all payments received by Lender from Borrowers or for Borrowers' account. Lender shall render monthly statements regarding the Loan Account to Borrowers, including principal, interest, fees, and including an itemization of all charges and expenses constituting Lender Expenses owing, and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and Lender.

2.6    **Maturity.**

(a)    All Obligations, including without limitation the outstanding unpaid principal balance and all accrued and unpaid interest on the Loans, shall be due and payable on the Termination Date. All principal of, interest on, and other amounts payable in respect of the Loans shall constitute Obligations.

(b)    The foregoing notwithstanding, Lender may terminate its obligations under this Agreement immediately upon the occurrence and during the continuation of an Event of Default.

2.7    **Effect of Maturity.** On the Termination Date, all Obligations immediately shall become due and payable without notice or demand. No termination of the obligations of Lender (other than payment in full of the Obligations) shall relieve or discharge Borrowers of their duties, Obligations, or covenants hereunder or under any other Loan Document and Lender's Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations have been paid in full. When all of the Obligations have been paid in full in cash, Lender will, at Borrowers' sole expense, execute and deliver any termination statements, lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, Lender's Liens and all notices of security interests and liens previously filed by Lender with respect to the Obligations.

2.8    **Lead Borrower.** Each Borrower hereby designates the Lead Borrower as its representative and agent for all purposes under the Loan Documents, including requests for Loans, delivery or receipt of communications, preparation and delivery of financial reports, receipt and payment of Obligations, requests for waivers, amendments or other accommodations, actions under the Loan

Documents (including in respect of compliance with covenants), and all other dealings with the Lender. The Lead Borrower hereby accepts such appointment.  The Lender shall be entitled to rely upon, and shall be fully protected in relying upon, any notice or communication (including any Funding Notice) delivered by the Lead Borrower on behalf of any other Borrower.  The Lender may give any notice or communication with a Borrower hereunder to the Lead Borrower on behalf of such Borrower.  Each Borrower agrees that any notice, election, communication, representation, agreement or undertaking made on its behalf by the Lead Borrower shall be binding upon and enforceable against it.

2.9    **Joint and Several Liability of Borrowers**  Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrower, with respect to the payment and performance of all of the Obligations, it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them. If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrower will make such payment with respect to, or perform, such Obligation until such time as all of the Obligations are paid in full.

## 3.    CONDITIONS TO THE CLOSING DATE.

3.1    **Conditions Precedent to the Closing Date.**

The obligation of the Lender to make the Loan on the Closing Date is subject to the satisfaction of the following conditions in a manner satisfactory to the Lender:

(a)    This Agreement and all Loan Documents and any other documents to be delivered in connection with the transactions contemplated by this Agreement shall have been delivered, executed, or recorded and shall be in form and substance satisfactory to Lender in its sole discretion.

(b)    Each Borrower shall have obtained any registrations, consents, approvals, notices, or other actions required by any Governmental Authority in connection with the execution, delivery, and performance by the Borrowers of the Loan Documents to which it is a party, and the consummation of the transactions contemplated by the Loan Documents.

(c)    Lender shall have received evidence, in form and substance satisfactory to Lender in its sole discretion that each Borrower shall have obtained all requisite consents and approvals in connection with the filing of the Bankruptcy Case and the execution, delivery and performance of this Agreement and the other Loan Documents.

(d)    Borrowers shall have filed their Bankruptcy Case in the Bankruptcy Court and each Borrower shall be a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code.

(e)    The Bankruptcy Court shall have entered the Interim Order, in form and substance satisfactory to Lender in its sole discretion, and such order shall be in full force and effect and shall not have been modified or amended (unless otherwise approved by Lender), reversed, stayed or subject to a motion for reargument or reconsideration, or appealed. The Borrowers and Lender shall be entitled to rely in good faith upon the Interim Order, and shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objections thereto, unless the relevant order has been stayed by a court of competent jurisdiction.

(f)     All first day motions and applications shall have been filed, and all orders with respect thereto and any other orders entered in the Bankruptcy Case prior to the Closing Date shall be in form and substance satisfactory to Lender in its sole discretion.

(g)     Lender shall have received the Initial Budget, in form and substance satisfactory to Lender in its sole discretion.

(h)     Lender shall have received the Historical Financial Statements.

(i)     All fees required to be paid on the Closing Date under this Agreement and the other Loan Documents shall have been paid (including, without limitation, all legal fees and expenses of Lender's counsel).

(j)     Lender shall have completed its business, legal, market and collateral due diligence, including (i) review of Material Contracts, (ii) UCC, tax lien, litigation and Intellectual Property searches, (iii) review of the Borrowers' and their respective Subsidiaries' books and records, in each case which shall be satisfactory to Lender in its sole discretion.

3.2    **Conditions Precedent to each Credit Extension.**

The obligation of the Lender to make a Loan on any Credit Date, including the Closing Date, are subject to the satisfaction, or waiver in accordance with Section 13, of each of the following conditions precedent:

(a)     Lender shall have received a fully executed and delivered Funding Notice.

(b)     Borrowers shall have complied fully and completely with all then applicable Chapter 11 Milestones set forth in Section 5.13 unless otherwise waived or consented to in writing by Lender.

(c)     Lender shall have received and approved in its sole discretion the most recent Budget required by Section 5.1(d).

(d)     The representations and warranties of the Borrowers contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

(e)     No action, proceeding, investigation, regulation or legislation shall have been instituted or threatened before any Governmental Authority to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of this Agreement or any of the other Loan Documents or the consummation of the transactions contemplated hereby and thereby and which, in Lender's sole judgment, would make it inadvisable to consummate the transactions contemplated by this Agreement or any of the other Loan Documents.

(f)     No Default or Event of Default shall have occurred and be continuing or shall result from the making of the Loan contemplated hereby.

## 4.    REPRESENTATIONS AND WARRANTIES.

In order to induce Lender to enter into this Agreement, each Borrower makes the following representations and warranties to Lender as of the Closing Date, and as of each Credit Date, and such representations and warranties shall survive the execution and delivery of this Agreement:

4.1    **Due Organization and Qualification; Subsidiaries.** Each Borrower (i) is duly formed and existing and in good standing under the laws of the jurisdiction of its formation, (ii) is qualified to do business in any state where the failure to be so qualified could reasonably be expected to result in a Material Adverse Change, and (iii) subject to any limitation under applicable bankruptcy law, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted and, upon the entry by the Bankruptcy Court of the Order, to enter into the Loan Documents and to carry out the transactions contemplated thereby.

4.2    **Due Authorization; No Conflict.**

Subject to the Bankruptcy Court's entry of the Orders:

(a)    The execution, delivery, and performance by each Borrower of the Loan Documents to which it is a party have been duly authorized by all necessary action on the part of such Borrower.

(b)    The execution, delivery, and performance by each Borrower of the Loan Documents to which it is a party do not and will not (i) violate any material provision of federal, state, or local law or regulation applicable to such Borrower, the Organizational Documents of such Borrower, or any order, judgment, or decree of any court or other Governmental Authority binding on such Borrower, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any Material Contract of any Borrower except to the extent that any such conflict, breach or default could not individually or in the aggregate reasonably be expected to result in a Material Adverse Change, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any Collateral of any Borrower, other than liens in favor of Lender, or (iv) require any approval of any Borrower's interest holders or any approval or consent of any Person under any Material Contract of any Borrower, other than consents or approvals that have been obtained and that are still in force and effect and except, in the case of Material Contracts, for consents or approvals, which the failure to obtain could not individually or in the aggregate reasonably be expected to result in a Material Adverse Change.

4.3    **Binding Obligations; Perfected Liens.** Subject to the Bankruptcy Court's entry of the Orders, each Loan Document has been duly executed and delivered by each Borrower and is the legally valid and binding obligation of each Borrower, enforceable against such Borrower in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally (regardless of whether such enforceability is considered in a proceeding at law or in equity).  Lender's Liens are validly created and perfected, subject to no prior Liens other than Permitted Senior Liens.

4.4    **Title to Assets; No Encumbrances.** Each Borrower has (i) good, sufficient and legal title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (iii) good title to (in the case of all other personal property), all of its properties and assets reflected in the Historical Financial Statements, in each case except for assets disposed of since the date of such financial statements in the ordinary course of business or as otherwise permitted under Section 6.4. Except as permitted by this Agreement, all such properties and assets are free and clear of Liens.

4.5 **Compliance with Laws; Permits.** To the knowledge of the Responsible Officers of each Borrower, Borrowers and each of their respective Subsidiaries are not (a) in violation of any applicable laws, rules, regulations, executive orders, or codes (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change, or (b) subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change. To the knowledge of the Responsible Officers of each Borrower, Borrowers and each of their respective Subsidiaries are in material compliance with, and have, all Permits required for the operation of their respective businesses, and for the execution, delivery and performance by, and enforcement against, Borrowers of each Loan Document. Neither Borrowers nor any of their respective Subsidiaries is in material breach of or default under the provisions of any such Permit, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both, would constitute or result in any of the foregoing.

4.6 **Fraudulent Transfer.** No transfer of property is being made by any Borrower or any of their respective Subsidiaries and no obligation is being incurred by any Borrower or any of their respective Subsidiaries in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of such Borrower or such Subsidiary.

4.7 **Intellectual Property.** Each Borrower and each of their respective Subsidiaries owns directly, or is entitled to use by license or otherwise, all Intellectual Property material to such Borrower's or such Subsidiary's business. All Intellectual Property material to such Borrower's and such Subsidiary's business is properly maintained, subsisting, in full force and effect and not in known conflict with the rights of any Person. Each Borrower and each of their respective Subsidiaries has made all filings and recordations necessary in the exercise of reasonable and prudent business judgment to protect its interest in its Intellectual Property. No actions, suits, proceedings or investigations are pending or, to the knowledge of any Borrower, threatened with respect to the validity, enforceability, infringement, use or ownership of any Borrower's or any of their respective Subsidiaries' Intellectual Property.

4.8 **Complete Disclosure.** All financial statements and other factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about the Borrowers' or any of their respective Subsidiaries' industry) furnished on or before the date hereof by or on behalf of any Borrower or any of their respective Subsidiaries in writing to Lender (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement or the other Loan Documents are true and accurate, in all material respects, on the date as of which such information is dated or certified and do not omit to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided.

4.9 **Patriot Act.** To the extent applicable, each Borrower and each of their respective Subsidiaries is in compliance with the (a) Trading with the Enemy Act and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V) and any other enabling legislation or executive order relating thereto, and (b) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001) (the "Patriot Act"). No part of the proceeds of any of the Loans will be used by any Borrower or any of their respective Subsidiaries or Affiliates, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone

else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

      4.10    **Payment of Taxes.** (a) All United States federal, state and other material tax returns and reports of each Borrower and each of their respective Subsidiaries required to be filed by any of them have been timely filed, and all taxes due with respect to the period covered by such tax returns and all material assessments, fees and other governmental charges upon any Borrower or any of their respective Subsidiaries that are due and payable, other than taxes that are the subject of a Permitted Protest, have been paid when due and payable, (b) each Borrower and each of their respective Subsidiaries have made adequate provision in accordance with GAAP for all material taxes not yet due and payable, and (c) no Borrower knows of any proposed tax assessment against any Borrower or any of their respective Subsidiaries with respect to United States federal or state taxes that is the subject of a Permitted Protest.

      4.11    **Governmental Regulation.** Neither Borrowers nor any of their respective Subsidiaries is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable. Neither Borrowers nor any of their respective Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

      4.12    **Budget.**  The Initial Budget represents the Borrowers' good faith estimate, on the date hereof, of the Borrowers' and their respective Subsidiaries' future performance for the periods covered thereby based upon the Borrowers' good faith assumptions believed by Borrowers to be reasonable at the time of the delivery thereof to Lender.

      4.13    **Environmental Matters.** Neither Borrowers nor any of their respective Subsidiaries nor any of their respective Facilities or operations are subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change. Neither Borrowers nor any of their respective Subsidiaries has received any letter or request for information under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9604) or any comparable state law. There are and, to each Borrowers' knowledge, have been, no conditions, occurrences, or Hazardous Materials Activities which could reasonably be expected to form the basis of an Environmental Claim against any Borrower or any of their respective Subsidiaries that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change. Neither Borrowers nor any of their respective Subsidiaries nor, to Borrowers' knowledge, any predecessor of any Borrower or any of their respective Subsidiaries has filed any notice under any Environmental Law indicating past or present treatment of Hazardous Materials at any Facility, and none of Borrowers' or any of their respective Subsidiaries' operations involves the generation, transportation, treatment, storage or disposal of hazardous waste, as defined under 40 C.F.R. Parts 260 270 or any state equivalent. Compliance with all current or reasonably foreseeable future requirements pursuant to or under Environmental Laws could not be reasonably expected to result in, individually or in the aggregate, a Material Adverse Change. No event or condition has occurred or is occurring with respect to any Borrower or any of their respective Subsidiaries relating to any Environmental Law, any Release of Hazardous Materials, or any Hazardous Materials Activity which individually or in the aggregate has resulted in, or could reasonably be expected to result in, a Material Adverse Change.

