**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| LMCHH PCP LLC, *et al.*,[1] | ) | Case No. 17-10201 (___) |
| | ) | |
| Debtors. | ) | Joint Administration Pending |
| | ) | |

**DECLARATION OF NEIL F. LURIA, CHIEF RESTRUCTURING OFFICER,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Neil F. Luria, declare and state as follows:

## I.    GENERAL BACKGROUND

1.      I am the Chief Restructuring Officer ("**CRO**") of LMCHH PCP LLC, a Delaware

limited liability company (the "**Physicians Group**"), and of Louisiana Medical Center and Heart

Hospital, LLC, a North Carolina limited liability company ("**LHH**" and collectively with the

Physicians Group, the "**Debtors**").  I was appointed CRO by the Debtors on January 19, 2017,

and began my duties thereafter, formally accepting the position on January 30, 2017.  I am

familiar with the day-to-day operations, businesses, and financial affairs of the Debtors.

2.      I submit this Declaration in support of the Debtors' petitions for relief under

Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy**

**Code**"), and the Debtors' First Day Motions (as defined below).  I am authorized to submit this

Declaration on behalf of the Debtors.

---

[1]      The last four digits of the taxpayer identification numbers for each of the Debtors follow in parenthesis:
(i) LMCHH PCP LLC (8569); and (ii) Louisiana Medical Center and Heart Hospital, LLC (7298).  The mailing
address for the Debtors is 64030 Highway 434, Lacombe, LA  70445.

3.      Upon commencement of these Chapter 11 cases (the "**Bankruptcy Cases**"), the Debtors will continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these Bankruptcy Cases, and in support of the First Day Motions.

5.      Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents or my opinion based upon my experience and knowledge of the Debtors' business operations and financial condition.  If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of the documents, or opinion based thereon.

## II.     OVERVIEW OF THE DEBTORS' BUSINESSES

### A.      The Debtors' History

6.      LHH was formed to develop, own, and operate an acute care hospital (the "**Hospital**") in Lacombe, Louisiana, located on the Interstate 12 corridor on the "North Shore" of New Orleans, at 64030 Hwy 434, Lacombe, LA  70445.

7.      The Hospital opened as a Cardiology and Spine Center in 2003 with 19 physician partners specializing in all aspects of cardiology and cardiovascular surgery.  In 2007, eight additional physician were added as partners, bringing the total number of physician partners to 27.

8.      LHH formed the Physicians Group to facilitate LHH's goal of providing a diversified offering of acute care specialties and to enable it to satisfy patient needs.  The Physicians Group formally associated first-class physicians and physician practice groups with

LHH's core operations.  In view of the symbiotic relationship between the Physicians Group and the Hospital's operations, the Hospital and the Physicians Group began to operate as one consolidated entity with the expenses of the Physicians Group being funded by the Hospital, using revenue generated by both Debtors.

9.      St. Tammany Parrish, where the Hospital is located, escaped the devastation of Hurricane Katrina causing LHH and the Physicians Group to experience unprecedented market growth as a result of relocation of residents from New Orleans to the "North Shore."

10.     While an increase in population expanded LHH's potential patient base, due to its limited initial service lines, LHH was not prepared to fulfill the full range of healthcare needs that the growing population demanded.

11.     To address the growing population's patient-care needs, in 2007, LHH undertook a physical and image expansion to: (i) boost access to acute patients; (ii) meet the expanded population's expectations, and (iii) build a franchise opportunity as a mainstream hospital.

12.     As part of its image expansion and to communicate its transition into a full-service and mainstream hospital and surgical care center, in 2007, LHH changed its name to Louisiana Medical Center and Heart Hospital.

13.     In May 2009, LHH completed its $40 million expansion of the Hospital and its diversification of medical staff to include non-cardiac services.

14.     The expansion more than tripled the Hospital's patient capacity by adding 120 beds, a 109,000-square-foot four-story patient tower, new operating rooms, twice as many emergency room beds and a full-modality, high-technology diagnostic imaging suite in the emergency center that includes a new MRI machine.

15.     The first 79 beds from the expansion were licensed in spring 2009.

16.     On or about September 30, 2011, Cardiovascular Care Group, Inc. ("**CCG**") through a wholly-owned subsidiary, CCG of Louisiana, LLC ("**CCG LA**"), acquired all of the direct and indirect interests of LHH owned by MedCath Corporation ("**MCC**"), Louisiana Hospital Management, LLC ("**Hospital Management**") and MedCath Financing Company, LCC ("**MedCath Finance**" and collectively with MCC and Hospital Management, "**MedCath**") and the outstanding loans between LHH and MedCath Finance pursuant to that certain Debt and Equity Purchase Agreement (the "**Acquisition**").

17.     CCG's Acquisition of the direct and indirect interests in the Debtors was in furtherance of its corporate vision to build a world class network of cardiovascular specialty hospitals with an integrated delivery system, delivering optimal patient-focused healthcare across the entire continuum of care for patients with cardiovascular diseases.