## 5.   AFFIRMATIVE COVENANTS.

Each Borrower covenants and agrees that, until payment in full of the Obligations, each Borrower shall, and shall cause each of their respective Subsidiaries to:

5.1   **Financial Statements, Reports, Certificates.** Provide to the Lender:

(a)   monthly consolidated unaudited consolidated balance sheet, cash flow and income statement of the Borrowers and their Consolidated Subsidiaries within thirty (30) days of month-end, certified by the chief financial officer of the Lead Borrower;

(b)   commencing on the first Wednesday to occur after the second Friday after the Filing Date and on each Wednesday of each week thereafter, (x) a report, in a form and substance sufficient to allow testing under Section 7 hereof and otherwise acceptable to Lender, showing Borrowers' actual cash receipts and disbursements for the preceding seven (7) day period of Saturday through Friday ending immediately prior to such Wednesday certified in writing by the Chief Financial Officer of Lead Borrower as being true and accurate in all material respects, together with a detailed reconciliation analysis of actual results compared to projected results for such period, and (y) a written explanation of all material variances;

(c)   commencing on the first Business Day after the Filing Date and on each Business Day thereafter, a daily cash report setting forth Liquidity for the immediately prior Business Day, in form and substance acceptable to Lender, certified by Responsible Officer of Lead Borrower as being true and accurate (the "Daily Cash Report");

(d)   commencing on the first Tuesday following the Closing Date, and continuing each successive Tuesday, Lead Borrower shall prepare and deliver an amendment to the Initial Budget that shall reflect projected cash receipts, operating disbursements, non-operating disbursements, professional fees and the then-current amount of the Loans outstanding on a weekly basis for the 13-week period beginning on such date and shall be in form and substance reasonably acceptable to the Lender. Subject to variances approved by Lender in its sole discretion, the expenditures authorized in the Budget shall be adhered to on a period basis and a cumulative basis and unused expenditures shall carry forward to successive weekly budget periods on a cumulative basis; and

(e)   promptly upon their becoming available, copies of (i) all financial statements, reports, notices and proxy statements sent or made available generally by Borrowers to their security holders acting in such capacity or by any Subsidiary of any Borrower to its security holders other than a Borrower or another Subsidiary of a Borrower, (ii) all press releases and other statements made available generally by any Borrower or any of their respective Subsidiaries to the public concerning material developments in the business of any Borrower or any of their respective Subsidiaries, and (iii) such other information and data with respect to any Borrower or any of their respective Subsidiaries as from time to time may be reasonably requested by Lender.

5.2   **Other Notices.** Provide to Lender each of the following:

(a)   Promptly upon any Responsible Officer of any Borrower obtaining knowledge (i) of any condition or event that constitutes a Default or an Event of Default or that notice has been given to any Borrower with respect thereto; (ii) that any Person has given any notice to any Borrower or any of their respective Subsidiaries or taken any other action with respect to any event or condition set forth in Section 8.1(c); or (iii) of the occurrence of any event or change that has resulted in, either individually or in the aggregate, a Material Adverse Change, a certificate of a Responsible Officer specifying the nature

and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action such Borrower has taken, is taking and proposes to take with respect thereto.

(b)     Promptly upon any Responsible Officer of any Borrower obtaining knowledge of (i) the institution of, or non-frivolous threat of, any Adverse Proceeding with asserted liabilities in excess of, or that could reasonably be expected to result in liabilities in excess of, $100,000, not previously disclosed in writing by the Borrowers to Lender, or (ii) any material development in any previously disclosed Adverse Proceeding that, in the case of either clause (i) or (ii), could be reasonably expected to result in a Material Adverse Change, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby, written notice thereof together with such other information as may be reasonably available to the Borrowers to enable Lender and its counsel to evaluate such matters.

(c)     Promptly (i)(A) after any Responsible Officer of any Borrower or any ERISA Affiliate knows or has reason to know that any ERISA Event has occurred, written notice thereof describing such ERISA Event and the action, if any, proposed to be taken with respect to such ERISA Event and a copy of any notice filed with the PBGC or the Internal Revenue Service pertaining to such ERISA Event and any notices received by such Borrower or such ERISA Affiliate from the PBGC or any other governmental agency with respect thereto, and (B)(1) after any Responsible Officer of any Borrower or any ERISA Affiliate knows or has reason to know of the existence of any Withdrawal Liability, (2) following the adoption of, or the commencement of contributions to, any Pension Plan subject to Section 412 of the Internal Revenue Code by any Borrower or any ERISA Affiliate, or (3) following the adoption of any amendment to a Pension Plan subject to Section 412 of the Internal Revenue Code which results in a material increase in contribution obligations of any Borrower or any ERISA Affiliate, a detailed written description thereof, and (ii) copies of such other documents or governmental reports or filings relating to any Pension Plan as Lender shall reasonably request.

(d)     Promptly, and in any event within 10 Business Days (i) after any Material Contract of any Borrower or any of their respective Subsidiaries is terminated or amended in a manner that is materially adverse to such Borrower or such Subsidiary, as the case may be, or (ii) after any new Material Contract is entered into, a written statement describing such event, with copies of such material amendments or new contracts, delivered to Lender (to the extent such delivery is permitted by the terms of any such Material Contract, provided, no such prohibition on delivery shall be effective if it were bargained for by the applicable Borrower or its applicable Subsidiary with the intent of avoiding compliance with this Section 5.2(d)), and an explanation of any actions being taken with respect thereto.

(e)     As soon as practicable following receipt thereof, copies of all environmental audits and reports with respect to environmental matters at any property of any Borrower or any of their respective Subsidiaries or which relate to any Environmental Liabilities of any Borrower or their respective Subsidiaries which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change.

(f)     With reasonable promptness, written notice of any change in the board of managers (or similar governing body) of any Borrower.

5.3     **Collateral Reporting.** Promptly to notify Lender if any material portion of the Collateral is damaged or destroyed.

5.4     **Existence.** Except as otherwise permitted under Section 6.3 or Section 6.4, at all times (a) maintain and preserve in full force and effect its existence (including being in good standing in its

jurisdiction of formation) and (b) maintain all its rights and franchises, licenses and permits, except where the failure to maintain any such rights and franchises, or licenses and permits, could not reasonably be expected to result in a Material Adverse Change.

5.5     **Maintenance of Properties And Intellectual Property; Permits.** Except where the failure to do so could not be expected to result in a Material Adverse Change, (a) maintain and preserve all of its assets that are necessary to the proper conduct of its business in good working order and condition, ordinary wear, tear, and casualty excepted and Permitted Dispositions excepted, (b) comply with the material provisions of all material leases to which it is a party as lessee, so as to prevent the loss or forfeiture thereof, unless such provisions are the subject of a Permitted Protest and (c) maintain, comply with and keep in full force and effect its Permits and its Intellectual Property, except as could not be expected to result in a Material Adverse Change.

5.6     **Taxes.** Cause all assessments and taxes imposed, levied, or assessed against any Collateral to be paid in full, before delinquency or before the expiration of any extension period, unless such assessment or tax is subject to a Permitted Protest.

5.7     **Inspection.** Permit Lender and each of its duly authorized representatives or agent to visit any of its properties and inspect any of its assets or books and records, to conduct appraisals and valuations, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers, employees, accountants and other advisors at such reasonable times and intervals as Lender may reasonably require and, so long as no Event of Default exists, with reasonable prior notice to Borrowers.

5.8     **Compliance with Laws.** Comply, and shall cause all other Persons, if any, on or occupying any Facilities to comply, with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority (including Environmental Laws), other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change.

5.9     **Environmental.**

(a)     Keep any property either owned or operated by any Borrower or any of their respective Subsidiaries free of any Environmental Liens or post bonds or other financial assurances sufficient to satisfy the obligations or liability evidenced by such Environmental Liens,

(b)     Comply with Environmental Laws and provide to Lender documentation of such compliance which Lender reasonably requests, except to the extent that any such failure to comply could not reasonably be expected to result in a Material Adverse Change,

(c)     Promptly notify Lender of any Release of which any Responsible Officer of any Borrower has knowledge of a Hazardous Material in any reportable quantity from or onto property owned or operated by any Borrower or any of their respective Subsidiaries that could reasonably be expected to result in a Material Adverse Change, and take any Remedial Actions required to abate said release or otherwise to come into compliance, in all material respects, with applicable Environmental Law (except to the extent that any such noncompliance could not reasonably be expected to result in a Material Adverse Change), and

(d)     Promptly, but in any event within one (1) Business Day of its receipt thereof, provide Lender with written notice of any of the following: (i) notice that an Environmental Lien has been filed against any of the real or personal property of any Borrower or any of their respective Subsidiaries,

(ii) commencement of any Environmental Action or written notice that an Environmental Action will be filed against any Borrower or any of their respective Subsidiaries, and (iii) written notice of a violation, citation, or other administrative order from a Governmental Authority.

5.10    **Further Assurances.** At any time upon the reasonable request of Lender, execute (if applicable) or deliver to Lender any and all financing statements, fixture filings, security agreements, pledges, assignments, indorsements of certificates of title, mortgages, deeds of trust, opinions of counsel, and all other documents (collectively, the "Additional Documents") that Lender may reasonably request in form and substance reasonably satisfactory to Lender, to create, perfect, and continue perfected or to better perfect Lender's Liens in all the Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), to create and perfect Liens in favor of Lender in any Collateral acquired by any Borrower or any of their respective Subsidiaries after the Closing Date, and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents. In furtherance and not in limitation of the foregoing, each Borrower shall take such actions as Lender may request from time to time to ensure that the Obligations are secured by substantially all of the assets of the Borrowers.

5.11    **Insurance.** The Borrowers will maintain or cause to be maintained, with financially sound and reputable insurers, (i) business interruption insurance reasonably satisfactory to Lender, and (ii) casualty insurance, such public liability insurance, third party property damage insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the Borrowers and their respective Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons and consistent with Borrowers' current insurance coverages. Without limiting the generality of the foregoing, the Borrowers will maintain or cause to be maintained (a) flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board of Governors of the Federal Reserve System, and (b) replacement value casualty insurance on the Collateral under such policies of insurance, with such insurance companies, in such amounts, with such deductibles, and covering such risks as are at all times carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses. Each such policy of insurance shall (i) name Lender as an additional insured thereunder as its interests may appear, and (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement, satisfactory in form and substance to Lender, that names Lender as the loss payee thereunder and provides for at least 30 days' prior written notice to Lender of any modification or cancellation of such policy.

5.12    **Use of Proceeds.** Each Borrower covenants and agrees that it shall use the proceeds of the Loans solely to the extent required to pay those expenses enumerated in the Budget as and when such expenses become due and payable.

5.13    **Chapter 11 Milestones.** Each Borrower shall:

(a)    No later than on the first Business Day on or after 35 days after the Filing Date, obtain the Final Order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Lender;

(b)    No later than on the first Business Day on or after July 31, 2017, in form and substance reasonably acceptable to Lender, consummate and finalize the restructuring or Sale.

**6.    NEGATIVE COVENANTS.**

Each Borrower covenants and agrees that, and without the prior consent of Lender, until payment in full of the Obligations, such Borrower will not, and shall ensure that their respective Subsidiaries will not, directly or indirectly, do any of the following:

6.1    **Indebtedness.** Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except for Permitted Indebtedness.

6.2    **Liens.** Create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

6.3    **Restrictions on Fundamental Changes.**

Except in connection with a Plan of Reorganization or a Sale approved by the Bankruptcy Court:

(a)    Enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its Stock,

(b)    Liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), or

(c)    Suspend or close a substantial portion of its or their business.

6.4    **Disposal of Assets.** Other than Permitted Dispositions, Permitted Investments, or transactions expressly permitted by Section 6.11, convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any Collateral held by any Borrower or any of their respective Subsidiaries..

6.5    **Change Name.** Change any Borrower's name, organizational identification number, state of organization or organizational identity.

6.6    **Nature of Business.** Make any change in the nature of its or their business as described in Schedule 6.6 or acquire any properties or assets that are not reasonably related to the conduct of such business activities; provided, however, that the foregoing shall not prevent any Borrower or any of their respective Subsidiaries from (i) engaging in any business that is reasonably related or ancillary to its or their business, or (ii) complying with any requirement of the Bankruptcy Code.

6.7    **Investments.** Make, acquire, or permit to exist any Investment other than Permitted Investments.

6.9    **Prepayments and Amendments.**

(a)    Prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness of any Borrower or any of their respective Subsidiaries, other than the Obligations in accordance with this Agreement or as may be directed by the Bankruptcy Court.

(b)    Make any payment on account of Indebtedness that has been contractually subordinated in right of payment if such payment is not permitted at such time under the subordination terms and conditions, or

(c)      Directly or indirectly, amend, modify, or change any material terms or provisions of:

        (i)      any agreement, instrument, document, indenture, or other writing evidencing or concerning Permitted Indebtedness other than the Obligations in accordance with this Agreement, to the extent such amendments, modifications, or changes, individually or in the aggregate, could not reasonably be expected to be adverse to the interests of Lender,

        (ii)      any Material Contract without the consent of Lender, in its reasonable discretion, or

        (iii)      the Organizational Documents of any Borrower.