18.     CCG LA currently acts as the Managing Member of LHH in accordance with LHH's operating agreement.

19.     Through the Acquisition, CCG sought to establish LHH as "The Cardiovascular Center of Excellence" in the North Shore region of New Orleans by (i) integrating a multi-disciplinary team of cardiovascular physicians into LHH's preexisting team; (ii) implementing a system of outreach clinics in surrounding communities to drive an increase in admissions; (iii) developing strategic relationships with Louisiana State University's residency programs; (iv) establishing strategic relationships with Bogalusa Medical Center; and (v) building upon the Debtors' non-cardiovascular lines.

B.      **Capital Structure**

20.     On or about July 7, 2004, MedCath Finance and LHH entered into that certain Real Estate Note and Loan Agreement (the "**MedCath Note**" and collectively with all

amendments, restatements, supplements, modifications, mortgages, assignments of leases and rents and other related documents, the "**MedCath Loan Documents**") to refinance the construction loan LHH incurred in connection with the construction on the Hospital related to the expansion.

21.     The MedCath Loan Documents, including the MedCath Note, are secured by a mortgage in the Hospital and the MOBs (defined below) pursuant to that certain Mortgage, Assignment of Lease and Rents and Security Agreement between MedCath and LHH.

22.     Immediately prior to the Acquisition, LHH was indebted to MedCath in an amount in excess of $81 million.

23.     In connection with the Acquisition, MedCath converted a portion of the indebtedness owing to it into equity in LHH, thereby increasing its ownership interest to 95.4% of the outstanding membership interests in LHH and reducing the outstanding amount owing to MedCath to $21,763,903 (the "**MedCath Debt**").

24.     The MedCath Debt, now held by CCG, remains outstanding and accrues interest monthly at a fixed rate of 7.50%.

25.     On December 12, 2011, following the Acquisition, CCG provided supplemental working capital to the Debtors pursuant to that certain Demand Note between CCG and LHH in the principal amount of $15,000,000 (as amended, modified, and supplemented over time, the "**CCG Demand Note**").  The CCG Demand Note is due upon demand and is unsecured.

26.     On or about January 22, 2014, pursuant to Amendment No. 1 to Demand Note, CCG and LHH amended the CCG Demand Note, increasing the allowed outstanding principal amount of the CCG Demand Note to $58,000,000.

01:21494335.1

27.    On November 12, 2014, pursuant to Amendment No. 2 to Demand Note, CCG and LHH amended the CCG Demand Note, increasing the allowed outstanding principal amount of the CCG Demand Note to $80,000,000.

28.    On January 25, 2016, pursuant to Amendment No. 4 to Demand Note, CCG and LHH amended the CCG Demand Note, increasing the allowed outstanding principal amount of the CCG Demand Note to $100,000,000.

29.    On January 19, 2017, pursuant to Amendment No. 5 to Demand Note, CCG and LHH amended the CCG Demand Note, increasing the allowed outstanding principal amount of the CCG Demand Note to $105,000,000.

30.    As of January 18, 2017, the amounts owing under the CCG Demand Note total $104,342,442.

31.    In 2014, LHH entered into a revolving line of credit with MidCap Financial, LLC ("**MidCap**") in the amount of $12,000,000 (the "**MidCap Revolver**").[2]  The MidCap Revolver bears interest at a variable rate based on the greater of the 1-month LIBOR rate or 1.50% plus an applicable margin of 4.25%.  The total amount owing under the MidCap Revolver (the "**MidCap Indebtedness**") is secured by a first-priority lien on substantially all of the Debtors' assets.[3]

32.    As of the Petition Date, the MidCap Indebtedness totaled approximately $6,729,460.83.[4]

33.    In order to ensure that the Debtors had sufficient funds to transition into bankruptcy and effectuate an orderly wind-down of its operations, on or about January 20, 2017,

---

[2]    Provided certain conditions are satisfied, the amount available under the MidCap Revolver can be increased to $15,000,000.

[3]    The Debtors' obligations under the MedCath Loan Documents were subordinated to the MidCap Indebtedness pursuant to that certain Subordination Agreement dated November 25, 2014.

[4]    Prior to the Petition Date, certain of the Debtors' bank accounts were swept daily and directed to MidCap to reduce the principal amounts owing on the MidCap Revolver prior to being re-advanced to the Debtors.

MedCare Investment Funds ("**MedCare**"), an affiliate of CCG, agreed to loan LHH up to $1,300,000 on a junior secured basis pursuant to that certain Demand Promissory Note (the "**MedCare Note**") and related security agreements (collectively, the "**MedCare Loan Documents**"). The Debtors have not requested, and MedCare has not funded, any amounts under the MedCare Note as of the Petition Date.

### C.    The Debtors' Current Operations

34.    The Debtors currently operate a state-of-the-art 213,000 square facility and two medical office buildings ("**MOBs**").

35.    Originally licensed for 58 beds in 2003, as a result of its physical and strategic expansion in 2007, the Hospital is now a full-service 132-bed acute care hospital with 7 operating rooms, 3 catheterization laboratories, and a 24-hour heart attack intervention center dedicated to providing advanced medical treatment and compassionate care to patients and families throughout the North Shore area.