6.10    **Change of Control.** Cause, permit, or suffer, directly or indirectly, any Change of Control.

6.11    **Restricted Junior Payment.** Make any Restricted Junior Payment.

6.12    **Accounting Methods.** Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

6.13    **Transactions with Affiliates.** Directly or indirectly enter into or permit to exist any transaction with any Borrower or any of their respective Subsidiaries or any Affiliate of any Borrower or any of their respective Subsidiaries (except for transactions that are (a) in the Ordinary Course of such Borrower's or such Subsidiary's business, including intercompany transactions among any Borrower or any of their respective Subsidiaries and their Affiliates; (b) upon fair and reasonable terms that are no less favorable to such Borrower or such Subsidiary than would be obtained in an arm's length transaction with a non-Affiliate, and (c) are fully disclosed to Lender) if they involve one or more payments by such Borrower or such Subsidiary in excess of $100,000 per year in the aggregate.

6.14    **Limitation on Capital Expenditures.** Except as set forth in the Budget, make or incur any Capital Expenditure.

6.15    **Sales and Lease Backs.** Become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Person (a) has sold or transferred or is to sell or to transfer to any other Person (other than any Borrower or any of their respective Subsidiaries), or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Person to any other Person (other than any Borrower or any of their respective Subsidiaries) in connection with such lease.

6.16    **Bankruptcy Case.** Seek, consent or suffer to exist or permit any of their respective Subsidiaries to seek, consent or suffer to exist (i) any modification, stay, vacation or amendment to the Orders; (ii) a priority claim for any administrative expense or unsecured claim against any Borrower or any of their respective Subsidiaries (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind specified in Section 503(b) or 507(b) of the Bankruptcy Code or, from and after the entry of the Final Order, Section 506(c) of the Bankruptcy Code) equal to or superior to the priority claim of Lender in respect to the Obligations; and (iii) any Lien on any Collateral having a priority equal or superior to the Liens in favor of Lender in respect of the Obligations other than Permitted Senior Liens.

6.17    **Plan.** Propose and/or support any plan or reorganization that fails to indefeasibly and finally satisfy all Obligations on the effective date of said plan either in cash or through a Sale or similar transfer of all or substantially all of the Collateral to Lender or its designees or assignee.

6.18    **Subsidiaries**. Neither any Borrower nor any of their respective Subsidiaries may form any direct or indirect Subsidiary or acquire any direct or indirect Subsidiary after the Closing Date without the consent of Lender.

## 7.    [INTENTIONALLY OMITTED]

## 8.    EVENTS OF DEFAULT.

8.1    **Event of Default.** Any one or more of the following events shall constitute an event of default (each, an "Event of Default") under this Agreement:

(a)    Failure to make Payments When Due. Failure by Borrowers to pay (i) the principal of and premium, if any, on any Loan whether at stated maturity, by acceleration or otherwise; or (ii) when due any interest on any Loan or any fee or any other amount due hereunder (including Lender Expenses) and, in the case of this clause (ii) such failure continues for more than five (5) days; or

(b)    Breach of Certain Covenants. Failure of any Borrower or any of their respective Subsidiaries to perform or comply with any term or condition contained in Sections 5.1, 5.2, 5.3, 5.4, 5.6, 5.9 and, 5.12, 5,13, or Section 6; or

(c)    Default in Other Agreements. (i) Failure of any Borrower or any of their respective Subsidiaries to pay when due any principal of or interest on one or more items of Indebtedness (other than Indebtedness referred to in Section 8.1(a)) in an individual principal amount of $500,000 or more or with an aggregate principal amount of $1,000,000 or more, in each case beyond the grace period, if any, provided therefor; or (ii) breach or default by such Borrower or any such Subsidiary with respect to any other term of (1) one or more items of Indebtedness in the individual or aggregate principal amounts referred to in clause (i) above, or (2) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness, in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; or

(d)    Breach of Representations, etc. Any representation, warranty, certification or other statement made or deemed made by the Borrowers in any Loan Document or in any statement or certificate at any time given by any Borrower or any of their respective Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(e)    Other Defaults Under Loan Documents. Any Borrower or any of their respective Subsidiaries shall default in the performance of or compliance with any term contained herein or any of the other Loan Documents, other than any such term referred to in any other Section of this Section 8.1, and such default shall not have been remedied or waived within 15 days after the earlier of (i) a Responsible Officer of such Borrower or such Subsidiary becoming aware of such default, or (ii) receipt by any Borrower of notice from Lender of such default; or

(f)     Loan Documents and Collateral Matters. At any time after the execution and delivery thereof, (i) this Agreement or any other Loan Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or Lender shall not have or shall cease to have a valid and perfected, first-priority (subject to Permitted Senior Liens and the Carve-Out) Lien in any Collateral purported to be covered by the Loan Documents, in each case for any reason other than the failure of Lender to take any action within its control, or (ii) any Borrower or any of their respective Subsidiaries shall contest the validity or enforceability of any Loan Document in writing or deny in writing that it has any further liability under any Loan Document; or

(g)     Bankruptcy Matters. The Bankruptcy Court enters any order, or any Borrower or any party in interest files a motion to seeks entry of an order, (i) amending, reversing, revoking, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Interim Order, the Final Order or any other order with respect to the Bankruptcy Case affecting in any material respect this Agreement or the Loan Documents, without Lender's consent, (ii) appointing a chapter 11 trustee or an examiner, with enlarged powers relating to the operation of the business pursuant to Section 1104 of the Bankruptcy Code (powers beyond those set forth in Section 1106(a)(3) and (4) and 1106(b) of the Bankruptcy Code) in the Bankruptcy Case, (iii) dismissing the Bankruptcy Case or converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, or (iv) granting relief from the automatic stay to any creditor holding or asserting a Lien or reclamation claim on the assets of the Borrowers to permit such creditor to foreclose upon or to reclaim Collateral with a value in excess of $100,000; or

(h)     Interim Order. If entry of the Interim Order, in form and substance reasonably satisfactory to Lender, is not made by the Bankruptcy Court within three (3) Business Days after the filing of the motion to approve the Interim Order; or

(i)     Collateral Matters in Bankruptcy. If a motion shall be filed (i) seeking to obtain additional financing under Section 364 of the Bankruptcy Code and to use cash collateral of Lender under Section 363(c) of the Bankruptcy Code without the consent of Lender, (ii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (iii) to take any other action or actions adverse to Lender or its rights and remedies hereunder or under any of the other Loan Documents or any of the documents evidencing or creating Lender's interest in any of the Collateral; or

(j)     Cash Collateral. If any Borrower uses cash collateral other than in accordance with the terms of an order approving its use entered by the Bankruptcy Court; or

(k)     Material Adverse Change. If any Material Adverse Change shall occur; or

(l)     Material Contracts. If there shall exist or have occurred a material violation, default or failure to perform, comply with or observe any term, provision, covenant or agreement under any Material Contract which is not cured by the later of (i) five (5) days after the date of receipt by a Responsible Officer of any Borrower of written notice of such violation, default or failure or after a Responsible Officer of any Borrower has knowledge thereof, and (ii) the expiration of any applicable cure period under the Material Contract, or if any Material Contract is terminated or otherwise not in full force and effect; or

(m)     Employee Benefit Plans. (i) There shall occur one or more ERISA Events which individually or in the aggregate results in or might reasonably be expected to result in liability of any

Borrower, any of their respective Subsidiaries or any of their respective ERISA Affiliates in excess of $250,000 during the term hereof; or (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest under Section 430(k) of the Internal Revenue Code or under Section 303(k) of ERISA; or

(n)     Dissolution. Any order, judgment or decree shall be entered against any Borrower or any of their respective Subsidiaries decreeing the dissolution or split up of such Person and such order shall remain undischarged or unstayed for a period in excess of 30 days; and

(1) upon the occurrence of any Event of Default described in Section 8.1(g) – (i), automatically and without notice to Borrowers, or (2) upon the occurrence of any other Event of Default, upon notice to Borrowers, the Loans , all interest thereon and all other Obligations payable under this Agreement and the other Loan Documents shall be forthwith due and payable.

8.2    **Rights and Remedies.** On the third Business Day after the Termination Date, and notwithstanding the provisions of Section 362 of the Bankruptcy Code, Lender may, by written notice to Borrowers, and in addition to any other rights or remedies provided for hereunder or under any other Loan Document (including, without limitation, the Order) or by the UCC or any other applicable law, do any one or more of the following:

(a)     declare the Obligations, whether evidenced by this Agreement or by any of the other Loan Documents immediately due and payable, whereupon the same shall become and be immediately due and payable, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by the Borrowers; and

(b)     obtain and liquidate the Collateral without the necessity for any further order from the Bankruptcy Court or any other court, or the initiation of any further proceeding with any Borrower, to be negotiated by Lender in good faith.

8.3    **Remedies Cumulative.** The rights and remedies of Lender under this Agreement, the other Loan Documents, and all other agreements shall be cumulative. Lender shall have all other rights and remedies not inconsistent herewith as provided under the UCC, by law, or in equity. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default shall be deemed a continuing waiver. No delay by Lender shall constitute a waiver, election, or acquiescence by it.

## 9.    PRIORITY AND COLLATERAL SECURITY.

9.1    **Grant of Security Interest**. As security for all Obligations, each Borrower hereby grants to the Lender a security interest in and continuing lien on all of such Borrower's right, title and interest in, to and under (1) all real property owned in fee or leased by any of the Borrowers, including as identified on Schedule 9.1 attached hereto and all fixtures and improvements located thereon and all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (all of which being hereinafter collectively referred to as the "Real Property Collateral"), and (2) all personal property of such Borrower including the following, in each case whether now owned or existing or hereafter acquired or arising and wherever located (all of which being hereinafter collectively referred to as the "Personal Property Collateral"):

(a)     Accounts;

(b)     Chattel paper, including electronic chattel paper or tangible chattel paper;

      (c)      Deposit Accounts;

      (d)      Documents;

      (e)      General Intangibles;

      (f)      Goods, including all Inventory and equipment (in each case, regardless of whether characterized as goods under the UCC);

      (g)      Instruments;

      (h)      Insurance;

      (i)      Intellectual Property;

      (j)      Investment Related Property;

      (k)      Letter of Credit Rights;

      (l)      Money;

      (m)      Receivables and Receivable Records;

      (n)      Commercial Tort Claims;

      (o)      to the extent not otherwise included above, all Collateral Records, Collateral Support and Supporting Obligations relating to any of the foregoing; and

      (p)      to the extent not otherwise included above, all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing.

      9.2    **Certain Limited Exclusions.** Notwithstanding anything herein to the contrary, in no event shall the Collateral include or the security interest granted under Section 9.1 attach to any lease, license, contract, property rights or agreement to which any Borrower is a party or any of its rights or interests thereunder if and for so long as the grant of such security interest shall constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of such Borrower therein or (ii) a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract property rights or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Section 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity); provided that the Collateral shall include and such security interest shall attach immediately at such time as the condition causing such abandonment, invalidation or unenforceability shall be remedied and to the extent severable, shall attach immediately to any portion of such lease, license, contract, property rights or agreement that does not result in any of the consequences specified in clause (i) or (ii) above. Notwithstanding the foregoing, the Collateral shall include any Proceeds, substitutions or replacements of any of the property described above (unless such Proceeds, substitutions or replacements would constitute property described above).

      9.3    **Collateral Security.**

(a)     Each Borrower warrants and covenants that, except as otherwise expressly provided in this paragraph, upon the entry of the applicable Order, the Obligations of each Borrower under the Loan Documents:

(i)     pursuant to Sections 361, 362, 364(c)(2), and 364(c)(3) of the Bankruptcy Code and the Security Instruments, shall at all times be secured by, and each Borrower hereby grants to Lender, a continuing, valid, binding, enforceable, non-avoidable and automatically properly perfected post-petition security interest and first priority (subject only to Permitted Senior Liens and the Carve-Out) Lien on all of such Borrower's rights in all rights, claims and other causes of action of such Borrower under Chapter 5 of the Bankruptcy Code and the proceeds thereof, including property received thereby whether by judgment, settlement or otherwise; and

(ii)     to the extent applicable, pursuant to Sections 364(d)(1) of the Bankruptcy Code, shall at all times be secured by, and each Borrower hereby grants to Lender, a continuing, valid, binding, enforceable, non-avoidable and automatically properly perfected post-petition security interest and first priority (subject only to Permitted Senior Liens and the Carve-Out) Lien on all of such Borrower's rights in the Collateral existing and after acquired, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Borrower, and any proceeds thereof.

(b)     Such Liens referred to in Section 9.1 shall be senior in priority to all other Liens on the assets and properties of such Borrower other than Permitted Senior Liens and the Carve-Out.

(c)     The amounts received by Borrowers under this Agreement may not be used to investigate or challenge the validity, perfection, priority, extent or enforceability of any Loan Document, or the Liens or security interests granted thereunder.