36.    In addition to providing the Debtors with capital financing under the CCG Demand Note, CCG provides access to a multi-disciplinary physician-led team of care givers with a shared goal of optimal patient care pursuant to that certain Management Services Agreement dated January 24, 2001, between LHH and Louisiana Hospital Management, Inc. (the "**Management Agreement**").[5] Under the Management Agreement, LHH has delegated to CCG authority to manage the Hospital and to provide all services and actions which CCG determines to be reasonably necessary or appropriate for the development and operation of the Hospital; including, without limitation, the right to:

   a.    Prepare a budget for the development and operations of the Hospital;

---

[5]    In connection with the Acquisition, the rights and obligations under the Management Agreement were assigned to CCG.

b.  Obtain equipment for the benefit of the hospital and enter into loans or other financing arrangements in connection therewith;

c.  Negotiate and enter into agreements regarding the purchase of goods or services for the Hospital;

d.  Expend all or portions of LHH's capital and income in furtherance of or relating to LHH's business and purposes;

e.  Employ or retain such persons, firms, or corporations to operate the Hospital;

f.  Enter into all leases deeds, contracts, rental agreements, construction contracts, sales agreements, and management contracts;

g.  To prepare or cause to be prepared all reports, statements, and other relevant information for distribution to LHH's members;

h.  Open, deposit and maintain funds in the name of LFF in banks or savings and loan associations; and

i.  Manage, direct, and guide the operation of the Hospital, including all necessary acts relating thereto.

37.     In its capacity as Manager, CCG leverages its management team, proprietary technology, and expertise in designing information technology solutions and resources to enable the Debtors to improve patient care and take advantage of efficiencies associated with a larger-scale operation.

## III.   THE DEBTORS' LIQUIDITY CRISIS

38.     Notwithstanding the growth of population in the North Shore and the Debtors' proven track record of providing excellent treatment of cardiovascular disease and injuries affecting the spine, the Debtors have failed to generate sufficient revenue to cover operating costs.

39.     In response to these continued operating losses, the Debtors' management identified and began implementing strategic initiatives, including deferring physician salaries, hiring new senior management, revenue enhancement measures (through the retention of

additional and complimentary physicians to the Physicians Group who could increase the Hospital's utilization), and non-essential expense reductions.

40.     Notwithstanding the Debtors' efforts and other strategic initiatives to reduce the Debtors' operating expenses, the Hospital did not see a concurrent increase in utilization.  As a result, the Debtors failed to achieve profitability and have continued experiencing monthly operational losses.

## IV.     THE DEBTORS EXPLORE GOING CONCERN SALES

41.     On September 15, 2016, CCG and LHH retained Solic Capital Advisors LLC ("**SOLIC**") to serve as financial advisor to identify viable strategic alternatives involving the Hospital and its related assets and operations, including identifying opportunities for the sale of the Hospital's facility, real estate, equipment, supplies, contracts, and accounts receivable (a "**Potential Transaction**").

42.     In furtherance of a Potential Transaction, SOLIC engaged in a fulsome process working with several prospective buyers over a period of several months.  Although SOLIC engaged in numerous discussions with potential purchasers concerning a sale of the Debtors, none of those discussions resulted in a viable offer acceptable to the Debtors.

## V.     THE DEBTORS ELECT TO SEEK RELIEF UNDER CHAPTER 11

43.     As result of the Debtors' liquidity position, the Debtors' failure to identify a buyer willing to acquire the Debtors outside of bankruptcy, and the Debtors' receipt of notice from CCG that it would not provide further financing on an unsecured basis, the Debtors began to consider various alternatives to maximize the value of their businesses.  Working with their counsel and advisors, the Debtors determined that commencing cases under Chapter 11 of the

Bankruptcy Code and pursuing a sale of substantially all of LHH's assets provided the best and only reasonable avenue to preserve and maximize the value of their estates.

## VI.    SUPPORT OF FIRST DAY MOTIONS

44.    As a result of my first-hand experience, my review of various materials and information, discussions with the Debtors' executives, and discussions with the Debtors' advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the motions addressed below (the "**First Day Motions**"), (b) the need for the Debtors to continue to operate effectively, and (c) the deleterious effects upon the Debtors of not obtaining such relief.

45.    I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe the facts set forth therein are true and correct.  Such representation is based upon my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition.  In connection with the First Day Motions, I declare as follows:

### A.    Motion for Joint Administration

46.    Through the Debtors' Motion for Order Directing Joint Administration of Related Chapter 11 Cases (the "**Motion for Joint Administration**") the Debtors request that the Bankruptcy Cases be administered jointly, utilizing one docket and one case number, so as to reduce the administrative burden on the Court, the Debtors, and parties in interest.  The Debtors' operations are conducted through two entities, LHH and the Physicians Group, each of which are Debtors in these Bankruptcy Cases.  LHH holds 95% of the interests in the Physicians Group. Despite common ownership and interrelated business operations, each Debtor maintains separate books and records, including audited financial statements.