9.4     **No Discharge; Survival of Claims.** Pursuant to Section 1141(d)(4) of the Bankruptcy Code, each Borrower hereby waives any discharge of the Obligations with respect to any plan of reorganization that shall not provide for the payment in full in cash of the Obligations (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) under this Agreement.

9.5     **Power of Attorney.** Each Borrower hereby irrevocably appoints the Lender (such appointment being coupled with an interest) as such Borrower's attorney-in-fact, with full authority in the place and stead of such Borrower and in the name of such Borrower from time to time in the Lender's discretion to take any action and to execute any instrument that the Lender may deem reasonably necessary or advisable to accomplish the purposes of this Agreement, including the following:

(a)     upon the occurrence and during the continuance of any Event of Default, to obtain and adjust insurance required to be maintained by the Borrowers or paid to the Lender pursuant to the Loan Documents;

(b)     upon the occurrence and during the continuance of any Event of Default, to ask for, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(c)     upon the occurrence and during the continuance of any Event of Default, to receive, indorse and collect any drafts or other instruments, documents and chattel paper in connection with clause (b) above;

-38-

(d)     upon the occurrence and during the continuance of any Event of Default, to file any claims or take any action or institute any proceedings that the Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Lender with respect to any of the Collateral;

(e)     to prepare and file any UCC financing statements against each Borrower as debtor;

(f)     to prepare, sign, and file for recordation in any intellectual property registry, appropriate evidence of the lien and security interest granted herein in the Intellectual Property in the name of each Borrower as debtor;

(g)     upon the occurrence and during the continuance of an Event of Default, to take or cause to be taken all actions necessary to perform or comply or cause performance or compliance with the terms of this Agreement, including access to pay or discharge taxes or Liens (other than Permitted Liens) levied or placed upon or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be reasonably determined by the Lender, any such payments made by the Lender to become obligations of such Borrower to the Lender, due and payable immediately without demand;

(h)     upon the occurrence and during the continuance of an Event of Default, generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Lender were the absolute owner thereof for all purposes; and

(i)     to do, at the Lender's option and the Borrowers' expense, at any time or from time to time, all acts and things that the Lender deems reasonably necessary to protect, preserve or realize upon the Collateral and the Lender's security interest therein in order to effect the intent of this Agreement, all as fully and effectively as any Borrower might do.

## 10.    WAIVERS; INDEMNIFICATION.

10.1    **Demand; Protest; etc..** Each Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by Lender on which any Borrower may in any way be liable.

10.2    **Lender's Liability for Collateral.** Each Borrower hereby agrees that: (a) so long as Lender complies with its obligations, if any, under the UCC, Lender shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by such Borrower, except any thereof resulting from the gross negligence, bad faith or willful misconduct of Lender as finally determined by a court of competent jurisdiction.

10.3    **Indemnification.** Each Borrower shall pay, indemnify, defend, and hold the Lender and the other Lender-Related Persons (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable and documented out-of-pocket fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification

(as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them in connection with or as a result of or related to the execution and delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of the Borrowers' or any of their respective Subsidiaries' compliance with the terms of the Loan Documents (each and all of the foregoing, the "Indemnified Liabilities"). The foregoing to the contrary notwithstanding, no Borrower shall have any obligation to any Indemnified Person under this Section 11.3 with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence, fraud or willful misconduct of such Indemnified Person or its officers, directors, employees, attorneys, or agents. This provision shall survive the termination of this Agreement and the repayment of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which any Borrower was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by such Borrower with respect thereto. **WITHOUT LIMITATION, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON.**

10.4    **General Release; Covenant Not to Sue; Reservation of Certain Third Party Rights.**

(a)    **EACH BORROWER, ON BEHALF OF ITSELF ITS AGENTS, REPRESENTATIVES, SUBSIDIARIES, HEIRS, SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE "RELEASORS"), HEREBY FOREVER WAIVES, RELEASES, HOLDS HARMLESS, ACQUITS AND DISCHARGES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE LENDER AND OTHER LENDER-RELATED PERSONS (COLLECTIVELY, THE "RELEASEES") FROM ANY AND ALL CLAIMS, LOSSES, LIABILITIES, DAMAGES, INTERESTS AND CAUSES OF ACTION OF ANY KIND OR NATURE BY, ON BEHALF OF, OR THROUGH THE BORROWER (COLLECTIVELY, THE "CLAIMS") THAT THE BORROWER HAS, HAD OR MAY HAVE AGAINST ANY OF THE RELEASEES BASED ON FACTS ARISING ON OR BEFORE THE DATE HEREOF THAT RELATE TO: (I) THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE PREPETITION LOANS OR FINANCINGS PROVIDED BY LENDER OR OTHER LENDER-RELATED PERSONS TO THE BORROWERS (DIRECTLY OR INDIRECTLY), OR OTHER TRANSACTIONS OR DEALINGS BETWEEN ANY BORROWER, ON THE ONE HAND, AND THE LENDER OR ANY OTHER SUCH LENDER-RELATED PERSON ON THE OTHER HAND (II) ANY TRANSACTION, ACTION OR OMISSION CONTEMPLATED HEREBY OR THEREBY OR (III) ANY ASPECT OF THE DEALINGS OR RELATIONSHIPS BETWEEN OR AMONG THE RELEASORS, ON THE ONE HAND, AND THE RELEASEES, ON THE OTHER HAND, RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR SUCH PREPETITION LOANS AND FINANCINGS OR ANY OTHER TRANSACTION, ACTION, DEALINGS OR OMISSION CONTEMPLATED HEREBY OR THEREBY.   THE PROVISIONS OF THIS SECTION 10.4 SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT.**

(b)    **To the fullest extent permitted by law, each Borrower, on behalf of itself and the other Releasors, hereby unconditionally and irrevocably agrees that it will not sue any Releasee on the basis of any Claim released, remised and discharged by any Releasor pursuant to Section 10.4(a) above.  If any Borrower or other Releasor violates the foregoing covenant, each of the Borrowers, for itself and the other Releasors (as applicable), agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.**

(c)    Notwithstanding the preceding, nothing herein or in the Final Order or the **Loan Documents shall prejudice the rights of any Committee, a successor trustee and any other party in interest with requisite standing other than the Debtor, to seek to object to or to challenge the Claims being released by the Releasors in Section 10.4(a) above.  Within 75 days of the date of entry of the Final Order, a party, including the Committee, must commence, as appropriate, a contested matter or adversary proceeding raising such claim, or must file a motion seeking standing; provided, however, that any such actions or claims must be brought and, where applicable standing obtained, no later than the earlier of (a) 120 days from the entry of the Final Order or (b) June 30, 2017 (the "Challenge Period"). The Challenge Period may only be extended with the written consent of the Lender (without need for Court Order or notice), or by order of the Court after notice and a hearing.  Upon the expiration of such applicable Challenge Period, to the extent not otherwise waived or barred: (A) any and all such claims by any party (including, without limitation, any Committee, any Chapter 11 trustee, and/or any examiner appointed in this Bankruptcy Case, and any Chapter 7 trustee and/or examiner appointed in any Successor Case), shall be deemed to be forever waived and barred.  The Final Order shall contain an injunction barring any Claims being asserted, or sought to be asserted, unless the conditions for bringing such Claims during the Challenge Period are met.**

## 11.    NOTICES.

All notices or demands relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or facsimile. In the case of notices or demands to any Borrower hereunder or any service of process to any Borrower or Lender, as the case may be, they shall be sent to the respective address set forth below:

| | |
|---|---|
| If to any Borrower: | c/o Cardiovascular Care Group, Inc.<br>3322 West End Avenue, 11th Floor<br>Nashville, Tennessee 37203<br>Attn: Robert Stillwell<br>Facsimile: 615-515-9891<br>Email: rstillwell@cvcaregroup.com |
| with a copy to:<br>(which shall not<br>constitute notice) | Louisiana Medical Center and Heart Hospital<br>64030 LA-434<br>Lacombe, Louisiana 70445<br>Attn:  Neil Luria<br>Facsimile: 801-751-9537<br>Email: nluria@soliccapital.com |
| with a copy to:<br>(which shall not<br>constitute notice) | Alston & Bird LLP<br>2828 North Harwood Street, Suite 1800<br>Dallas, Texas 75201<br>Attn: Stacie L. Cargill<br>Facsimile: 615-515-9891<br>Email: stacie.cargill@alston.com |

|                      |                                      |
|----------------------|--------------------------------------|
| If to Lender:        | MedCare Investment Fund V, L.P.      |
|                      | Attn: Thomas W. Lyles, Jr.           |
|                      | 115 N Loop 1604 E, Suite 2207        |
|                      | San Antonio TX 78232                 |
|                      |                                      |
| with copies to:      | Miller, Egan, Molter & Nelson LLP    |
| (which shall not     | 221 West 6th Street, Suite 700       |
| constitute notice)   | Austin, Texas 78701                  |
|                      | Attn: Matthew R. Bair, Esq.          |
|                      | Email: matt.bair@milleregan.com      |

And

Dykema Cox Smith PLLC
Comerica Bank Building
1717 Main Street, Suite 4200
Dallas, Texas 75201
Attn: Mark Andrews
Facsimile: 214-462-6401
Email: mandrews@dykema.com

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this <u>Section 12</u>, shall be deemed received on the earlier of the date of actual receipt or three (3) Business Days after the deposit thereof in the mail; <u>provided</u>, <u>that</u> (a) notices sent by overnight courier service shall be deemed to have been given when received, (b) notices by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, they shall be deemed to have been given at the opening of business on the next Business Day for the recipient) and (c) notices by electronic mail shall be deemed received when sent. If any notice, disclosure, or report is required to be delivered pursuant to the terms of this Agreement on a day that is not a Business Day, such notice, disclosure, or report shall be deemed to have been required to be delivered on the immediately following Business Day.

### 12.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.

(a)    THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.

(b)    THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN SAN ANTONIO, TEXAS; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH BORROWER AND THE LENDER WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF <u>FORUM</u> <u>NON</u> <u>CONVENIENS</u> OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE

WITH THIS <u>SECTION 13(b)</u>; <u>PROVIDED, FURTHER, HOWEVER</u>, THAT ALL PARTIES HEREBY AGREE THAT THEY HAVE CONSENTED TO THE JURISDICTION OF THE BANKRUPTCY COURT.

(c)　　TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH BORROWER AND THE LENDER HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. BORROWER AND LENDER REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

### 13.　　AMENDMENTS; WAIVERS; SUCCESSORS; INDEMNIFICATION.

13.1　　<u>**Amendments and Waivers.**</u>

No amendment, waiver or other modification of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Borrower therefrom, shall be effective unless the same shall be in writing and signed by the Lender and each Borrower and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given.

13.2　　<u>**No Waivers; Cumulative Remedies.**</u> No failure by Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Lender in exercising the same, will operate as a waiver thereof. No waiver by Lender will be effective unless it is in writing, and then only to the extent specifically stated. No waiver by Lender on any occasion shall affect or diminish Lender's rights thereafter to require strict performance by the Borrowers of any provision of this Agreement. Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Lender may have.

13.3　　<u>**Successors.**</u> This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; <u>provided</u>, <u>however</u>, the Borrowers may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely void *ab initio*. No consent to assignment by Lender shall, unless otherwise provided in such consent, release the Borrowers from their Obligations. Lender may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder or assign the Loans or its Loan Commitment (in whole or in part) to an affiliate without notice to or consent of the Borrowers.

13.4　　<u>**Costs and Expenses; Indemnification.**</u> Lender may incur Lender Expenses for the performance and fulfillment of its functions, powers, and obligations pursuant to the Loan Documents, including court costs, attorney's fees and expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral. The Borrowers shall promptly pay and reimburse the Lender for all reasonable and documented out-of-pocket expenses (including, but not limited to, reasonable legal fees and expenses and expenses incurred in connection with due diligence, travel, courier, reproduction, printing and delivery expenses) of the Lender associated with the preparation, execution, delivery, administration, amendment, waiver or modification

(including proposed amendments, waivers or modifications) of the Loan Documents. The undertaking in this Section shall survive the payment of all Obligations hereunder.

## 14.    GENERAL PROVISIONS.

14.1    **Effectiveness.** This Agreement shall be binding and deemed effective when executed by the Borrowers and Lender.

14.2    **Section Headings.** Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

14.3    **Interpretation.** Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against Lender or the Borrowers, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

14.4    **Severability of Provisions.** Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

14.5    **Debtor-Creditor Relationship.** The relationship between Lender and the Borrowers is solely that of creditor and debtor. Lender does not have (and shall not be deemed to have) any fiduciary relationship or duty to Borrowers arising out of or in connection with the Loan Documents or the transactions contemplated thereby.

14.6    **Counterparts; Electronic Execution.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by facsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

14.7    **Revival and Reinstatement of Obligations.** If the incurrence or payment of the Obligations by the Borrowers or the transfer to Lender of any property should for any reason subsequently be asserted, or declared, to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "Voidable Transfer"), and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Lender is required or elects to repay or restore, and as to all reasonable out-of-pocket costs, expenses, and attorney's fees of Lender related thereto, the liability of the Borrowers automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

14.8    **Lender Expenses.** The Borrowers agree to pay any and all Lender Expenses promptly after demand therefor by Lender and agree that its respective obligations contained in this Section 14.8 shall survive payment or satisfaction in full of all other Obligations.