01:21494335.1

10

47.    Although the Debtors have separate and distinct assets and liabilities, together the Debtors provide a symbiotic and interrelated approach to patient care.  In providing such services, the Debtors put forth a joint business model to their patients and vendors.  Accordingly, in some instances, both Debtors are parties to the same transaction or multiple, related transactions.  Therefore, many of the notices, applications, motions, pleadings, and much of the relief sought in these cases will concern both of the Debtors.  Moreover, the Debtors anticipate that these Bankruptcy Cases will proceed on the same timetable.  Absent joint administration, the resources of the Debtors, the Court, and other parties would be needlessly expended on filing and service of the same or similar pleadings in multiple cases.

48.    The joint administration of these Bankruptcy Cases will ease the administrative burden on the Court by allowing the Clerk of the Court, parties in interest, and the Debtors to use a single general docket for these cases rather than maintaining and updating two different dockets.  Similarly, joint administration will eliminate the need for duplicative notices, applications and orders, allowing the Debtors, their creditors, and other parties in interest to file one pleading in a consolidated case rather than several pleadings in the Debtors' individual cases, to combine and streamline service of those pleadings and other notices on creditors and other parties in interest, and to monitor these Bankruptcy Cases by reviewing one docket rather than two separate dockets.  In sum, joint administration of the Bankruptcy Cases will reduce the number of documents that must be prepared, filed and served in connection with these Bankruptcy Cases, reduce the administrative burden of coordinating these cases, and reduce the monitoring burden that these cases will impose on the Court, the Clerk of the Court, the Office of the United States Trustee, and all other parties in interest.

49.     The rights of the respective creditors of the Debtors will not be adversely affected by the proposed joint administration of these Bankruptcy Cases because the rights of each creditor against the respective estates will be preserved.   The Debtors' Motion for Joint Administration is not a motion for substantive consolidation of the Debtors' estates and does not seek to change the relative rights and remedies of creditors as against the individual Debtors. Accordingly, the substantive rights of parties in interest will not be prejudiced or otherwise negatively affected by the entry of an order directing the procedural joint administration of these Bankruptcy Cases.

**B.      Motion Regarding Cash Management**

50.     Through the Motion Pursuant to Sections 105(a), 345(b), and 363(c) of the Bankruptcy Code for an Order (i) Authorizing the Debtors to Continue Use of Cash Management System, (ii) Authorizing Waiver of Certain Bank Account and Related Requirements of the Office of the United States Trustee for the District of Delaware, and (iii) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis (the "**Motion Regarding Cash Management**") the Debtors seek the authority to continue utilizing their existing bank accounts in the ordinary course of their business.

51.     The Physicians Group and LHH each maintain two (2) Bank Accounts with Bank of America ("**BOA**"), which are used primarily for the deposit of government receivables and other non-government receivables. Each weekday, the government receivables for each Debtor are swept into their respective non-government receivables account. The funds in the non-government receivables account are, in turn, swept and transferred to MidCap which, as a secured lender, holds perfected liens on these accounts.

52.    The Physicians Group and LHH each maintain a Bank Account with First NBC Bank ("**NBC**"), which the Physicians Group and LHH use as the depository accounts for the cash payments they receive.  Approximately once a month, the deposits from the NBC accounts are withdrawn and deposited into an account with the Debtors' other receivables.

53.    LHH maintains two Bank Accounts with BOA used for disbursements and deposits.  LHH's lenders, including MidCap and CCG, periodically deposit money into LHH's deposit account, which is subject to a lien asserted by MidCap.  The deposit account is linked to the disbursement account, from which all accounts payable are made.  The disbursement account is a zero balance account, having a daily average balance of $0, which draws the funds required to satisfy checks, ACH transfers, and other withdrawals, including payroll, from the deposit account each weekday.

54.    Through their use of the Bank Accounts, the Debtors efficiently collect, transfer, and disburse funds generated from their operations and records, on a daily basis.  The continued use and maintenance of the Debtors' existing Accounts, at least on a temporary basis, as well as the continued use of the checks relating to those Accounts, will prevent the Debtors from incurring unnecessary administrative expense and burden, and will allow the Debtors to focus on reorganizing their businesses and operating the same so as to maximize value for the estates and their creditors.

55.    Debtors maintain only one Bank Accounts from which checks can be written and payments can be made, the disbursement Bank Account. To minimize the expense to the Debtors' estates, the Debtors request that the UST Requirements be waived to the extent they are inconsistent with the Cash Management System and that the Debtors be authorized to continue to use their checks existing immediately before the Petition Date, without reference to the Debtors'

status as debtors-in-possession.  Notwithstanding their continued use of their checks, parties doing business with the Debtors will undoubtedly be aware of the Debtors' status as Chapter 11 debtors-in-possession through their communications with the Debtors, the publicity regarding these Chapter 11 cases, and the proper notice that will be provided to all creditors.  The Debtors thus request in accordance with Local Rule 2015-2 that they be authorized to use their existing checks without reference to their being "debtors-in-possession" until the checks are either depleted or can be electronically modified, as the case may be.