14.9    **USA PATRIOT Act.** Lender hereby notifies the Borrowers that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of each Borrower and other information that will allow Lender to identify each Borrower in accordance with the Patriot Act.

14.10    **Integration.** This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

[Signature pages follow.]

**IN  WITNESS  WHEREOF,** the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**BORROWERS:**                          **LOUISIANA MEDICAL CENTER AND HEART HOSPITAL, LLC**
a North Carolina limited liability company, as a Borrower


By: _____
Name:
Title:

**LMCHH PCP LLC**
a Delaware limited liability company, as a Borrower


By: _____
Name:
Title:

**LENDER:**                          **MEDCARE INVESTMENT FUND V, L.P.**
                                     a Delaware limited partnership

                                     By:   MedCare Fund V GP, L.L.C.,
                                           Its General Partner


                                     By: _____
                                     Name:  Thomas W. Lyles, Jr.
                                     Title:  Manager

**SCHEDULE A-1**

**LOAN ACCOUNT**

**SCHEDULE C-1**

**COMMERCIAL TORT CLAIMS**

**SCHEDULE C-2**

**COMMODITIES ACCOUNTS; DEPOSIT ACCOUNTS AND SECURITIES ACCOUNTS**

## SCHEDULE P-1

## PERMITTED INDEBTEDNESS

**SCHEDULE P-2**

**PERMITTED LIENS**

**SCHEDULE P-3**

**PLEDGED DEBT AND EQUITY**

**SCHEDULE 9.1**
(Real Estate Collateral)


**In addition to any leasehold interests held by Borrowers, all of which are also intended to be part of the Collateral, the Collateral shall include the land commonly known as Louisiana Heart Hospital located at 64030 Highway 434, Lacombe, St. Tammany Parish, Louisiana 70445, the legal description of which is believed to be as follows**:


<u>**Tract 1**</u>

A certain parcel of land situated in **SECTIONS 8 AND 17, TOWNSHIP 8 SOUTH, RANGE 13 EAST, ST**. **TAMMANY PARISH, LOUISIANA**, designated as the Louisiana Heart Hospital Site and more fully described as follows:

Commence at the Section corner common to Sections 7, 8, 17 and 18, Township 8 South, Range 13 East, and measure East, a distance of 2641.00 feet to a point; thence South 00 degrees 59 minutes 07 seconds East a distance of 284.39 feet to the POINT OF BEGINNING.

From the POINT OF BEGINNING continue South 00 degrees 59 minutes 07 seconds East a distance of 986.28 feet to a point on the northerly line of a 30' United Gas Pipeline Co. Servitude; thence along said northerly line, North 59 degrees 18 minutes 11 seconds West, a distance of 1270.98 feet to a point on the proposed easterly right of way line of Louisiana State Highway No. 434; thence along said easterly line, North 30 degrees 54 minutes 01 seconds East, a distance of 1100.35 feet to a point on the southerly line of the Fire Department Site; thence along said southerly line, South 61 degrees 05 minutes 26 seconds East, a distance of 363.00 feet to a point on the easterly line of the Fire Department Site; thence along said easterly line, North 30 degrees 54 minutes 01 seconds East, a distance of 120.07 feet to a point on the southerly line of a 125' CLECO Servitude; thence along said southerly line, South 61 degrees 05 minutes 26 seconds East, a distance of 387.45 feet to a point; thence South 30 degrees 54 minutes 01 seconds West a distance of 404.53 feet to the POINT OF BEGINNING.

**LESS AND EXCEPT THE FOLLOWING TWO PARCELS:**

<u>Parcel 1</u> (Medical Office Building-Centex), sold to CC Lacombe, LLC by Sale of Property recorded on September 9, 2003, in CIN 1391009, records of St. Tammany Parish, Louisiana.

One certain portion of ground situated in Sections 8 & 17, Township 8 South, Range 13 East, St. Tammany Parish, State of Louisiana, at the Louisiana Heart Hospital Site, designated as the Medical Office Building Site and being more fully described as follows:

Commence at the corner common to Sections 7, 8, 17 & 18 Township 8 South, Range 13 East, and measure along the line common to Sections 8 & 17, East, a distance of 1942.01 feet to a point on the proposed easterly right of way line of Louisiana State Highway No. 434; thence along said easterly line, North 30 degrees 54 minutes 01 seconds East, a distance of 120.08 feet to a point; thence South 59 degrees 07 minutes 26 seconds East, a distance of 243.09 feet to the POINT OF BEGINNING.

From the POINT OF BEGINNING measure North 30 degrees 52 minutes 34 seconds East, a distance of 42.98 feet to a point; thence South 59 degrees 07 minutes 26 seconds East a distance

of 164.92 feet to a point; thence South 30 degrees 52 minutes 34 seconds West a distance of 119.92 feet to a point; thence North 59 degrees 07 minutes 26 seconds West a distance of 49.03 feet to a point; thence South 30 degrees 52 minutes 34 seconds West a distance of 8.38 feet to a point; thence North 59 degrees 07  minutes 26 seconds West a distance of 41.52 feet to a point; thence North 30 degrees 52 minutes 34 seconds East a distance of 8.38 feet to a point; thence North 59 degrees 07 minutes 26 seconds West a distance of 74.37 feet to a point; thence North 30 degrees 52 minutes 34 seconds East a distance of 76.94 feet to the POINT OF BEGINNING.

Said portion of ground contains 0.4620 Acres.

Parcel 2 (Utility Site), sold to Southeastern La. Water and Sewer Co., LLC, by Act of Sale recorded on February 14, 2005, in CIN 1477772, records of St. Tammany Parish, Louisiana, as amended by Amendment and Modification to Act of Sale recorded on February 4, 2010, in CIN 1757385, records of St. Tammany Parish, Louisiana.

A certain parcel of ground situated in Section 17, Township 8 South, Range 13 East, St. Tammany Parish, Louisiana, at the Louisiana Heart Hospital Site, designated as a 0.352 Acre utility site and being more fully described as follows:

Commence at the corner common to Sections 7, 8, 17 and 18, Township 8 South, Range 13 East and measure East, a distance at 1942.01 feet to a point on the proposed easterly right of way line of La. State Highway No. 434, thence leaving said right of way line, measure South 60 degrees 58 minutes 40 seconds East, a distance of 648.01 feet to the POINT OF BEGINNING.

From the POINT OF BEGINNING, measure South 59 degrees 59 minutes 50 seconds East, a distance of 108.02 feet; thence South 30 degrees 11 minutes 49 seconds West, a distance of 141.84 feet; thence North 59 degrees 59 minutes 50 seconds West, a distance of 108.02 feet; thence North 30 degrees 11 minutes 49 seconds East, a distance of 141.84 feet back to the POINT OF BEGINNING.

Said parcel contains 0.352 Acres.

**FURTHER LESS AND EXCEPT THE FOLLOWING PARCEL,** conveyed to Southeastern Louisiana Water & Sewer Co., L.L.C., by Quitclaim Deed recorded on January 25, 2010, in CIN 1756208, records of St. Tammany Parish, Louisiana.

> All that certain parcel of ground situated in Section 17, Township 8 South, Range 13 East, ST. Tammany Parish, Louisiana and being more fully described as follows:
>
> Commence at the corner common to Sections 7, 8, 17 and 18, Township 8 South, Range 13 East and go East, a distance of 1942.01 feet to a point and the proposed right-of-way line of Louisiana State Highway No. 434; thence leaving said right-of-way line go South 60 degrees 58 minutes 40 seconds East, a distance of 648.01 to the POINT OF BEGINNING;
>
> From the POINT OF BEGINNING, run South 59 degrees 59 minutes 50 seconds East for a distance of 138.00 feet; thence run South 30 degrees 11 minutes 49 seconds West, for a distance of 187.00 feet; thence run North 59 degrees 59 minutes 50 seconds West, for a

CHI 66788633v4

EAST\135011618.3

LEGAL02/36951168v4

distance of 138.00 feet; thence run North 30 degrees 11 minutes 49 seconds East, for a distance of 187.00 feet back to the POINT OF BEGINNING.

Said parcel of land contains 0.59 acres or 25,805.85 sq. feet more or less.

**FURTHER LESS AND EXCEPT THE FOLLOWING PARCE**L, leased by Louisiana Heart Hospital, LLC, as Landlord, to LA Heart MOB, L.P., as Tenant, per Memorandum of Ground Lease recorded on July 6, 2007, in CIN 1631429, as modified by Amendment to Notice of Ground Lease between Louisiana Medical Center and Heart Hospital, LLC, as Landlord, and LA Heart MOB, LP, as Tenant, recorded on March 27, 2008, in CIN 1674728, records of St. Tammany Parish, Louisiana:

A portion of a certain 24.42 acre tract of land being situated in Sections 8 & 17, Township 8 South, Range 13 East; St. Tammany Parish, Louisiana and more fully described as follows:

Commencing at a found ½" iron rod at the southeast corner of the aforementioned 24.42 acre tract; thence run along the North line of a 30 foot gas line right-of-way (COB 117, folio 317) North 59 degrees 18 minutes 11 seconds West for a distance of 772.97 feet to a point; thence run North 30 degrees 41 minutes 49 seconds East a distance of 84.53 feet to the POINT OF BEGINNING.

From the POINT OF BEGINNING, run North 59 degrees 18 minutes 11 seconds West for a distance of 218.00 feet to a point; thence run North 30 degrees 41 minutes 49 seconds East for a distance of 104.00 feet to a point; thence run South 59 degrees 18 minutes 11 seconds East for a distance of 218.00 feet to a point; thence run South 30 degrees 41 minutes 49 seconds West for a distance of 104.00 feet back to the Point of Beginning.

Said Tract of land contains 0.52 acres more or less.

## Tract 2

THAT CERTAIN SERVITUDE ESTATE for the benefit of Tract 1, created by the Reciprocal Easement and Restrictive Covenants Agreement between Louisiana Heart Hospital, LLC, and CC Lacombe, LLC, recorded on September 9, 2003, in CIN 1391010, records of St. Tammany Parish, Louisiana, affecting the property therein described.

## Tract 3

**THAT CERTAIN RIGHT OF USE** for the benefit of **Tract 1,** created in the Act of Dedication and Donation between Louisiana Heart Hospital, LLC, and The Parish of St. Tammany, recorded on April 22, 2002, in CIN 1298786, records of St. Tammany Parish, Louisiana, affecting the following described property:

**A CERTAIN PIECE OR PORTION OF LAND,** situated in **Sections 8 and 17, Township 8 South, Range 13 East, St. Tammany Parish, Louisiana,** and more fully described as follows, to-wit:

- 11 -

Commence at the section corner common to Sections 7, 8, 17 and 18, Township 8 South, Range 13 East, and measure East a distance of 2,641.00 feet; thence go South 00 degrees 59 minutes 07 seconds East a distance of 1,270.67 feet; thence go North 59 degrees 18 minutes 11 seconds West a distance of 1,270.98 feet to the POINT OF BEGINNING.

From the POINT OF BEGINNING continue North 59 degrees 18 minutes 11 seconds West a distance of 50.00 feet; thence go North 30 degrees 54 minutes 01 seconds East a distance of 1,218.86 feet; thence go South 61 degrees 05 minutes 26 seconds East a distance of 50.03 feet; thence go South 30 degrees 54 minutes 01 seconds West a distance of 1,220.42 feet back to the POINT OF BEGINNING, and containing 1.40 acres of land, more or less, all as per survey and plat numbered A01-190-1 by Kelly J. McHugh and Associates, Inc. dated 20th July, 2001, last revised 4th March, 2002, a copy of which is recorded as Map File No. 2302, in MIN 1298780, records of St. Tammany Parish.