56.    The continued use and maintenance of the Debtors' existing Accounts, at least on a temporary basis, as well as the continued use of the checks relating to those Accounts, will prevent the Debtors from incurring unnecessary administrative expense and burden, and will allow the Debtors to focus on reorganizing their businesses and operating the same so as to maximize value for the estates and their creditors.

57.    I believe that continuation of the Bank Accounts and business forms is essential to a smooth and orderly transition into Chapter 11 and to a successful going concern sale or liquidation.  In contrast, requiring Debtors to open numerous new accounts and create new business forms would inevitably lead to confusion and delays.  By permitting existing accounts to remain open, preserving business continuity, and avoiding the operational and administrative paralysis that closing the accounts and opening new ones would necessarily entail, all parties in interest, including Debtors' employees and customers, will be best served, and Debtors' estates will benefit considerably.

### C.    <u>Motion to Honor Employee Obligations</u>

58.    Through the Motion of the Debtors for Entry of an Order (A) Authorizing the Debtors to Pay Certain Prepetition Employee Wages and Salaries, Payroll Related Taxes,

Reimbursable Expenses, Health Plan Claims, and Insurance Premiums; (B) Authorizing the Debtors to Maintain Their Employee-Related Insurance Programs Postpetition, and Honor any Prepetition Obligations in Respect Thereof; (C) Authorizing the Debtors to Make Deductions from Employees' Paychecks; (D) Authorizing the Debtors to Continue Workers' Compensation Programs; and (E) Authorizing and Directing Banks and Other Financial Institutions to Honor All Checks and Electronic Payment Requests Made by the Debtors Related to the Foregoing (the "**Motion to Honor Employee Obligations**"), the Debtors are seeking the Court's permission to take certain actions as to certain unpaid prepetition employee obligations, payroll tax obligations and insurance obligations and to continue certain employment procedures and programs that will ensure that the Debtors' workforce will continue to work during the wind down to preserve the Debtors' value through the bankruptcy process. The Debtors' workforce in these cases includes physicians, nurses, and other trained medical professionals.

59. Specifically, the Debtors are seeking authority to: pay to its employees compensation that accrued prior to the Petition Date in amounts not to exceed $12,850 per employee; deduct from employees' paychecks and turnover to the appropriate taxing authorities all amounts necessary to pay payroll taxes; pay any prepetition portions of estimated premiums and unpaid deductibles related to the Debtors' workers' compensation policy; pay self-funded workers' compensation benefits as they come due; continue the Debtors' payroll practices and procedures; and continue honoring and providing certain benefits provided to the Debtors' employees including supplemental insurance coverage, medical benefits, COBRA coverage, 401(k) plans and Flexible Spending Accounts.

60. The relief sought is vital to the employees as well. Nonpayment of employee compensation and benefits and the inability to create some level of normality in the postpetition

01:21494335.1

15

workplace by assuring employees that the Debtors can continue certain prepetition employment practices and programs, such as employee health benefits, could severely undermine morale, thus creating a significant risk of attrition at a time when the employees' support is critical.  In fact, if the Motion to Honor Employee Obligations is not granted, the disruption to usual operations that would be caused by the loss of employees would have other significant costs, including the out-of-pocket and intangible costs and the loss of fees earned by the Debtors.

61.    Without their existing workforce, the Debtors would likely be unable to meet their obligations.  Accordingly, I believe that the payment of the amounts, and the continuation of the employee programs, described in the Motion to Honor Employee Obligations is in the best interests of the Debtors' estates and creditors, and is critical to the success of these Bankruptcy Cases.

**D.    Motion to Approve DIP Financing and Use of Cash Collateral**

62.    Through the Motion for Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Authorizing Debtor to (A) Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. 105(a), 362(d), 363(b), 364(c)(1), 364(c)(2), 364(c)(3), and 364(e), and (B) Apply Cash Collateral to Prepetition Secured Claim of DIP Lender Pursuant to 11 U.S.C. 363(b)(1) and 364(c)(2)(A), and (III) Scheduling Final Hearing (the "**DIP Motion**"), the Debtors request, among other things, entry of an interim order (i) authorizing the Debtors to use, pursuant to 11 U.S.C. § 363 and subject to certain terms and conditions, cash collateral within the meaning of 11 U.S.C. § 363(a) in which the Secured Parties (as defined herein) assert that they have a security interest, (ii) authorizing the Debtors to provide adequate protection under 11 U.S.C. §§ 361 and 363 on account of such use, (iii) (a) authorizing the Debtors to obtain postpetition financing from MedCare Investment Fund V, L.P. (the "**DIP Lender**," or "**MedCare**") subject to

the budget attached to the DIP Motion as <u>Exhibit B</u> (the "**Budget**," as the same may be amended or supplemented from time to time in accordance with the DIP Credit Agreement) and pursuant to the terms of the Debtor-In-Possession Loan and Security Agreement (the "**DIP Loan Agreement**") attached to the DIP Motion as <u>Exhibit A;</u> (b) confirming the DIP Lender's good faith in furnishing the loans under the DIP Loan Agreement; (c) authorizing the Debtors to use a portion of the collection of the receivables and cash proceeds in which MidCap asserts an interest (the "**Cash Collateral**") to pay down the prepetition secured loans provided by MidCap; (d) modifying the automatic stay imposed by Bankruptcy Code Section 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Agreement and the DIP Orders; and (e) waiving any applicable stay (including under Bankruptcy Rule 6004 and any applicable Local Rules) and providing for immediate effectiveness of the DIP Orders; and (iv) as part of the Interim Order only, scheduling a final hearing (the "**Final Hearing**") to consider approval of the relief sought in the Motion on a final basis pursuant to the Final Order.