CHI 66788633v4

EAST\135011618.3

LEGAL02/36951168v4

# EXHIBIT B

## **Budget**

**DIP BUDGET**
**CONSOLIDATED LOUISIANA HEART HOSPITAL, LLC ("LHH")**
**AND LOUISIANNA HEART MEDICAL GROUP ("LHMG")**
As of: 1/30/2017
(Whole $)

| Period # | 1 Forecast 2/5/2017 | 2 Forecast 2/12/2017 | 3 Forecast 2/19/2017 | 4 Forecast 2/26/2017 | 5 Forecast 3/5/2017 | 6 Forecast 3/12/2017 | 7 Forecast 3/19/2017 | 8 Forecast 3/26/2017 | 9 Forecast 4/2/2017 | 10 Forecast 4/9/2017 | 11 Forecast 4/16/2017 | 12 Forecast 4/23/2017 | 13 Forecast 4/30/2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Ending** | | | | | | | | | | | | | |
| **Cash Receipts** | | | | | | | | | | | | | |
| Total Cash Receipts | $ 1,806,514 | $ 2,138,574 | $ 2,226,381 | $ 1,247,966 | $ 1,357,169 | $ 1,246,725 | $ 1,635,267 | $ 773,937 | $ 722,479 | $ 584,155 | $ 565,857 | $ 334,016 | $ 315,718 |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Total Operating Disbursements | $ (605,862) | $ (2,973,397) | $ (316,000) | $ (4,192,023) | $ (6,945) | $ (747,593) | $ (6,945) | $ (1,414,327) | $ - | $ (386,284) | $ - | (406,284) | $ (124,164) |
| **Net Operating Cash Flow** | $ 1,200,651 | $ (834,824) | $ 1,910,381 | $ (2,944,056) | $ 1,350,223 | $ 499,131 | $ 1,628,321 | $ (640,390) | $ 722,479 | $ 197,871 | $ 565,857 | $ (72,268) | $ 191,554 |
| **Non-Operating Receipts/(Disbursements)** | | | | | | | | | | | | | |
| Capital Expenditures (Emergency) | (137,076) | (11,916) | (11,916) | (78,038) | (11,916) | (11,916) | (11,916) | (66,122) | - | - | - | - | (66,122) |
| Principal Payments - Midcap | (449,673) | (532,688) | (554,640) | (311,340) | (333,292) | (306,396) | (293,532) | (188,851) | (175,987) | (146,039) | (141,464) | (83,504) | (78,929) |
| Principal Payments - Capital Leases | - | - | - | (60,062) | - | - | - | (60,062) | - | - | - | - | (60,062) |
| Interest - Midcap | - | - | (27,538) | - | - | - | (20,324) | - | - | - | (16,469) | - | - |
| Interest - Capital Leases | - | - | - | (12,345) | - | - | - | (12,345) | - | - | - | - | (12,345) |
| Interest - DIP Facility | - | - | - | - | (11,829) | - | - | - | (25,165) | - | - | - | (25,165) |
| **Wind-down Related Expenses** | | | | | | | | | | | | | |
| **Professional Fees** | | | | | | | | | | | | | |
| Alston & Bird, LLP | - | - | - | (733,875) | - | - | - | (318,750) | - | - | - | (116,250) | - |
| SOLIC[1] | - | - | - | (320,000) | - | - | - | (320,000) | - | - | - | (170,000) | - |
| Young Conaway (Delaware Local Counsel) | - | - | - | (22,500) | - | - | - | (22,500) | - | - | - | (22,500) | - |
| Other Administrative Expenses | - | - | - | (95,000) | - | - | - | (95,000) | - | - | - | (95,000) | - |
| **Total Non-Operating Receipts/(Disbursements)** | $ (586,749) | $ (544,604) | $ (594,094) | $ (1,633,159) | $ (357,037) | $ (318,312) | $ (325,771) | $ (1,083,630) | $ (201,152) | $ (146,039) | $ (157,933) | $ (487,254) | $ (242,623) |
| **Net Cash Flows** | $ 613,902 | $ (1,379,428) | $ 1,316,287 | $ (4,577,215) | $ 993,187 | $ 180,819 | $ 1,302,550 | $ (1,724,020) | $ 521,327 | $ 51,832 | $ 407,924 | $ (559,522) | $ (51,069) |
| Beginning Cash Balance | - | 613,902 | - | 1,316,287 | - | 993,187 | 1,174,006 | 2,476,556 | 752,537 | 1,273,864 | 1,325,696 | 1,733,620 | 1,174,098 |
| **Ending Balance - Pre-DIP Borrowings** | $ 613,902 | $ (765,525) | $ 1,316,287 | $ (3,260,929) | $ 993,187 | $ 1,174,006 | $ 2,476,556 | $ 752,537 | $ 1,273,864 | $ 1,325,696 | $ 1,733,620 | $ 1,174,098 | $ 1,123,029 |
| Borrowings/(Repayments) - DIP Facility | - | 765,525 | - | 3,260,929 | - | - | - | - | - | - | - | - | - |
| **Ending Balance - Post-DIP Borrowings** | $ 613,902 | $ - | $ 1,316,287 | $ - | $ 993,187 | $ 1,174,006 | $ 2,476,556 | $ 752,537 | $ 1,273,864 | $ 1,325,696 | $ 1,733,620 | $ 1,174,098 | $ 1,123,029 |
| **Midcap - Revolving Credit Facility** | | | | | | | | | | | | | |
| Beginning Balance | 6,729,461 | 6,279,787 | 5,747,099 | 5,192,459 | 4,881,119 | 4,547,827 | 4,241,431 | 3,947,899 | 3,759,048 | 3,583,061 | 3,437,022 | 3,295,558 | 3,212,054 |
| Borrowing/(Repayments) | (449,673) | (532,688) | (554,640) | (311,340) | (333,292) | (306,396) | (293,532) | (188,851) | (175,987) | (146,039) | (141,464) | (83,504) | (78,929) |
| **Ending Balance** | $ 6,279,787 | $ 5,747,099 | $ 5,192,459 | $ 4,881,119 | $ 4,547,827 | $ 4,241,431 | $ 3,947,899 | $ 3,759,048 | $ 3,583,061 | $ 3,437,022 | $ 3,295,558 | $ 3,212,054 | $ 3,133,124 |

**Notes:**
1. In addition, SOLIC is entitled to a Deferred Restructuring Fee pursuant to the terms of its engagement letter and such fee is deemed included in the Budget

**DIP BUDGET**
**CONSOLIDATED LOUISIANA HEART HOSPITAL, LLC ("LHH")**
**AND LOUISIANNA HEART MEDICAL GROUP ("LHMG")**
As of: 1/30/2017
(Whole $)

| Period # | 14 Forecast 5/7/2017 | 15 Forecast 5/14/2017 | 16 Forecast 5/21/2017 | 17 Forecast 5/28/2017 | 18 Forecast 6/4/2017 | 19 Forecast 6/11/2017 | 20 Forecast 6/18/2017 | 21 Forecast 6/25/2017 | 22 Forecast 7/2/2017 | 23 Forecast 7/9/2017 | 24 Forecast 7/16/2017 | 25 Forecast 7/23/2017 | 26 Forecast 7/30/2017 | Total Forecast 2/5 - 7/30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Ending** | | | | | | | | | | | | | | |
| **Cash Receipts** | | | | | | | | | | | | | | |
| Total Cash Receipts | $ 258,445 | $ 248,331 | $ 167,029 | $ 156,915 | $ 133,850 | $ 130,507 | $ 105,468 | $ 102,126 | $ 94,187 | $ 92,717 | $ 93,977 | $ 92,508 | $ 91,429 | $ 16,722,246 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Total Operating Disbursements | $ (66,717) | $ (9,285) | $ (73,275) | $ (118,200) | $ (152,613) | $ (4,853) | $ (36,575) | $ (116,173) | $ (16,731) | $ (3,472) | $ (26,734) | $ (3,474) | $ (16,645) | $ (11,824,572) |
| **Net Operating Cash Flow** | $ 191,728 | $ 239,046 | $ 93,753 | $ 38,714 | $ (18,763) | $ 125,655 | $ 68,893 | $ (14,047) | $ 77,456 | $ 89,246 | $ 67,243 | $ 89,033 | $ 74,785 | $ 4,897,674 |
| **Non-Operating Receipts/(Disbursements)** | | | | | | | | | | | | | | |
| Capital Expenditures (Emergency) | - | - | - | - | - | - | - | - | - | - | - | - | - | $ (406,935) |
| Principal Payments - Midcap | (64,611) | (62,083) | (41,757) | (39,229) | (33,462) | (32,627) | (26,367) | (25,531) | (23,547) | (23,179) | (23,494) | (23,127) | (22,857) | (4,038,209) |
| Principal Payments - Capital Leases | - | - | - | (60,062) | - | - | - | (60,062) | - | - | - | - | 0 | (300,309) |
| Interest - Midcap | - | - | (14,406) | - | - | - | (13,701) | - | - | - | (13,229) | - | - | (105,666) |
| Interest - Capital Leases | - | - | - | (12,345) | - | - | - | (12,345) | - | - | - | - | (12,345) | (74,068) |
| Interest - DIP Facility | - | - | - | - | (25,165) | - | - | - | (25,165) | - | - | - | (25,165) | (137,656) |
| **Wind-down Related Expenses** | | | | | | | | | | | | | | |
| **Professional Fees** | | | | | | | | | | | | | | |
| Alston & Bird, LLP | - | - | (179,875) | - | - | - | (45,000) | - | - | - | (45,000) | - | - | $ (1,438,750) |
| SOLIC[1] | - | - | (170,000) | - | - | - | (170,000) | - | - | - | (88,000) | - | - | (1,238,000) |
| Young Conaway (Delaware Local Counsel) | - | - | (30,000) | - | - | - | (22,500) | - | - | - | (2,500) | - | - | (300,309) |
| Other Administrative Expenses | - | - | (35,000) | - | - | - | (35,000) | - | - | - | (35,000) | - | - | (390,000) |
| **Total Non-Operating Receipts/(Disbursements)** | $ (64,611) | $ (62,083) | $ (471,038) | $ (111,635) | $ (58,628) | $ (32,627) | $ (312,568) | $ (97,938) | $ (48,712) | $ (23,179) | $ (207,223) | $ (23,127) | $ (60,367) | $ (8,252,093) |
| **Net Cash Flows** | $ 127,116 | $ 176,963 | $ (377,285) | $ (72,921) | $ (77,391) | $ 93,028 | $ (243,675) | $ (111,985) | $ 28,744 | $ 66,066 | $ (139,980) | $ 65,906 | $ 14,418 | $ (3,354,419) |
| Beginning Cash Balance | 1,123,029 | 1,250,145 | 1,427,108 | 1,049,824 | 976,903 | 899,512 | 992,540 | 748,865 | 636,881 | 665,624 | 731,691 | 591,711 | 657,617 | |
| **Ending Balance - Pre-DIP Borrowings** | $ 1,250,145 | $ 1,427,108 | $ 1,049,824 | $ 976,903 | $ 899,512 | $ 992,540 | $ 748,865 | $ 636,881 | $ 665,624 | $ 731,691 | $ 591,711 | $ 657,617 | $ 672,035 | $ (3,354,419) |
| Borrowings/(Repayments) - DIP Facility | - | - | - | - | - | - | - | - | - | - | - | - | - | 4,026,454 |
| **Ending Balance - Post-DIP Borrowings** | $ 1,250,145 | $ 1,427,108 | $ 1,049,824 | $ 976,903 | $ 899,512 | $ 992,540 | $ 748,865 | $ 636,881 | $ 665,624 | $ 731,691 | $ 591,711 | $ 657,617 | $ 672,035 | $ 672,035 |
| **Midcap - Revolving Credit Facility** | | | | | | | | | | | | | | |
| Beginning Balance | 3,133,124 | 3,068,513 | 3,006,430 | 2,964,673 | 2,925,445 | 2,891,982 | 2,859,355 | 2,832,988 | 2,807,457 | 2,783,910 | 2,760,731 | 2,737,236 | 2,714,109 | $ 6,729,461 |
| Borrowings/(Repayments) | (64,611) | (62,083) | (41,757) | (39,229) | (33,462) | (32,627) | (26,367) | (25,531) | (23,547) | (23,179) | (23,494) | (23,127) | (22,857) | (4,038,209) |
| **Ending Balance** | $ 3,068,513 | $ 3,006,430 | $ 2,964,673 | $ 2,925,445 | $ 2,891,982 | $ 2,859,355 | $ 2,832,988 | $ 2,807,457 | $ 2,783,910 | $ 2,760,731 | $ 2,737,236 | $ 2,714,109 | $ 2,691,252 | $ 2,691,252 |

**Notes:**
1. In addition, SOLIC is entitled to a Deferred Restructuring Fee pursuant to the terms of its engagement letter and such fee is deemed included in the Budget

# EXHIBIT C

## Proposed Interim Order

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| LMCHH PCP LCC, *et al.*,[1] | ) | Case No. 17-_____ |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Ref. Docket No._____** |

_____

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105(a), 362(d), 363(b), 364(c)(1), 364(c)(2), 364(c)(3) AND 364(e) AND (B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363(c)(2)(A) AND (II) SCHEDULING FINAL HEARING**

Upon the Motion[2] of the debtors and debtors in possession (the "**Debtors**") for entry of interim and final orders, pursuant to Bankruptcy Code Sections 105(a), 362(d), 363(b), 363(c)(2)(A), 364(c)(1), 364(c)(2), 364(c)(3) and 364(e), Bankruptcy Rules 2002, 4001 and 6004 and Local Rules 2002-1 and 4001-2, authorizing the Debtors to, among other things, (i) incur postpetition indebtedness, (ii) grant security interests, and (iii) use cash collateral (the "**Motion**"); and the Debtors having, more specifically sought entry of this Interim Order:

(a)    approving the Debtors' entry into the Debtor-in-Possession Loan and Security Agreement attached to the Motion as <u>Exhibit A</u> (the "**DIP Loan Agreement**") and authorizing Debtors to borrow from time to time, up to $4.2 million (the "**DIP Loan**") from MedCare Investment Fund V, L.P. ("**MedCare**," and in its capacity as the lender under the DIP Loan Agreement, the "**DIP Lender**") subject to the Budget attached

_____

[1]    The last four digits of the taxpayer identification numbers for each of the Debtors follow in parenthesis: (i) LMCHH PCP LLC (8569); and (ii) Louisiana Medical Center and Heart Hospital, LLC (7298). The mailing address for both of the Debtors is 64030 Highway 434, Lacombe, LA 70445.