63.     The Debtors and their professionals have considered several methods of obtaining DIP financing on the best terms possible and have concluded, based upon their discussions with potential lenders and their familiarity with the financing market in general and in this industry, among other things, that they would be unable to obtain unsecured credit allowable solely as an administrative expense under 11 U.S.C. § 364(b) or solely on the basis of a super-priority or a junior lien under 11 U.S.C. § 364(c)(1) or sufficient to continue its operations at current levels.  I believe that any potential DIP lenders would require first priority liens on some or all of the Debtors' assets.  I do not believe that third party debtor-in-possession financing is available from any other lenders on more attractive terms than the DIP Loan being provided by the DIP Lender.

64.    The Debtors intend to finance the expedited sale or liquidation and wind-down of its estate through the use of cash collateral and a $4.2 million postpetition loan by DIP Lender, of which $1 million will be funded prior to the entry of the Final Order.  The reasons supporting Debtors' need to incur postpetition financing are compelling.  The Debtors' prepetition credit facility requires the Debtors' Bank Accounts to be swept daily such that there is little to no unencumbered cash for the Debtors to fund a postpetition sale or wind-down of its operations, including the expenses related to the Debtors' bankruptcy cases.  In addition, the Debtors simply cannot generate cash fast enough to cover expenses as they arise, without the Loan Agreement, the Debtors will have little available cash and will, effectively, be unable to effectuate a quick conclusion to this Chapter 11 case, be unable to maximize the value of its assets, and be unable to minimize the adverse effects of the commencement of the Chapter 11 Case on its business.  Consequently, postpetition financing will be necessary to fund the Debtors' cash needs during the pendency of the Chapter 11 case.

65.    The terms of the Loan Agreement are more specifically set forth in the DIP Loan and Security Agreement.  The key provisions of the Loan are as follows:

(a)    <u>Borrower</u>:  Louisiana Medical Center and Heart Hospital, LLC and LMCHH PCP LLC

(b)    <u>Facility Amount</u>:  $4,200,000 (with $1,000,000 funded upon entry of the Interim Order).

(c)    <u>Type of Facility</u>:  Secured debtor-in-possession credit facility comprised of a $4,200,000, subject to the terms and conditions and in reliance on the representations and warranties of the Borrowers set forth in the Loan Agreement.  The DIP Loan will be junior-in-priority to Permitted Senior Liens (as defined in the DIP Credit Agreement to include the lien provided to MidCap and other valid and existing liens of non-affiliated third parties).

(d)    <u>Purpose</u>:  To finance working capital and other general corporate purposes while under Chapter 11 protection, including the payment of expenses associated with the Chapter 11 Case and the sale or wind-down and liquidation of the Debtor's estate.

(e)    <u>Lender</u>:  MedCare Investment Fund V, L.P.

(f)    <u>Maturity Date</u>:  July 31, 2017.

(g)    <u>Collateral and Security</u>:  As security for all Obligations, each Borrower hereby grants to the Lender a security interest in and continuing lien on all of such Borrower's right, title and interest in, to and under all real and personal property of such Borrower including the following, in each case whether now owned or existing or hereafter acquired or arising and wherever located (all of which being hereinafter collectively referred to as the "Collateral"): Accounts; Chattel paper, including electronic chattel paper or tangible chattel paper; Documents; General Intangibles; Goods, including all Inventory and equipment (in each case, regardless of whether characterized as goods under the UCC); Instruments; Insurance; Intellectual Property; Investment Related Property; Letter of Credit Rights; Money; Receivables and Receivable Records; Commercial Tort Claims; to the extent not otherwise included above, all Collateral Records, Collateral Support and Supporting Obligations relating to any of the foregoing; and to the extent not otherwise included above, all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing. The "Collateral" does ***not*** include any of Debtor's or its estate's rights under 11 U.S.C. §§ 502(d), 544, 546, 547, 548, 549, 550 or 553.

(h)    <u>Interest Rates and Interest Periods</u>:  All Obligations shall bear interest on the Daily Balance thereof at a fixed rate equal to 7.5% per annum. Upon the occurrence and during the continuation of an Event of Default, all Obligations shall bear interest on the Daily Balance thereof at a per annum rate equal to four percentage points (4%) above the per annum rate otherwise applicable hereunder without any notice from Lender or any other Person.

(i)    <u>Fees</u>:  Reimbursement of reasonable legal expenses incurred in connection with the DIP Loan.