[2]    Capitalized terms used but not defined herein shall have the same meaning ascribed to them in the Motion or the DIP Loan Agreement, as applicable.

to the Motion as <u>Exhibit B</u> (as the same may be amended or supplemented from time to time in accordance with the DIP Loan Agreement) with an interim initial funding of $1,000,000;

(b)    affording the DIP Lender the protections of Bankruptcy Code Sections 364(c)(1), 364(c)(2) and 364(c)(3);

(c)    confirming the DIP Lender's good faith in furnishing the DIP Loans and the attendant applicability of the protections afforded by Bankruptcy Code Section 364(e);

(d)    authorizing the Debtors to use the cash collateral, as defined in Bankruptcy Code Section 363(a), of MidCap (the "**Cash Collateral**") and provide adequate protection by, among other things, paying down the prepetition secured claim of the existing senior secured lender MidCap Financial, LLC ("**MidCap**"), as described below;

(e)    modifying the automatic stay imposed by Bankruptcy Code Section 362 solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Agreement and this Interim Order

(f)    waiving any applicable stay, including under Bankruptcy Rule 6004 and any applicable Local Rules, and providing for immediate effectiveness of this Interim Order;

(g)    scheduling a final hearing on the Motion to be held within twenty (20) days after the Petition Date (the "**Final Hearing**")  to consider entry of a final order that grants all of the relief requested in the Motion on a final basis (the "**Final Order**"); and

(h)     authorizing the DIP Lender to terminate the commitment of the DIP Lender to make the DIP Loans (the "**Commitment**") on the terms set forth in the DIP Loan Agreement and this Interim Order, including upon the occurrence and during the continuance of an "Event of Default" under the DIP Loan Agreement and declare the DIP Loans then outstanding to be due and payable.

After notice and a hearing held on February __, 2017, and due deliberation after receiving evidence and argument, and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND** that:

A.     This Court has jurisdiction over the Chapter 11 Case and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is properly before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

B.     An interim hearing on the Motion was held and concluded before this Court on February __, 2017 (the "**Interim Hearing**") and based on the record presented to the Court by the Debtors, the interim relief requested in the Motion is in the best interests of the Debtors' estate, its creditors and other parties in interest and is necessary to avoid immediate and irreparable harm to the Debtors' pending the Final Hearing and otherwise is fair and reasonable and is essential for the continued operation of the Debtors' business.

C.     The Debtors Stipulate that MedCare, the proposed DIP Lender, is an affiliate of the Debtors, and another MedCare affiliate, Cardiovascular Care Group, Inc. ("**CCG**"), is a creditor and an affiliate of the Debtors. Subsequent to CCG's acquisition of Louisiana Medical Center and Heart Hospital, LLC ("**LHH**"), which owns and operates Louisiana Heart Hospital (the "**Hospital**"), CCG provided supplemental working capital to the Debtors pursuant to that

certain Demand Note between CCG and LHH in the initial principal amount of $15 million (as amended over time, the "**CCG Demand Note**"). The CCG Demand Note has since been amended on five (5) occasions to increase the face amount of the note. As of the Petition Date, the principal amounts owing under the CCG Demand Note totaled approximately $104 million. The CCG Demand Note is due upon demand and is unsecured.

D.    The Debtors Stipulate that in 2004, prior to the acquisition of the Hospital by CCG (the "**Acquisition**"), MedCath Finance Company and LHH entered into that certain Real Estate Note and Loan Agreement (the "**MedCath Note**" and collectively with all amendments, restatements, supplements, modifications, mortgages, assignments of leases and rents and other related documents, the "**MedCath Loan Documents**") to refinance the construction loan incurred to construct the Hospital. The MedCath Note and the other MedCath Loan Documents are secured by a mortgage in the Hospital and two medical office buildings pursuant to that certain Mortgage, Assignment of Lease and Rents and Security Agreement between MedCath and LHH (the "**MedCath Mortgage**").  Immediately prior to the Acquisition, LHH was indebted to MedCath in an amount totaling $81,431,000. In connection with the Acquisition, MedCath converted a portion of the indebtedness owing to MedCath into equity in LHH, thereby increasing its ownership interest to approximately 95.4% of the outstanding membership interests in LHH and, with certain working capital adjustments, reducing the outstanding amount owing to MedCath to $21,763,903.   The MedCath debt, purchased by CCG as part of the Acquisition, remains outstanding and accrues interest monthly at a fixed rate of 7.50%.

E.    The Debtors stipulate that in 2014, LHH entered into a revolving line of credit with MidCap in the amount of $12,000,000 (the "**MidCap Revolver**").  The MidCap Revolver bears interest at a variable rate based on the greater of the 1-month LIBOR rate or 1.50% plus an

applicable margin of 4.25%.  The amounts owing under the MidCap Revolver (the "**MidCap Indebtedness**") are secured with a first-priority lien on substantially all of the Debtors' assets. In connection with the MidCap Revolver, the MedCath Note and the MedCath Mortgage held by CCG were subordinated to the MidCap Indebtedness and liens.

F.      The Debtors stipulate that, as of the Petition Date, the MidCap Indebtedness totaled approximately $6,729.460.83.

G.      The Debtors have historically been dependent on support from CCG and its predecessors.  In the absence of immediate access to the DIP Loans the Debtors will be unable to bear the costs and expenses of the Chapter 11 Case, the value of the estate will deteriorate rapidly, and serious and irreparable harm to the Debtors, its estate and other interested parties will occur, thus preventing the Debtors from realizing their chapter 11 objectives.

H.      Given (a) the nature of and risks associated with the Debtors' business, and (b) that the Debtors do not have material unencumbered assets, the Debtors do not believe that third-party debtor-in-possession financing is available from any other lenders on more attractive terms than the DIP Loan being provided by the DIP Lender.

I.      Financing on a postpetition basis is not otherwise available without the Debtors' securing, pursuant to Bankruptcy Code Sections 364(c)(2) and 364(c)(3), such indebtedness and obligations with Liens on and security interests in the DIP Collateral as described below, subject to the Carve-Out.

J.      No trustee, examiner, or creditors' committee has been appointed in these Chapter 11 cases.  The Debtors have served notice of this Motion on (a) the United States Trustee; (b) those creditors holding the twenty (20) largest unsecured claims; (c) the Internal Revenue

Service; (d) MedCare; (e) MidCap; and (f) CCG.  The Debtors submit that no other or further notice need be provided.

K.      Based on the record presented to the Court by the Debtors at the Interim Hearing, the DIP Loan Agreement has been negotiated in good faith and at arm's length between the Debtors and the DIP Lender, and any credit extended, issued or made to the Debtors pursuant to the DIP Loan Agreement shall be deemed to have been extended, issued or made, as the case may be, in good faith as required by, and within the meaning of Bankruptcy Code Section 364(e).

L.      Based on the record presented to the Court by the Debtors at the Interim Hearing, the terms of the DIP Loan are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

M.      The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).  The Motion and this Interim Order comply with Local Rule 4001-2.  The permission granted herein to enter into the DIP Loan Agreement on the interim terms contained herein and to obtain funds thereunder on an interim basis pending the Final Hearing and entry of the Final Order is necessary to avoid immediate and irreparable harm to the Debtors.  This Court concludes that entry of this Interim Order is in the best interest of the Debtors' estate and its creditors and other stakeholders as its implementation will, *inter alia*, allow for the Debtors to pay the costs and expenses of the Chapter 11 Case, preserve the value of the Debtors' assets and enhance the Debtors' prospects of realizing its chapter 11 objectives.

Based upon the foregoing findings and conclusions, and upon the record made before this Court by the Debtors at the Interim Hearing, and good and sufficient cause appearing therefore;

01:21494310.1

**IT IS HEREBY ORDERED** that:

1.      The Motion is granted on an interim basis, subject to the terms and conditions set forth herein.  Any objections to the Motion that have not previously been withdrawn or resolved are hereby overruled on their merits.  To the extent any provisions in this Interim Order conflict with any provisions of the DIP Loan Agreement, the provisions of this Interim Order shall control and govern to the extent of such conflict.

2.      The Debtors are expressly authorized and empowered to execute and deliver to the DIP Lender the DIP Loan Agreement and to obtain the DIP Loans.  Additionally, the Debtors are authorized and directed to comply with and perform all of the terms and conditions of the DIP Loan Agreement and to repay amounts borrowed with interest to the DIP Lender in accordance with and subject to the terms and conditions set forth in the DIP Loan Agreement and this Interim Order.

3.      The Debtors are expressly authorized to borrow from the DIP Lender, on the terms and subject to the conditions set forth in the DIP Loan Agreement and this Interim Order, up to $1.0 million in principal in the aggregate, subject to further borrowing requests as may be authorized at the Final Hearing and in a Final Order.  The Debtors are authorized to use the proceeds of the DIP Loan and cash collateral for working capital needs and for general corporate purposes, in accordance with the terms of the DIP Loan Agreement and this Interim Order and will only be used to pay, when due, the expenses set forth in the Budget (subject to the Variance).

4.     The Debtors are expressly authorized to grant MidCap replacement liens in the same collateral generated post-petition (i.e. accounts receivable), which, in addition to the existing value of MidCap's collateral in excess of the MidCap debt, plus the payments of adequate protection payments to be applied to the principal and interest on the MidCap debt, provide MidCap adequate protection for the use of its Cash Collateral by the Debtors.

5.     The Debtors are expressly authorized to pay to MidCap 25% of the collections of the accounts receivable in which MidCap has a senior lien and security interest (such amounts shall be used to reduce the principal and accrued and unpaid interest of MidCap's senior secured debt).

6.     MedCare as the DIP Lender, shall be granted liens in all of the Debtor's assets subject only to an existing liens and security interests, except that such liens shall be senior to the existing lien and security interests of CCG (defined below) which is subordinated to the MidCap liens in the real property owned by the Debtors.

7.     The liens on and security interests in the DIP Collateral, including a lien on the Hospital real estate, granted pursuant to this Interim Order and the DIP Loan Agreement shall be referred to as the "**DIP Liens**."  The DIP Liens are deemed to constitute valid, enforceable, unavoidable and duly perfected security interests and liens, and neither MidCap nor the DIP Lender are required to file or serve financing statements, notices of lien or similar instruments which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Debtors to execute any documentation relating to the DIP Liens and MidCap adequate protections liens does not affect the validity, enforceability, unavoidability, perfection or priority of the DIP Liens or the MidCap adequate protections liens.  If, however, the DIP

Lender or MidCap shall determine to file any such financing statements, notices of lien or similar instruments, or to otherwise confirm perfection of such DIP Liens or adequate protection liens to MidCap, the Debtors are directed to cooperate with and assist in such process.  For the avoidance of doubt, the DIP Liens do not include liens on Avoidance Actions.  The stay imposed by Bankruptcy Code Section 362(a) is hereby modified to allow the filing and recording of a certified copy of this Interim Order or any such financing statements, notices of lien or similar instruments, and all such documents shall be deemed to have been filed or recorded at the time of and on the date this Court enters this Interim Order.

8.    The DIP Liens and other rights, benefits, and remedies granted under this Interim Order to the DIP Lender shall continue and be enforceable, for all purposes, in the Chapter 11 Case, and (a) shall not be subject to Bankruptcy Code Sections 506(c) conditioned upon entry of the Final Order, 510, 549, 550, or 551, (b) shall not be subordinate to, or *pari passu* with, any lien that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code Section 551, and (c) shall be valid and enforceable against any trustee or any other estate representative appointed or elected in the Chapter 11 Case, upon the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "**Successor Case**"), and/or upon the dismissal of the Chapter 11 Case to the maximum extent permitted by law.  The DIP Liens shall maintain their priority as provided in this Interim Order until the DIP Obligations have been indefeasibly paid in full in cash and completely satisfied and the DIP Lender's commitment has been terminated in accordance with the DIP Loan Agreement.

9.    The DIP Lender is afforded superpriority administrative claim status under Bankruptcy Code Sections 364(c)(1), having priority over any and all administrative expenses of

the kind specified in Bankruptcy Code Section 105, 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 or 1114, subject and subordinate only to, upon the occurrence and during the continuance of an Event of Default, the payment of the Carve-Out (as defined below).

10.    Notwithstanding any provision of this Interim Order or the DIP Loan Agreement to the contrary, the DIP Liens granted to the DIP Lender pursuant to the DIP Loan Agreement and this Interim Order shall be subject to the Permitted Senior Liens as set forth in the DIP Loan Agreement and the "Carve-Out."