(j)    <u>Advances</u>:  Advances will be available on same day notice if notice is made before 11:00 a.m.

(k)    <u>Carve-Out</u>:  The DIP Loan Agreement contains a typical Carve-Out provision for payment of professionals and the UST.

(l)    <u>Conditions Precedent to the initial Advances</u>:  Customary for facilities of this nature, as set forth in the DIP Credit Agreement attached hereto.

(m)    Covenants:  The DIP Loan Agreement contains affirmative, negative and financial reporting covenants customary for facilities of this nature and otherwise satisfactory to DIP Lender.

66.    I recommend the approval of the DIP Loan Agreement because the Debtors are currently in a precarious financial position.  Debtors are unable to find other financing and converting these cases to cases under Chapter 7 would result in a loss of significant value to Debtors' estate.

67.    Debtors' proposed use of the Cash Collateral is more specifically detailed in the Interim Order. Debtors' seek to use the Cash Collateral solely for the purposes identified therein, and the amounts provided for in the Cash Collateral Budget, for the purpose of meeting Debtors' cash needs from the date of entry of the Interim Order through the Termination Date in accordance with the Budget and any amendments approved by the Court.  Under the Interim Order, the use of Cash Collateral may vary from the line items in the Budget so long as the actual expenditures paid by the Debtors do not exceed 110% of the projected expenditures in the Budget and provided that Debtors' weekly minimum cash balance is not less than 90% of the amount projected in the Budget for the week shown.

68.    Debtors shall provide the following adequate protection to MedCare and MidCap, in exchange for use of Cash Collateral:

(i) Collateral Security.  The Debtors are authorized to grant MidCap replacement liens in the same collateral generated post-petition (i.e. accounts receivable), in which, MidCap has a security interest pre-petition.

In addition, (a) the existing value of MidCap's collateral in excess of the MidCap debt, plus (b) the payment of adequate protection payments to MidCap equal to 25% of all accounts receivables collected by the Debtors postpetition shall provide MidCap adequate protection for the use of its cash collateral.

MedCare as the DIP Lender, shall be granted liens in all of the Debtor's assets subject only to an existing liens and security interests, except that such liens shall be

senior to the existing lien and security interests of CCG (defined below) which is subordinated to the MidCap liens in the real property owned by the Debtors.

*(ii) Payment of the Secured Parties' Professional Fees.* Debtors shall pay to the MidCap the professional fees and expenses it incurs, subject to a ten (10) day objection period by Debtors, the U.S. Trustee or the Committee (if appointed) after delivery of a statement of fees and expenses (without disclosing the substance of the underlying work or any privileged matters). MedCare's professionals fees shall be paid as provided in the DIP Loan Agreement.

69. Subject to the Carve-Out, Debtors may pay the reasonable fees and expenses of their professionals in accordance with the Cash Collateral Budget and permitted variances. The Carve-Out is for all unpaid fees of the Clerk of Court and the U.S. Trustee and Professional Fees of professionals retained by Debtors and any Committee in an amount not to exceed the amounts in the Budget.

70. Subject to entry of a final order and the Challenge Period (as defined in the DIP Loan Agreement), the entry of the Interim Order by the Court shall be a conclusive and binding determination on all parties as to the scope, extent, perfection, validity, and enforceability, in all respects, of the MedCare security interests and liens. Upon entry of a Final Order (not the Interim Order), no costs or expenses of administration that have been or may be incurred in Debtors' cases at any time shall be charged against MedCare or its claims and liens pursuant to 11 U.S.C. §§ 105, 506(c) or 552.

71. Additionally, Debtors request that the automatic stay imposed by Section 362 of the Bankruptcy Code be vacated and modified insofar as necessary to permit the Secured Parties to: (i) receive certain approved payments to be made by the Debtors and (ii) take any action expressly authorized or contemplated by the Interim Order.

72. The Debtors submit that the proposed use of Cash Collateral under the terms of the Interim Order was negotiated in good faith and at arms' length, with all parties represented

01:21494335.1

by counsel, and is fair and reasonable under the circumstances of the Debtors' cases. Furthermore, the Debtors respectfully submit that, pursuant to 11 U.S.C. § 361(2), the Adequate Protection Liens and priority granted to MidCap and MedCare, combined with the substantial equity cushion in LHH's assets, constitute adequate protection for the Debtors' use of Cash Collateral.

73.     Without the ability to use the Cash Collateral, the Debtors will have little choice but to terminate or suspend all operations and dismiss employees, thus destroying the value of their business during the pendency of these Bankruptcy Cases.