11.    "Carve-Out" means, at any time, the aggregate amount of the following: (a) all accrued and unpaid fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. §1930(a) plus interest pursuant to 31 U.S.C. § 3717, (b) an amount equal to $35,000 to compensate an examiner or a Committee or any of their Professionals for the costs of investigating the claims, if any, that Borrowers may have against the Lender, (c) all accrued and unpaid fees and disbursements of Professionals relating to the Chapter 11 Case incurred by persons or entities authorized to receive compensation under 11 U.S.C. §§ 330, 331 or 363, but limited to (i) subject to the Budget, all accrued and unpaid fees, disbursements costs and expenses of professional or professional firms retained by the Borrowers and the Committee accrued or incurred at any time before the date and time of the delivery by the Lender of a Carve-Out Trigger Notice, plus (ii) fees, costs and expenses incurred by the aforementioned after the date of delivery by the Lender of the Carve-Out Trigger Notice in an amount not to exceed $500,000, plus (iii) in all cases, whether before or after the date of delivery by the Lender of the Carve-Out Trigger Notice, any Deferred Restructuring Fee (as defined in the SOLIC Engagement Letter) payable to SOLIC (as defined in the SOLIC Engagement Letter) pursuant to the SOLIC Engagement Letter, plus (d) if the

Chapter 11 Case is converted to a case under Chapter 7 of the Code, all accrued and unpaid professional fees and disbursements relating to the case (following such conversion) by the trustee or successor trustee appointed pursuant to §701, §702 or § 703 of the Bankruptcy Code in an aggregate amount not to exceed $25,000 (it being understood that the limitation set forth in this clause (d) in no way serves as a limitation on any of the items described in clauses (a) through (c) above).

12.    Subject to entry of the Final Order, no costs or expenses of administration or other charge, lien, assessment or claim incurred on or after the Petition Date of any Person or entity (with the exception of the Carve-Out) shall be imposed against the DIP Lender, its claims or the DIP Collateral under Bankruptcy Code Section 506(c) or otherwise, and the Debtors hereby irrevocably waives any and all such rights, remedies and benefits under Bankruptcy Code Section 506(c) as to the DIP Lender, its claims or the DIP Collateral.

13.    The DIP Lender shall not be subject to the equitable doctrine of "marshaling", "election of remedies" or any other similar doctrine, in each case, with respect to any of its interest in the DIP Collateral.

14.    In accordance with the terms of the DIP Loan Agreement, the Debtors have agreed to grant a release and covenant not to sue to the DIP Lender, MedCare, and it agents, representatives, subsidiaries, heirs, successors, and assigns from any claims each Debtor has, had, or may have against Lender, and Lender's related investment funds and management company, and their respective partners, shareholders, directors, managers, officers, employees, agents, advisors, representatives, heirs, successors and assigns, when acting in a representative or official capacity on behalf of Lender (collectively the "Releasees"), based on facts arising on or before the date of the DIP Loan Agreement, that relate to:  (I) the DIP Loan Agreement, the Loan documents, the prepetition loans or financings provided by Lender or any Lender Related Persons to the

Borrowers (directly or indirectly), or other transactions or dealings between any Borrower and the Lender or any Lender Related Person, (II) any transaction, action or omission contemplated by the DIP Loan Documents, or (III) any aspect of the dealings or relationships between or among the Debtors and the Releasees relating to the DIP Loan Agreement, the Loan documents, or any other transaction, action, dealings, or omissions contemplated hereby. The release shall be binding unless within 75 days of the date of entry of the Final Order, a party, including the Committee, commences, as appropriate, a contested matter or adversary proceeding raising such claim, or must file a motion seeking standing to bring such a claim; provided, however, that any such actions or claims must be brought and, where applicable standing obtained, no later than the earlier of (a) 120 days from the entry of the Final Order or (b) June 30, 2017 (the "Challenge Period"). The Challenge Period may only be extended with the written consent of the Lender (without need for Court Order or notice), or by order of the Court after notice and a hearing. Upon the expiration of such applicable Challenge Period, to the extent not otherwise waived or barred: (A) any and all such claims by any party (including, without limitation, any Committee, any Chapter 11 trustee, and/or any examiner appointed in this Bankruptcy Case, and any Chapter 7 trustee and/or examiner appointed in any Successor Case), shall be deemed to be forever waived and barred. The Final Order shall contain an injunction barring any Claims being asserted, or sought to be asserted, unless the conditions for bringing such Claims during the Challenge Period are met.

15.    As long as the DIP Loan Agreement remains in effect, the Debtors shall not seek, and it shall constitute an Event of Default under the DIP Loan Agreement if (among other Events of Default contained in the DIP Loan Agreement) the Debtors seek, or if there is entered, an order dismissing or converting the Chapter 11 Case to a case under another chapter of the

Bankruptcy Code. If an order dismissing or converting the Chapter 11 Case under Bankruptcy Code Section 1112 or otherwise is at any time entered (or any other Event of Default occurs), (a) the DIP Liens granted pursuant to this Interim Order to the DIP Lender shall continue in full force and effect, shall remain binding on all parties in interest notwithstanding such dismissal and (b) this Court shall, to the extent permitted by applicable law, retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP Liens.

16.     Upon the occurrence of an Event of Default, and upon notice to the Debtors and counsel to the Committee, the DIP Lender may exercise rights and remedies and take all or any of the following actions without further modification of the automatic stay pursuant to Bankruptcy Code Section 362 (which is hereby deemed modified and vacated to the extent necessary to permit such exercise of rights and remedies and the taking of such actions) in order to: (a) terminate the Commitment; (b) declare the DIP Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable); and/or (c) exercise any other right or remedy permitted to the DIP Lender under the DIP Loan Agreement, this Interim Order or by operation of law; provided, however, the DIP Lender may take the actions described in clause (c) above only after providing five (5) business days' prior written notice to the Court, the Debtors, and counsel to the Committee appointed in the Chapter 11 Case.

17.     The Debtors are authorized to perform all acts, and execute and comply with the terms of such other documents, instruments and agreements, as the DIP Lender may reasonably require, as evidence of and for the protection of the DIP Obligations, or which otherwise may be deemed reasonably necessary by the DIP Lender to effectuate the terms and conditions of this Interim Order and the DIP Loan Agreement.

18.     The Debtors and the DIP Lender shall be authorized to implement, in accordance with the terms of the DIP Loan Agreement, any amendment, consents, modifications or waivers of the DIP Loan Agreement **(including, without limitation, any amendment or supplement to the Budget)** which are not material and adverse to the Debtors, and the Debtors shall provide the United States Trustee for the District of Delaware, and counsel to any Committee with prior written notice (and, to the extent practicable, not less than three (3) business days prior written notice) of such amendments, consents, modifications or waivers.  Any amendment, consent, modification or waiver of the DIP Loan Agreement which is material and/or adverse to the Debtors, shall be subject to prior approval by this Court upon motion by the Debtors.

19.     Having been found to be extending credit and making DIP Loans to the Debtors in good faith, the DIP Lender shall be entitled to the full protection of Bankruptcy Code Section 364(e) with respect to the DIP Obligations and the DIP Liens created or authorized by this Interim Order in the event that this Interim Order or any authorization contained herein is stayed, vacated, reversed or modified on appeal.  Any stay, modification, reversal or vacation of this Interim Order shall not affect the validity of any obligation of the Debtors to the DIP Lender incurred pursuant to, or the grant of any protection afforded to the DIP Lender under, this Interim Order.

20.     The DIP Liens and all other rights and remedies of the DIP Lender and MidCap as the prepetition lender granted by this Interim Order and the DIP Loan Agreement shall survive entry of any order which may be entered (a) confirming any plan of reorganization in the Chapter 11 Case (and the DIP Obligations shall not be discharged by the entry of any such order or pursuant to Bankruptcy Code Section 1141(d)(4), the Debtors having hereby waived such discharge); (b) converting the Chapter 11 Case to a case under Chapter 7; or (c) dismissing

the Chapter 11 Case; and the terms and provisions of this Interim Order as well as the DIP Liens granted pursuant to this Interim Order and the DIP Loan Agreement shall continue in full force and effect notwithstanding the entry of any such order, and such DIP Liens shall maintain their priority as provided by this Interim Order until all of the DIP Obligations are indefeasibly paid in full and discharged.

21.     Notwithstanding anything in this Interim Order to the contrary, the DIP Lender's obligation to make DIP Loans in accordance with the DIP Loan Agreement shall automatically terminate without any further action by this Court or the DIP Lender, upon the Termination Date.

22.     The DIP Lender shall have no obligation to continue to provide postpetition funding to the Debtors pursuant to the DIP Loan Agreement in the event that (among other Events of Default) the Final Order approving the DIP Loan Agreement is not entered within twenty (20) days after the Petition Date.

23.     Notwithstanding anything herein to the contrary, no Cash Collateral, Borrowings or any portion of the Carve-Out may be used to assert any claims or causes of action against MidCap as the prepetition lender or object to or contest in any manner, or raise any defenses to, the validity, perfection, priority, extent or enforceability of the DIP Obligations, or the DIP Liens.

24.     The DIP Lender shall have the unqualified right to credit bid up to the full amount of DIP Loans in any sale of the DIP Collateral, under or pursuant to (a) Bankruptcy Code Section 363, (b) a plan of reorganization or plan of liquidation under Bankruptcy Code Section 1129, or (c) a sale or disposition by a chapter 7 trustee under Bankruptcy Code Section 725.

25.     The DIP Lender and MidCap as the prepetition lender may, as applicable, petition this Court for any such additional protection they may reasonably require with respect to the DIP Obligations, the MidCap debt, or otherwise, including, without limitation, their rights to request additional adequate protection of their interests in the DIP Collateral and the MidCap collateral, as applicable.  Except as otherwise set forth herein, entry of this Interim Order shall not in any way constitute agreement, consent, or acquiescence by the DIP Lender or MidCap as the prepetition lender to the terms of any plan of reorganization filed in the Chapter 11 Cases, other than the plan of reorganization that was filed with the Court on the Petition Date as such plan may be modified with, to the extent required, the consent of the DIP Lender and MidCap as the prepetition lender, as applicable.

26.     The Debtors shall pay all reasonable and documented fees, costs and expenses incurred by the DIP Lender as set forth in the DIP Loan Agreement, without regard to the amounts set forth with respect thereto in the Budget.  Payment of such fees shall not be conditioned on prior allowance by the Court.  Professionals for the DIP Lender (collectively, the "Lender Professionals") shall not be required to comply with the U.S. Trustee fee guidelines, but the Lender Professionals shall submit copies of invoices to the U.S. Trustee, counsel to the Committee (if applicable), and such other parties as the Court may direct, at least ten (10) days prior to payment by the Debtors.  If the Debtors, the U.S. Trustee, or the Committee object to the reasonableness of the fees and expenses of any Lender Professional and cannot resolve such objection among themselves, the objecting party may file with the Court and serve on such Lender Professional an objection (the "**Fee Objection**") limited to the issue of reasonableness of such fees and expenses.  The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order the undisputed fees, costs and expenses

reflected on any invoice to which a Fee Objection has been filed, and shall promptly pay such fees, costs and expenses that are subject to a Fee Objection upon resolution of such Fee Objection by the Court.

27.      Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.  In determining to make any loan (whether under the DIP Loan Agreement or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Agreement, the DIP Lender shall not (a) be deemed to be in control of the operations of the Debtors, or (b) owe any fiduciary duty to the Debtors or their creditors, members, shareholders, or estates.

28.      The Final Hearing to consider entry of the Final Order is scheduled for _____, 2017 at ____ (Eastern Time) before this Court.

29.       On or before _____, 2017, the Debtors shall serve by United States mail, first-class postage prepaid (such service constituting adequate notice of the Final Hearing) (a) notice of the entry of this Interim Order and of the Final Hearing (the "**Final Hearing Notice**") and (b) a copy of this Interim Order, on the parties having been given notice of the Interim Hearing, to any other party that has filed a request for notices with this Court, to any Committee, if the same shall have been appointed, or counsel to any such committee, and to all secured creditors, including taxing authorities who may hold secured claims.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of this Court no later than February __, 2017, which objections shall be served upon (a) counsel to the Debtors, (i) Joel A. Waite, Young, Conaway, Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE

19801-0391 and (ii) Grant T. Stein, Alston & Bird LLP, 1201 West Peachtree Street, Atlanta, GA 30309-3424; (b) counsel to the DIP Lender, Matt Bair, Miller, Egan, Molter & Nelson LLP, 221 West Sixth Street, Suite 700, Austin, TX 78701, (c) counsel to MidCap as the prepetition lender, Katie G. Stenberg, Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, TN 37219; (d) counsel to any Committee; and (e) the Office of the United States Trustee for the District of Delaware, in each case to allow actual receipt of the objection no later than _____, 2017 at 4:00 p.m. (Eastern Time).

30.     Notwithstanding the possible applicability of Bankruptcy Rules 4001(a)(3) 6004(h), 7062 or otherwise, the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

31.     The terms of this Interim Order shall be binding (a) upon any trustee appointed in the Chapter 11 Case or (b) in any Subsequent Case.

32.     The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated: _____, 2017
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT A**

Budget