74.     As such, I believe that the Debtors' use of the Cash Collateral as described in the Cash Collateral Motion is in the best interests of the Debtors' estates and creditors, and is critical to the success of these Bankruptcy Cases

E.     **Motion to Reject Executory Contracts and Motion for Authority to Enter Into Prepetition Agreements**

75.     Through two complimentary motions, (i) Debtors' First Omnibus Motion to Reject Executory Contracts *Nunc Pro Tunc* to the Petition Date (the "**Rejection Motion**"); and (ii) Debtors' Motion for the Entry of an Order Authorizing Debtors to Enter into Postpetition Agreements Outside of the Ordinary Course of Business Pursuant to Section 363(b) of the Bankruptcy Code (the "**Postpetition Agreements Motion**"), the Debtors seek to transition their currently employed physicians from employees to independent contractors by rejecting each physicians' contract as of the Petition Date, to minimize postpetition wage claims, and offering each physician the option to enter into an Independent Contractor Physician Services Agreement ("**Postpetition Agreements**") with the Physicians Group, which would extend the ability of the physicians to practice through the wind down period.   The rejection of the employment agreements and execution of the Postpetition Agreements work in tandem to provide the

Debtors' patients continuity in care during the Debtors' wind down, and to provide the physicians with a flexible arrangement to continue working while transitioning their current practices.

76.      The Rejection Motion seeks authority to reject the employment agreements between the Debtors and each of its employed physicians as of the Petition Date.  The Debtors, in their exercise of business judgment, believe this rejection is beneficial to the estate as it will limit the costly administrative expenses that the Debtors would otherwise incur in connection with the postpetition wages that the Debtors would owe to the physicians pursuant to the terms of their current contracts.

77.      The Postpetition Agreements Motion picks up where the Rejection Motion leaves off by providing the Debtors' physician employees with the means to continue their practice during the Debtors' wind down, while providing necessary services and care to the Debtors' patients.  The Postpetition Agreements allow the physicians to continue to use the Debtors' equipment, staff, and Medicare and Medicaid provider numbers, each of which is vital to the physicians' continued practice.  The Postpetition Agreements propose a pay structure based on postpetition revenue generated rather than any contractual rate of pay.

78.      Because the hospital will be slowly reducing the number of admitted patients and procedures performed, I believe that it is in the Debtors' best interests, as well as the interests of Debtors' creditors, for the Court to grant the Debtors the authority to reject the physicians' contracts and enter into the Postpetition Agreements, which will more accurately account for this decrease in operations and revenue.

### F.  Utility Provider Motions

79.     Through the Motion of the Debtors for Interim and Final Orders Pursuant to Section 366 of the Bankruptcy Code (i) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (ii) Deeming Utility Companies Adequately Assured of Future Performance, and (iii) Establishing Procedures for Determining Adequate Assurance of Payment (the "**Utility Providers Motion**") the Debtors request that the Court prohibit the Debtors' utility providers from disconnecting service to the Debtors and allow the Debtors to deposit funds into an escrow account as adequate assurance of the Debtors' future payment for utility services.

80.     The Debtors' facilities are comprised of a hospital and numerous leased medical buildings.  These locations depend on the constant and reliable provision of utility services including natural gas, electricity, sewer, sanitation and other services (the "**Utility Services**") in order to continue operations.  Should companies providing utility services ("**Utility Providers**") refuse or discontinue service, even for a brief period of time, the Debtors' business operations would be severely disrupted.

81.     Prior to the Petition Date, the Debtors paid approximately $97,000 per month to the Utility Providers on account of Utility Services.  Based on the budget analysis performed in preparation for the Bankruptcy Cases, the Debtors' management believes that they have or will have sufficient availability of funds with which to pay all postpetition charges for utility services.

82.     To provide adequate assurance of payment for future services Utility Services, the Debtors propose to segregate and hold in escrow a sum equal to fifty percent (50%) of the Debtors' estimated monthly cost of Utility Services on or before thirty (30) days after the Petition Date.  If any Utility Provider believes additional adequate assurance is required, they

may request such additional assurance pursuant to the procedures set forth in the Utility Providers Motion.

### G.  Application to Retain GCG

83.    Through the Application of the Debtors for Entry of an Order Authorizing Debtors to Employ and Retain Garden City Group, LLC as Claims and Noticing Agent *Nunc Pro Tunc* to the Petition Date Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a) and Local Rule 2002-1(f) (the "**Application to Retain GCG")** the Debtors request entry of an order authorizing the retention and appointment of Garden City Group, LLC ("**GCG**"), as claims and noticing agent in these Bankruptcy Cases.  The Debtors selected GCG after soliciting proposals from GCG and at least two other potential claims and noticing agents, as I am advised is required by this Court.

84.    I believe that the retention of GCG will benefit the Debtors' estates, their creditors, and other parties in interest, as I understand that GCG is a data processing firm with extensive experience in noticing, claims processing and other administrative tasks in chapter 11 cases.  Given the need for the services described above and GCG's expertise in providing such services, I believe that retaining GCG will expedite service of notices, streamline the claims administration process, and permit the Debtors to focus their efforts on these Bankruptcy Cases. I also understand, as reflected in the Johnson Declaration, GCG neither holds nor represents an interest materially adverse to the Debtors' estates nor has a connection to the Debtors, their creditors, or their related parties with respect to any matter for which GCG will be employed.

## VII.    <u>CONCLUSION</u>

85.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just.

Dated: January 30, 2017

By:    Neil F. Luria
        Chief Restructuring Officer,
        LMCGG PCP LLC and Louisiana Medical
        Center and Heart Hospital, LLC